UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO.: |
| BLOSSMAN BANCSHARES, INC. | 11-13519 |
| Debtor | SECTION "B" |
| | CHAPTER 11 |

**MOTION FOR AUTHORITY TO SELL CERTAIN ASSETS FREE AND CLEAR
OF ALL ENCUMBRANCES AND FOR ORDERS PURSUANT TO 11 U.S.C. §§
105(a) AND 363(b); FED. R. BANKR. P. 2002, 6004, AND 9014; (I) APPROVING
(A) AUCTION PROCEDURES AND (B) THE FORM AND MANNER OF
NOTICE OF THE SALE OF CERTAIN ASSETS; AND
WAIVING THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h)**

NOW INTO COURT, through undersigned counsel, comes Blossman Bancshares, Inc. ("BBI") and hereby submits this motion (this "Motion")[1] seeking the authority to sell certain assets of BBI, and for orders approving the auction procedures and the form of notice of the sale of certain assets pursuant to 11 U.S.C. §§ 105(a) and 363(b); FED. R. BANKR. P. 2002, 6004, and 9014:

I.

**JURISDICTION**

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.

II.

CORE PROCEEDING

This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Acquisition Agreement, dated as of September 27, 2011 by and between BBI and First NBC Bank Holding Company ("FNBC") (the "Agreement") attached hereto as Exhibit A.

1

VENUE

III.

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

IV.

PROCEDURE

The statutory predicates for the relief herein are Bankruptcy Code §§ 105(a) and 363(b); Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

In support of this Motion, BBI respectfully represents as follows:

## PRELIMINARY STATEMENT

By this Motion, BBI seeks to obtain approval of the Sale of its most significant asset, its100% equity ownership in its bank subsidiary, Central Progressive Bank ("CPB" or the "Bank"). Currently, BBI and CPB employ collectively 164 individuals who serve over 19,650 deposit and loan customers. Over the past several years, CPB has fallen victim to the current financial crisis, which has affected its capital.

Despite BBI's efforts to raise capital on behalf of the Bank, BBI has not been successful thus far. Beginning in 2009, BBI undertook extensive efforts to raise capital on behalf of CPB. A multitude of investors and strategic partners were contacted. Those efforts were thwarted for various reasons.

Unable to attract capital for CPB through investments in BBI or direct capital investment in CPB and as a result of continued deterioration in value and the continued inability to recapitalize CPB, CPB's capital levels have declined.

Consequently, BBI has concluded that the only way to recapitalize CPB to

preserve value for BBI and its creditors is to conduct a Sale of its 100% stock interest in CPB pursuant to Section 363 of the Bankruptcy Code. Through the bankruptcy process, BBI will be able to recapitalize CPB, and the value obtained in connection with the Sale will be preserved for BBI's creditors. Furthermore, BBI has obtained a commitment from one dedicated investor with the requisite regulatory approvals and capital commitments to accomplish this transaction. Specifically, FNBC is prepared to proceed with a transaction to acquire CPB with an amount up to $900,000——a commitment most investors could not make on the shortened time frame applicable to this case due to regulatory pressures.

These timing constraints have also led BBI to request an expedited schedule for approving the Sale and related Auction Procedures (defined below). Specifically, BBI requests expedited deadlines outlined in the *Ex Parte Motion for Expedited Hearing on Motion for Authority to Sell Certain Assets and Orders Pursuant to 11 U.S.C. §§ 105(a), and 363(b); Fed. R. Bankr. P. 2002, 6004 and 9014: (I) Approving (A) Auction Procedures and (B) the Form and Manner of Notice of the Sale of Certain Assets, and Granting Related Relief; (II) Authorizing and Approving the Sale of Certain Assets; and (III) Waiving the 14-day Stay of Fed. R. Bankr. P. 6004(h)* filed concurrently with this Motion. BBI plans to send all parties in interest a notice and to publish same explaining the relevant dates related to the Sale and Auction Procedures as approved by this Court. The most significant proposed dates, subject to this Court's calendar, include the following: (i) November 2, 2011 at 2:00 p.m. as the hearing date for approval of the Auction Procedures; and (ii) November 14, 2011 at 9:00 a.m. as the Auction and hearing date for the Sale Hearing (each term defined below).

# BACKGROUND

### A.    General Background

Founded in 1977, BBI[2], headquartered in Lacombe, Louisiana, is a Louisiana corporation registered as a bank holding company under the Bank Holding Company Act of 1956. BBI is the direct or indirect corporate parent of a non-debtor subsidiary: CPB, a Louisiana state chartered bank that is insured by the Federal Deposit Insurance Corporation ("FDIC") and wholly-owned by BBI. CPB operates in Southeastern Louisiana.

BBI functions as a holding company for CPB, which is its primary asset. CPB gathers deposits and provides loans to approximately 19,650 deposit and loan customers. CPB serves customers in a total of 17 branches across Southeastern Louisiana. As of October 26, 2011 (the "Petition Date"), BBI and CPB collectively have 164 employees across its 17 branches and 1 support facility.

The Bank offers residential and commercial loan products to hundreds of individuals and companies across its market areas in Louisiana. CPB offers a variety of deposit accounts to both consumer and business customers, including checking accounts, money market demand accounts, and savings accounts. Numerous services are also provided to CPB's consumer and business customers with convenient bank access, including ACH origination, remote check capture (i.e., on-site imaging and electronic processing of checks) and currency services. CPB also generates non-interest income by offering both consumer and business credit cards and merchant bankcard services through arrangements with third party providers.

CPB and BBI are highly regulated institutions. The principal regulators of CPB

---

[2] BBI was previously known as Central Progressive Bancshares, Inc.

are the FDIC and the Louisiana Office of Financial Institutions (the "OFI"). The principal regulators of BBI are the Board of Governors of the Federal Reserve System and the OFI. Unless context otherwise requires, references herein to the "Regulators" collectively refer to these state and federal regulatory agencies.

**B.    CPB's Capital Structure**

BBI's 100% equity ownership in CPB totals 379 issued and outstanding shares of common stock of CPB, no par value (the "CPB Stock"). No other shares of capital stock of CPB are issued or outstanding. All of CPB Stock is beneficially owned and held by BBI, duly authorized and validly issued, fully paid and nonassessable, have been issued in full compliance with all applicable securities laws and other applicable legal requirements, and free and clear of any and all Encumbrances.

As of the Petition Date, BBI had outstanding unsecured indebtedness totaling approximately $23,417,321.81,[3] consisting of three separate subordinated debt securities.

**C.    BBI and CPB's Objective**

BBI has commenced this Chapter 11 case as the only plausible mechanism to recapitalize CPB while protecting, to the greatest extent possible, BBI's creditors. By commencing this Chapter 11 case, BBI hopes to sell its 100% equity ownership in CPB on an expedited basis, concurrently with the acquisition of CPB by FNBC.

Absent a sale of the CPB Stock to a sufficiently capitalized and qualified bank or bank holding company, CPB's Stock value will continue to be reduced. FNBC presents CPB with a solution to this dilemma—a proposed acquirer with the requisite financial resources to acquire and recapitalize CPB and with the regulatory posture to obtain regulatory approval for the transaction.

---

[3] See Statements and Schedules filed concurrently herewith.

Any course of action other than a sale of CPB Stock will preclude the return of any value to the creditors of BBI, and would have adverse consequences for the CPB's customers, the communities that it serves and its employees. An expedited sale of the CPB Stock at the best possible price is therefore the only feasible way to restructure CPB as a viable institution on an ongoing basis and protect, to the greatest extent possible, BBI's creditors.

Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, BBI continues in the management and possession of its property as a debtor-in-possession. No trustee or examiner has been appointed in this case, and no official committee has been appointed or designated. Additional facts regarding BBI and CPB, including its business operations, assets and liabilities, and the events leading to the filing of this Chapter 11 case, are set forth below.

### D.   Factors Leading to the Sale

The current financial and credit crisis—resulting in over 400 nationwide bank failures since 2010[4]—has impacted CPB's ability to compete. Beginning approximately three years ago, effects from the housing crisis, including tumbling home prices, loan defaults, and high unemployment rates, began to affect CPB, and ultimately BBI.

### E.   BBI's Efforts to Recapitalize

Beginning in 2007, BBI and CPB's management initiated efforts to deal with asset quality problems in its loan portfolio, reduce expenses, build capital reserves, and take other appropriate actions to return CPB to profitability and reduce its risk profile. However, in early 2008 it became clear to the CPB and BBI's management and Board of

---

[4] http://www.fdic.gov/bank/individual/failed/banklist.html

Directors that additional capital would be required.

Beginning in 2010 and continuing to the present, BBI and CPB have undertaken significant efforts to raise additional capital, including efforts to sell CPB assets, or to sell BBI or CPB to another financial institution. BBI's multi-phased marketing effort is summarized as follows:

A. In 2008, BBI originally engaged Chaffe and Associates, Inc. ("Chaffe"), a recognized investment banking firm with particular experience with respect to financial institutions, to advise and assist BBI in raising additional capital.

B. Starting in the second quarter of 2009, BBI and CPB focused on a number of methods for raising capital for BBI, including but not limited to capital infusion from major shareholders.

C. In the third quarter of 2010, CPB and BBI had discussions with multiple banks and bank holding companies involving a modified good bank/bad bank structure.

D. In the third quarter of 2010, CPB and BBI received a letter of intent proposing a business combination of the two entities; however, the deal collapsed in May of 2011 because the other entity could not find other entities to purchase CPB's assets.

E. In 2010 and 2011, BBI and CPB presented various proposals to other entities for the purchase of CPB's non-performing assets. The parties were unable to come to agreement on the purchase of these assets.

F. CPB and BBI next investigated the feasibility for private investors to

7

invest directly with BBI. However, significant issues arose involving shareholder approval.[5]

G.   By the second quarter of 2011, it was clear that, although there was investor interest in CPB, no investor was willing to engage in any of the transaction structures discussed. Regardless of BBI's position on the feasibility of any particular mechanism, if there was no investor willingness to proceed, the mechanism would not work.

**F.   State and Federal Regulatory Actions**

On January 28, 2009, CPB entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (the "Stipulation") with the FDIC. Pursuant to the Stipulation, the FDIC issued an Order to Cease and Desist (the "Order") against CPB on January 28, 2009. The Order required, among other things, that CPB take actions necessary to return to a proportion of its assets to Tier 1 Capital within thirty (30) days of the Order.

From the second quarter of 2010 through the third quarter of 2011, pursuant to the Order and Stipulation, CPB and BBI worked together with senior management of CPB to create a Capital Plan and Capital Restoration Plan for CPB by assisting in the identification and implementation of cost saving measures and revenue enhancements and preparing a budget and projections detailing the results of these measures. These plans, however, were rejected by the Regulators as insufficient.

Although CPB's management and BBI's management have undertaken all

---

[5] Investment in CPB at the necessary level would likely constitute a sale of substantially all of BBI's assets, which would require prior shareholder approval and approval of the Regulators and, most likely, the Federal Reserve Board.

actions within its power to comply with all aspects of the Order, and the Stipulation (collectively, the "Regulatory Orders"), CPB and BBI have, to date, been unable to comply with the recapitalization or sale of CPB. A recapitalization or sale of CPB is the only path for restoring CPB to financial viability on an ongoing basis.

## H.    CPB and BBI's Compliance Efforts

In an effort to restore CPB to financial viability, BBI and CPB undertook the efforts described above to attract potential investors. However, as mentioned above, it is abundantly clear that, as a practical matter, the recapitalization requirements outside of bankruptcy and an investment directly at the bank level outside of bankruptcy presents insurmountable obstacles in attracting investors. Continued delay would further erode the franchise value of CPB and therefore value to BBI and its creditors. It also damages prospects for CPB's resurgence and negatively impacts the many customers, employees, and affected communities who rely on CPB.

In its continuing efforts to identify a viable mechanism for a capital raise, in 2011 BBI and CPB began to investigate the recapitalization of CPB through a section 363 sale of CPB to one or more investors as part of the bankruptcy of BBI, followed by an asset purchase of CPB's Other Real Estate Owned ("OREO").

As they  investigated this possibility, BBI and Chaffe again contacted qualified investors, who had earlier been contacted about BBI and CPB, to discuss this possible course, and also conducted discussions with newly identified potential investors.

BBI and CPB are well aware of the numerous obstacles involved in raising capital in today's economic environment. Notwithstanding BBI's unrelenting efforts over the last two years, no interested parties other than FNBC have been willing or able to

commit.

### I. Entry into the Agreement

Following its comprehensive marketing efforts, after extensive strategic analysis and negotiations, including discussions with the Regulators, BBI, in consultation with Chaffe, identified FNBC's bid for CPB Stock as the only viable way to accomplish the necessary recapitalization of CPB and to protect the interests of BBI's creditors. After extensive negotiations regarding the terms and conditions thereof, BBI and FNBC have agreed, in principle, to the key terms of the Sale, and have executed the Agreement, which remains subject to this Court's approval.

If effectuated, the Sale will maximize the value available for BBI's creditors, and preserve hundreds of jobs, while simultaneously allowing CPB to continue serving the needs of thousands of individuals and businesses in CPB's market areas.

### J. Discussions with the Regulators

During the months preceding this Chapter 11 filing, CPB's management and BBI's management have engaged in numerous detailed discussions and in-person meetings with the Regulators to keep them apprised of its efforts. Many of these conversations focused on the requirements for approval of a sale of CPB. Generally, throughout the process, the Regulators have remained supportive of CPB and BBI's efforts. Within the last three months, BBI and CPB introduced to the Regulators, in a number of meetings, the prospect of a Section 363 bankruptcy sale as the potential key to overcome the obstacles that BBI and CPB have encountered in their efforts. During the course of these meetings, FNBC emerged as the potential party to such a transaction, and thereafter both representatives of FNBC and management of BBI and CPB explored

in depth with the Regulators the proposed transaction, including the bankruptcy sale process that is the subject of this Motion.

As the transaction will require regulatory approval, the Regulators will need to evaluate the regulatory applications that FNBC has submitted to the Regulators for approval. The Regulators have not objected to this bankruptcy filing or otherwise to the path on which BBI has embarked to secure adequate capital for CPB.

**K.      The Need for an Expedited Sale Process**

The Sale is the only viable option that effectively addresses BBI's financial situation. Given the potential for further deterioration, the Sale must be effectuated expeditiously to avoid a potential customer crisis and preserve the going concern value of the entity, for BBI's, creditors, CPB's employees, and the communities served by CPB.[6]

First, as a result of BBI's required public announcement of this bankruptcy filing, there is significant risk of customer confusion.[7] Notwithstanding the fact that at least 98% of CPB's customer deposits are fully protected by FDIC insurance, during any prolonged period of uncertainty customers may become concerned and may look elsewhere for banking services.

Throughout, BBI and FNBC have kept the Regulators fully informed of the pending Sale and related bankruptcy process. As part of BBI's discussions with the FDIC, the FDIC has advised BBI that it does not object to the Sale. Nevertheless, the FDIC will

---

[6] Simultaneously with the filing of this Motion, BBI has sought the entry of the proposed *Order Setting Hearing Dates* for purposes of this Court's expedited consideration of the Sale.

[7] Indeed, this precise scenario happened to IndyMac. Depositors withdrew a total of $1.3 billion after certain third-party statements sparked widespread panic. Reuters' News, *U.S. seizes IndyMac as financial troubles spread*, July 12, 2008, *available at http://uk.reuters.com/article/2008/07/12/uk-indymac-idUKWA000014120080712.*

remain sensitive to the situation and has made it clear to BBI that it reserves the right to act.

Second, a non-expedited process allowing for a longer auction period would lend little to no net value to BBI's estate, and could indeed prove futile. With the marketing process having been ongoing for approximately two years, BBI believes that every party that reasonably could be expected to have the interest and capacity to consummate a transaction to purchase or recapitalize CPB is aware of BBI's marketing efforts. In order to be a successful bidder, a potential investor would need sufficient funds to recapitalize CPB to required regulatory levels, and be able to obtain regulatory approvals to acquire CPB within the currently available time frame. At present, all other qualified potential investors who have expressed interest in CPB have not pursued the opportunity. Therefore, potential bidders who may re-emerge and participate in the bidding process should have little need for further time to make and submit an Initial Overbid (as defined below).

There is no solution outside of a section 363 sale in bankruptcy that can be expected to timely address the situation. The universe of potential investors who either have regulatory approvals in hand or who could obtain them quickly is finite and identifiable, and most, if not all, of these entities have already investigated and declined to be a part of BBI's recapitalization efforts (including the bankruptcy and section 363 sale approach). During this marketing period, only FNBC has remained actively interested, incurring significant expenses in connection with diligence and negotiations with BBI. Also during this period, FNBC made it clear to BBI that without the prospect of the Expense Reimbursement (as defined below) to reimburse such expenses, FNBC

would not have continued its efforts either.

Therefore, an expedited process designed to consummate the Sale, while also providing an opportunity for bidders to participate and demonstrate their likelihood of regulatory approvals, achieves the overarching objectives of BBI: providing for the acquisition of CPB and preserving CPB's going concern for the benefit of its creditors and its customers. An expedited sale process avoids potential negative consequences.

Further to the proposed procedures and timeline and in the *Ex Parte Motion for Expedited Hearing on Motion for Authority to Sell Certain Assets Free and Clear of Encumbrances and for Orders Pursuant to 11 U.S.C. §§ 105(a), and 363(b); Fed. R. Bankr. P. 2002, 6004 and 9014: (I) Approving (A) Auction Procedures and (B) the Form and Manner of Notice of the Sale of Certain Assets, and Granting Related Relief; and (II) Waiving the 14-day Stay of Fed. R. Bankr. P. 6004(h)* filed contemporaneously herewith, the Sale represents the best opportunity to provide for the acquisition of CPB and thereby preserve the value of BBI's assets for its creditors. The Sale is the only viable and timely alternative.

## RELIEF REQUESTED

Prior to the commencement of this case, BBI executed the Agreement for the sale of the CPB Stock to FNBC. The Sale is subject to approval by this Bankruptcy Court and additional competitive bidding pursuant to the Auction Procedures Order. By this Motion, BBI seeks entry of two orders as follows:

(a) "Auction Procedures Order"(substantially in the form annexed hereto as Exhibit B):

(i) Approving the Auction Procedures;

(ii) Approving the Bidding Protections, including the Stalking-Horse

Reimbursement Expense, Minimum Overbid, and the Bidding Increments described below;

(iii)    Approving the form and manner of the Notice of Sale;

(iv)    Scheduling the sale hearing (the "Sale Hearing") to take place on or before November 14, 2011 at 9:00 a.m., following the entry of the Auction Procedures Order; and

(v)    Granting related relief.

(b)    "Sale Order" (substantially in the form annexed hereto as Exhibit C):

(i)    Approving the Acquisition Agreement or Prevailing Stock Purchase Agreement;

(ii)    Confirming that the sale of the CPB Stock shall be free and clear of all liens, claims and Encumbrances;

(iii)    Waiving the 14-day stay incorporated by Bankruptcy Rule 6004(h);

(iv)    Confirming that the Successful Bidder and BBI may cause the Closing to occur as soon as practicable after the entry of the Sale Order; and

(v)    Approving the finding of facts and conclusions of law reasonably similar to, but not limited to the following:

(A)    the Notice of Sale, and the parties who were served with copies of such Notice and the publication of same, were in compliance with Sections 102 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 9014 and any other applicable provision of the Bankruptcy Code, the Bankruptcy Rules, or any local bankruptcy rule governing the sale of assets free and clear of encumbrances;

(B)    one or more of the standards set forth in Section 363(f) of the Bankruptcy Code for the Sale free and clear of encumbrances has been satisfied;

(C)    the Successful Bidder is a purchaser in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the Sale is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(D)    the Successful Bidder and BBI did not engage in any conduct which would allow the Agreement to be set aside pursuant to 363(n) of the Bankruptcy Code;

(E)    pursuant to Section 105 of the Bankruptcy Code, any creditors of BBI are prohibited from taking any actions against the Successful Bidder or the CPB Stock; and

(F)    the terms and provisions of the Sale are fair and reasonable.

BBI proposes the following timeline in connection with the relief sought in this Motion:

| EVENT | DATE |
| --- | --- |
| Petition Date | October 26, 2011 |
| Objection deadline for Auction Procedures portion of the Motion | November 1, 2011 at 5:00 p.m. |
| Hearing on Auction Procedures | November 2, 2011 at 2:00 p.m. |
| Notice of Sale issued and published | November 3, 2011 (or 1 day following entry of Auction Procedures Order) |
| Deadline for Competing bids | November 11, 2011 at 3:00 p.m. |
| Auction and Sale Hearing | November 14, 2011 at 9:00 a.m. |
| Regulatory Approval | To Be Determined |
| Closing | On or before November 30, 2011 |

## SALE OF ASSETS

**A.    Terms and Conditions of the Acquisition Agreement**

Pursuant to the Agreement, BBI will sell the CPB Stock free and clear of all Encumbrances. The following highlights the material terms and conditions of the Agreement, all of which are more fully explained in the Agreement:

    **a.    Consideration**

FNBC will acquire the CPB Stock from BBI for a purchase price of Four Hundred Thousand Dollars ($400,000.00) ("Closing Consideration"). The Closing Consideration shall be payable by FNBC to BBI at Closing. Additionally, subject to certain adjustments

as provided in the Agreement, FNBC shall deliver to BBI Five Hundred Thousand Dollars ($500,000.00) ("Additional Consideration") on the third anniversary of the Closing Date.

**b.    Closing Date and Closing Conditions**

The Agreement date of closing shall be within ten (10) Business Days following the receipt of all necessary regulatory, corporate, and other approvals, including approval by the Bankruptcy Court and Auction pursuant to the Auction Procedures Order. Further, BBI's and FNBC's obligations to consummate the Sale are jointly subject to certain closing conditions, such as the following: (i) the representations and warranties of the parties in the Agreement will be true and correct as of the date of the Agreement as well as at Closing, except those representations and warranties specifically made as of an earlier date; (ii) performance or observance of all agreements, terms, covenants and conditions required by the Agreement; (iii) entry by the Bankruptcy Court of the Sale Order (with such additional changes as may be acceptable to FNBC) as a Final Order; (iv) entry by the Bankruptcy Court of the Auction Procedures Order (with such additional changes as may be acceptable to FNBC); (v) FNBC shareholder approval of the Agreement; (vi) BBI and CPB having obtained all required approvals, acquiescences or consents of the transactions contemplated by this Agreement from all necessary Governmental Authorities and other third parties; (vii) the absence of an injunction, restraining order, or other ruling or litigation prohibiting or limiting the approval of the Agreement.

The conditions specifically apply to BBI's obligations to consummate the Agreement essentially require that FNBC perform all material covenants and obligations

under the Agreement (and not breach any material representations or warranties).

Parallel conditions apply to FNBC's obligations to consummate the Agreement in addition to a few additional conditions. These material conditions include, but are not limited to, the following: (i) BBI shall execute an instrument dated as of the Closing Date releasing CPB from any and all claims of BBI; (ii) the directors of BBI and CPB shall execute an instrument dated as of the Closing Date releasing CPB from any and all claims of such directors; (iii) the officers of BBI and CPB with the titles of Vice President and above shall execute an instrument dated as of the Closing Date releasing CPB from any and all claims of such officers; (iv) FNBC shall receive Support Agreements from each director of BBI and CPB; (v) the Shareholders' Equity will not be less than the Shareholders' Equity Minimum; (vi) FNBC will have entered into an indemnification agreement with certain shareholders of BBI on terms mutually agreeable to said shareholders and FNBC; and (vii) all conditions precedent to the closing of the Agreement will have been satisfied or waived.

### c.   **Termination**

Subject to certain qualifications (further described in the Agreement), the Agreement may be terminated in various circumstances, the most significant of which include the following: (i) by mutual written consent of FNBC and BBI; (ii) by either FNBC or BBI if the conditions precedent to such parties' obligations to close have not been met or waived by December 31, 2011; (iii) by either FNBC or BBI if any of the transactions contemplated by the Agreement are disapproved by any Governmental Authority or any court of competent jurisdiction enters a decree and/or order prohibiting the Agreement or the transactions contemplated therein; (iv) by FNBC, if in good faith,

there is a substantial likelihood that any necessary approval by a Governmental Authority will not be obtained or will be obtained but only upon condition(s) that make it inadvisable to proceed with the Agreement; (v) by FNBC, if the Agreement is terminated in accordance with its terms and conditions; (vi) by FNBC, if BBI fails to comply with any of its covenants or agreements contained within the Agreement and such failure is not cured within thirty (30) days' notice from FNBC to BBI; (vii) by BBI, if FNBC fails to comply with any of its covenants or agreements contained within the Agreement and such failure is not cured within thirty (30) days' notice from BBI to FNBC; (viii) by FNBC, if the Bankruptcy Court approves an Alternative Transaction; (ix) by FNBC, if it determines that any approval of a Governmental Authority required to consummate the transactions contemplated in the Agreement will not be obtained within sufficient time; and (x) By FNBC, if the contents of the Confidential Schedules are unsatisfactory to FNBC.

### d.    Representations and Warranties

The Agreement contains representations and warranties by FNBC, BBI and CPB. The representations and warranties provided by BBI and CPB regarding the CPB Stock include, but are not limited to, representations with respect to corporate status and authority, capitalization of CPB, business operations, regulatory reports, permits, financial statements, liabilities, litigation, assets, lease contracts and agreements, tax matters, insurance, intellectual property, property, deposits, financial matters, claims, employee benefit plans and compliance with applicable laws. Meanwhile, FNBC's representations and warranties in the Agreement relate to representations with respect to corporate status and authority, litigation, and truthfulness of its representations.

### e. **Covenants**

BBI agreed to and cause CPB to use all commercially reasonable efforts to effectuate the consummation of the transactions contemplated in the Agreement. BBI also agreed to and cause CPB to furnish FNBC within ten (10) Business Days from request thereof, with all necessary documentation. BBI further agreed to operate CPB in all material aspects in the ordinary course of business consistent with past practice, including but not limited to, using its reasonable efforts to preserve its present customers, depositors and employees; using its reasonable efforts to maintain assets owned or leased by CPB; performing all of its obligations under contracts, leases and documents relating to CPB's assets, properties or business; maintaining in full force and effect, all insurance policies; timely filing of the necessary reports with any Government Authority; timely filing of documents relating to Tax Returns; withholding from each payment made to employees the proper amount of taxes; accounting for all transactions and preparing all Financial Statements and Call Reports in accordance with GAAP; promptly classifying and charging off loans and making appropriate adjustments to loss reserves in accordance with Call Report Instructions and the Uniform Retail Credit Classification and Account Management Policy; using good faith best efforts to comply or maintain compliance with any and all regulatory commitments, cease and desist order or written agreements to which CPB is subject to; joining in the Agreement, an Asset Purchase Agreement and P&A Agreement and paying all costs and expenses incurred by CPB in connection with the transaction before the Closing Date. Additionally, BBI agreed to certain forbearances in which BBI is prevented from causing CPB to engage in activities including, but not limited to, the following: (i) taking or failing to take actions that would cause the

representations and warranties made in the Agreement to be inaccurate; (ii) except in accordance with the terms of the Agreement, consolidating with or selling its assets to any other person, changing CPB's Constituent Documents, increasing the number of shares of CPB Stock or increasing the amount of CPB's surplus; (iii) except in accordance with a contract existing as of the date of the Agreement, engaging in any transaction with an affiliated person or allowing such person to acquire any assets from CPB, except in the form of wages, salaries, fees for services, reimbursement of expenses and benefits accrued under Employee Plans or any deposit made by an officer, director or employee; (iv) discharging or satisfying any lien or paying any obligation or liability outside the ordinary course of business; (v) issuing, selling or authorizing the issuance of any shares of CPB's stock or other securities; (vi) accelerating the vesting of pension or other benefits in favor of employees of CPB; (vii) acquiring any capital stock or other equity ownership in any other entity except under certain circumstances; (viii) mortgaging, pledging or subjecting to lien any of CPB's property, business or assets except under certain circumstances; (ix) selling, transferring or leasing to others or disposing of any of CPB's assets outside the ordinary course of business; (x) cancelling or compromising any debt or claim, waiving or releasing any right or claim of a value in excess of $10,000; (xi) making any changes in the rate or timing of payment of compensation, commission or remuneration of any of CPB's shareholders, directors, officers, employees or agents, other than periodic increases in compensation consistent with past practice; (xii) entering into employment or consulting contract or other agreement with any director, officer or employee or adopting, amending in any material respect or terminating any pension, employee welfare, retirement, stock purchase, stock

option, phantom stock, stock appreciation rights, termination, severance, income protection, golden parachute, savings or profit-sharing plan (including trust agreements and insurance contracts embodying such plans), any deferred compensation, or collective bargaining agreement, any group insurance contract or any other incentive, welfare or employee benefit plan or agreement maintained by it for the benefit of its directors, employees or former employees; (xiii) except for improvements or betterments relating to the properties of CPB, making any capital expenditures, additions or betterments in excess of an aggregate of $10,000; (xiv) creating a new position or hiring or employing any person as a replacement for an existing position with an annual salary greater than $30,000; (xv) Selling or disposing of any corporate books or records, except in accordance with a sound retention policy; (xvi) making any changes in credit underwriting standards, asset liability management techniques, or accounting methods and practices, except as required by changes in GAAP or by regulatory authorities; (xvii) reducing the amount of CPB's allowance for loan losses except through charge offs or as required by any applicable Regulatory Authority; (xviii) selling or purchasing any investment securities other than the purchase of obligations of the U.S. Treasury with a duration of four (4) years or less and an AAA rating by at least one of the nationally recognized ratings agency; (xix) making, committing to make, extending the maturity of or alter terms of any loan in excess of $50,000 unless consented to by FNBC per the terms of the Agreement or mutually agreed by the parties; (xx) making, committing to make any, renewing, extending the maturity of or altering any of the material terms of any loan to a borrower who is on CPB's internal classified asset or watch list; (xxi) entering into any acquisitions or leases of real property; (xxii) removing any loans from

CPB's watch list; and (xxiii) entering into any agreement or making any commitment to take any actions which are prohibited as provided above.

FNBC has agreed to use its commercially reasonable efforts to take, in good faith, all actions necessary to consummate the transactions contemplated in the Agreement. FNBC will provide BBI with all information concerning FNBC required for inclusion of any application or statement to be made or filed by either party in connection with the transactions contemplated in the Agreement. FNBC will notify BBI in writing if it becomes aware of any fact or condition that (i) makes or shows to be untrue any representation or warranty made by FNBC in, or any information or Confidential Schedules provided to BBI under, the Agreement, (ii) would cause or constitute a breach of, or failure to comply with, any of the covenants or agreements of FNBC herein, or (iii) reasonably could be expected to give rise, individually or in the aggregate, to the failure of any closing condition set forth in the Agreement. FNBC will also notify BBI in writing of any legal action, suit or proceeding or investigation, pending or threatened against FNBC or First NBC Bank, (i) that questions or might question the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by the parties or their respective Subsidiaries, or (ii) that seeks to enjoin or otherwise restrain the transactions contemplated in the Agreement. Lastly, FNBC agrees to promptly, but in no event later than 10 days after the date BBI provides FNBC with the necessary information, file applications for all regulatory approvals required to be obtained by FNBC in connection with the Agreement.

### f.    Indemnification

Certain Shareholders of BBI identified by FNBC will have entered into an

indemnification agreement on terms and conditions mutually agreeable to FNBC and such Shareholders.

### B.    Auction Procedures

The Auction Procedures are the proposed procedures that prospective bidders must follow in order to bid on the CPB Stock.  BBI crafted the Auction Procedures to permit an expedited Sale necessitated by the potential risks faced by BBI, while simultaneously fostering an orderly and fair sale process.  BBI has determined that the Auction Procedures establish a framework that is most likely to maximize the value of the CPB Stock for the benefit of BBI's estate, its creditors and other interested parties.

The proposed Auction Procedures are attached hereto as <u>Exhibit D</u>.  Those procedures are summarized in relevant part below subject to certain qualifications specifically outlined in the Auction Procedures.[8]

### a.    <u>Participation Requirements</u>

In order to be qualified to receive any confidential information from BBI or CPB, to submit an Initial Overbid (defined below) and to participate in the Auction, a potential bidder other than FNBC (an "<u>Overbidder</u>") must submit each of the following to BBI:  (i) an executed confidentiality agreement substantially in the form of Exhibit "E" attached and (ii) current audited financial statements and the latest unaudited financial statements (collectively, the "<u>Financials</u>") or if the Overbidder is an entity formed for the purpose of acquiring the CPB Stock, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Overbidder who will

---

[8] The summary of the Auction Procedures set forth herein is provided for informational purposes only. **Interested parties should read the entire Auction Procedures, which are annexed hereto as <u>Exhibit D</u>.** In the event of any conflict between the Auction Procedures and this summary, the Auction Procedures shall control.  Capitalized terms used in this summary have the meaning ascribed to them in the Auction Procedures.

guarantee the obligations of the Overbidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow BBI to make a reasonable determination as to the Overbidder's financial and other capabilities to consummate the Sale (including but not limited to, the ability to obtain all necessary regulatory approvals with respect to the ownership of the CPB Stock and operation of CPB on a timely basis).

### b.    Bid Deadline

In order to participate at the Auction, an Overbidder must submit its bid in a form acceptable to BBI (with copies to certain professionals as explained in the Auction Procedures) on or before November 11, 2011 at 3:00 p.m. (Central Time)(the "Bid Deadline").

### c.    Bid Requirements

A bid must be a written irrevocable offer from an Overbidder and shall contain, among other things, the following:   (a) a proposed stock purchase agreement (the "Competing Stock Purchase Agreement") on substantially the same terms and conditions as set forth in the Agreement; (b) a cashier's check made payable to the order of BBI in the amount of Fifty Thousand and No/100 Dollars  ($50,000.00) (the "Overbidder's Deposit") shall be submitted to BBI's counsel and shall be retained by BBI as a deposit for application against the purchase price at the closing of the transaction, if the Overbidder is determined to be the highest bidder or the Bankruptcy Court determines that the Overbidder shall serve as a back-up bidder in the event the highest bidder does not close, or shall be returned to the Overbidder within three (3) calendar days of the Closing, in the event that the Bankruptcy Court does not approve a sale of the CPB Stock

to the Overbidder; (c) admissible evidence in the form of affidavits or declarations establishing, among other things, the Overbidder's financial ability, good faith, and ability to perform the obligations under the Competing Stock Purchase Agreement (collectively "Bidder Representations"); (d) remains open until the conclusion of the Closing ; (e) contains terms and conditions that are higher and better than the terms of the Agreement; (f) provides for the purchase price to be paid to BBI that exceeds the sum of the Closing Consideration, Additional Consideration and the Expense Reimbursement by at least $25,000.00 (the "Minimum Overbid") (i.e. the Minimum Overbid must be at least $1,325,000.00); and (g) evidence of the Overbidder's ability to obtain all regulatory approvals necessary to consummate the transactions contemplated by the Competing Stock Purchase Agreement in a timely manner.

### d.     Initial Overbid

FNBC, and any entity that conforms with the above requirements by submitting a Competing Stock Purchase Agreement, supporting documentation and the Overbidder's Deposit (collectively, an "Initial Overbid") shall each be deemed a "Qualified Overbidder") and may bid for the CPB Stock at the Auction.

### e.     As Is, Where Is

The sale of the CPB Stock shall be on an "as is, where is" basis without representations or warranties of any kind, nature, or description by BBI, its agents, its advisors, or estate, except to the extent set forth in the Agreement or in the Competing Stock Purchase Agreement with the Successful Bidder(s). Except as otherwise provided in the Agreement or the Competing Stock Purchase Agreement with the Successful Bidder(s), all of the right, title and interest in and to the CPB Stock to be acquired will be

sold free and clear of all liens, security interests, encumbrances, and interests thereon and there against (collectively, the "Encumbrances"). The Encumbrances, if any, will attach to the net proceeds of the sale of such CPB Stock, subject to any claim of the "stalking horse bidder" to such proceeds for payment of the Expense Reimbursement.

## f.     The Auction

If no timely, conforming Initial Overbid is submitted, BBI shall not conduct an Auction. Rather, BBI shall request at the Sale Hearing that the Bankruptcy Court approve the proposed Sale of the CPB Stock to FNBC under the Agreement and request that the Sale Order shall be immediately effective upon entry. If one or more timely conforming Initial Overbids is received, BBI will conduct an auction of the CPB Stock (the "Auction") at the Sale Hearing, subject to approval of the Bankruptcy Court, in which FNBC and all other Qualified Overbidders may participate.

## g.     Auction Procedures

The Auction will be governed by the following procedures, the most significant of which include the following (the "Auction Rules"): (a) bidding will commence at the amount of the highest bid submitted by a Qualified Overbidder, as determined by BBI and as announced at the commencement of the Auction, subject to approval by the Bankruptcy Court; (b) each subsequent bid will be in increments no less that Twenty-Five Thousand Dollars ($25,000.00) (the "Bidding Increments"); (c) FNBC will have the right, but not the obligation to match bids made by any Qualified Overbidder (and include the amount of the Expense Reimbursement in its bid), and in such event, FNBC's matching bid will be deemed the highest and best bid for CPB's Stock; (d) if, upon conclusion of the Auction, FNBC's final bid matches (or is greater than) the highest bid

made by any Qualified Overbidder, the Bankruptcy Court will approve the Agreement and authorize BBI to sell the CPB Stock to FNBC; and (e) BBI may, with Bankruptcy Court approval, elect to deem FNBC's final bid to be the highest bid, notwithstanding the receipt of an apparently higher bid from another Overbidder if FNBC's bid including the Expense Reimbursement is equal to or greater than the bid of the Overbidder.

### C.    Notice Procedures

BBI shall, within one (1) day of the entry of the Auction Procedures Order on the Bankruptcy Court's docket, serve a copy of each of the Motion, the proposed form of the Sale Order, the Auction Procedures Order, and a copy of the Notice of Sale, substantially in the form annexed hereto as Exhibit F, by first-class mail, postage prepaid, upon the following parties (collectively, the "Notice Parties"): (i) any entities known to have asserted any Encumbrance in or upon the CPB Stock; (ii) all federal, state or local regulatory authorities which have a reasonably known interest in the relief requested by the Motion, including the FDIC and Louisiana OFI and the Federal Reserve Board; (iii) all parties to the Agreement and all related agreements; (iv) Office of the United States Trustee; (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) all entities that have requested notice in accordance with Bankruptcy Rule 2002; (viii) all other known creditors of BBI; (ix) counsel to any committee established in this Chapter 11 case.

BBI also proposes pursuant to Bankruptcy Rules 2002(d) and 2002(l), that within one (1) day after the Auction Procedures Order is entered on the Bankruptcy Court's docket, or as soon thereafter as is practicable, BBI shall cause notice, substantially in the form of the notice attached hereto as Exhibit F to be published in *The Times Picayune* for

a period of five (5) continuous days. The publication notice shall constitute an additional

component of the Notice of Sale.

## ARGUMENT

### A.    The CPB Stock is Property of BBI's Bankruptcy Estate

Section 541(a) of the Bankruptcy Code provides in relevant part:

> The commencement of a case under section
>
> 301, 302, or 303 of this title creates an estate.
>
> Such estate is comprised of all thefollowing property, wherever located and by whomever held:
>
> (1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541. Congress intended that §541 be interpreted broadly. *United States v.*

*Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983); *Weingarten Nostat, Inc. v. Serv. Merch.*

*Co., Inc.*, 396 F.3d 737, 742 (6th Cir. 2005). The shares of CPB Stock are property of

BBI's estate under § 541(a), and therefore are subject to the jurisdiction of this Court

pursuant to 28 U.S.C. § 157(b)(2)(M). Courts have uniformly held that while the assets of

non-debtor subsidiaries are not property of the estate, the shares of the subsidiary owned

by a debtor are property of that debtor's bankruptcy estate. *See, e.g., United States v.*

*Ken Int'l Co.*, 184 B.R. 102, 107 (D. Nev. 1995) (reciting rule regarding ownership of

non-debtor's stock)(internal citations omitted); *Hays v. Cummins (In re Cummins)*, 166

B.R. 338, 358 (Bankr. W.D. Ark. 1994) (stock certificates part of debtor's bankruptcy

estate); *Murray v. Marres (In re Murray)*, 147 B.R. 688, 690 (Bankr. E.D. Va. 1992)

(shares of non-debtor corporation's stock owned by debtor, not assets of non-debtor

corporation, are property of the estate under section 541); *Deak & Co., Inc. v. Ir. R.M.P. Soedjono (In re Deak & Co., Inc.)*, 63 B.R. 422, 427 (Bankr. S.D.N.Y. 1986) (shares of non-debtor corporation's stock owned by debtor were considered "legal or equitable interests" within the property of the debtor's estate).

## B. The Sale Should be Approved as Fair, Reasonable, and in the Best Interest of Creditors.

Bankruptcy Code section 363(b) and Bankruptcy Rule 6004 authorize a debtor to sell assets of the estate other than in the ordinary course of business, after notice and a hearing. *See, e.g., In re Moore*, 608 F.3d 253 (5th Cir. 2010). In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or public auction. *See* FED. R. BANKR. P. 6004(f)(1). Here, BBI believes that its ability to select the highest and best bidder at the Court-supervised Auction enhances and benefits the marketing process by providing a motivation for bidders to submit a Qualified Bid with a high market value.

Certain circumstances necessitate and allow for the sale of virtually all of the estate's property prior to confirmation of a plan. *Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2nd Cir. 1983) ("There must be some articulated business justification ... before the bankruptcy judge may order such disposition."); *In re Condere Corp.*, 228 B.R. 615, 626 (Bankr. S.D. Miss. 1998) (It is now generally accepted that section 363 allows such sales in chapter 11, provided, however, that the sale proponent demonstrates a good, sound business justification for conducting the sale prior to confirmation, other than appeasement of the loudest creditor, that there has been adequate and reasonable notice of the sale, that the sale has been proposed in good faith, and that the purchase price is fair and reasonable) citing Collier, P 363.02[4] at 363-19 to 20 (footnotes omitted). One of the most obvious business

justifications in any sale of estate assets, is the ultimate purpose of obtaining the highest price for the property sold. *In re Lounds*, 98-CV-003, 1998 U.S. Dist. LEXIS 10925 at *6 (W.D. Mich. June 23, 1998) citing *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). "In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e. it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length transaction.'" *Wilde Horse Enters., Inc.*, 136 B.R. at 841; *Condere Corp.*, 228 B.R. at 626.

In assessing the prudence of a section 363 sale, courts have examined (i) whether a sound business reason exists for the proposed transaction; (ii) whether fair and reasonable consideration is provided; (iii) whether a transaction has been proposed and negotiated in good faith; (iv) the proportionate value of the asset to the estate as a whole; (v) the proceeds to be obtained from the disposition vis-á-vis any appraisals of the property; and (vi) whether the asset is increasing or decreasing in value. *See, e.g., In re Continental Airlines, Inc.*, 780 F. 2d 1223, 1226 (5th Cir. 1986). All factors are satisfied here.

### 1. There is a Valid Business Justification and Good Business Reason to Support the Sale.

The Fifth Circuit in *Cont'l Air Lines, Inc.*, 780 F.2d at 1226 applied a flexible, case-by-case test to determine whether a sound business purpose justifies a proposed sale under section 363(b). Adopting the reasoning of the Second Circuit in *In re Lionel Corp.*, 722 F.2d at 1071, the Fifth Circuit noted that whether a proffered justification is sufficient will depend on the specifics of the case. This Court should consider all salient factors pertaining to the case and act to further the diverse interests of the debtor and

creditors alike. *Id.*

The instant facts amply support BBI's business judgment that the Sale is in the best interest of its creditors and BBI's estate. As detailed above, an expedited Sale and concurrent acquisition is BBI's only viable opportunity to satisfy the Regulators and salvage CPB's value. In stark contrast, failure by BBI to consummate the Sale would have disastrous consequences for BBI's estate.

Moreover, the proposed Auction Procedures and the submission of a stalking horse bid afford assurance that the highest and best price will be realized for the CPB Stock. A Notice of Sale will be provided to all persons BBI believes may have an interest in the CPB Stock. BBI believes notice to such parties will provide appropriate encouragement for overbids for the CPB Stock.

In sum, the Sale achieves the greatest overall benefit for BBI's estate. Accordingly, BBI believes, in the exercise of its sound business judgment, that the Sale should be approved, pursuant to an expedited process, to provide the best, and for practical purposes, the only, means to salvage CPB.

The courts have long recognized that where a sale by a debtor is made in good faith and upon a reasonable basis—as the Sale is here—"[t]he court will not entertain objections to a trustee's [debtor in possession's] conduct of the estate where that conduct involves a business judgment made in good faith on a reasonable basis and within the scope of his authority under the Code." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981); *see also In re S. Biotech., Inc.*, 37 B.R. 318, 322-23 (Bankr. M.D. Fla. 1983). This is because it is the "Trustee [debtor in possession], not the Court, [that] is selling [the] property." *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 516

(Bankr. N.D. Ala. 2002). In accordance with *Walters* and the foregoing cases, BBI submits that there is valid business justification and good business reason for the Sale on the terms contained in the Agreement and in the manner provided in the Auction Procedures. As such, BBI believes this Court should approve the Sale and allow it to move forward expeditiously.

**2.     The Sale is in Good Faith and FNBC or the Successful Bidder Should be Afforded the Protections of 11 U.S.C. § 363(m).**

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

Although the Bankruptcy Code does not define "good faith purchaser," the courts have defined a good faith purchaser as follows: "One who purchases the assets for value, in good faith, and without notice of adverse claims." *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1197 (7th Cir. 1978); *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 8 (1st Cir. 1993). Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Ewell*, 958 F.2d 276, 279 (9th Cir. 1992); *In re Abbotts Dairies, Inc.*, 788 F.2d 143, 147 (3rd Cir. 1986); *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 56 (7th Cir. 1983); *In re General Motors Corp.*, 407 B.R. 463 (Bankr S.D. N.Y. 2009); *Badami v. Burgess (In re Burgess)*, 246 B.R. 352, 356 (8th Cir. 2000); *In re Rock Indus. Mach. Corp.*, 572 F.2d at 1198.

The Sale is proposed in good faith. The Agreement is a product of intensive arm's-length negotiations between BBI and FNBC, and does not contain special treatment for BBI, BBI's estate, FNBC, or their respective affiliates or insiders. The Agreement specifically provides for overbids at the Auction. Moreover, BBI submits that any stock purchase agreement reached as a result of the Auction Procedures will be an arm's-length, negotiated transaction entitled to the protections of section 363(m). To maintain the integrity of the bidding process, the proposed Auction Procedures require each Qualified Bidder to confirm that it has not engaged in any undisclosed group bidding or any collusion with respect to the bidding or the sale. In addition, the terms of the Sale will be fully disclosed to creditors and other potential bidders pursuant to the Notice of Sale as described above.

Based on the foregoing, FNBC or the Successful Bidder, as the case may be, should be deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

### 3.   The Purchase Price is Fair and Reasonable/Appraisal is Not Needed.

There is no per se requirement that an appraisal is a necessary prerequisite to a valid sale under §363. *In re Barbel*, 2010-137, 2011 U.S. Dist. LEXIS 83143 at * (D. V.I. July 28, 2011). An auction sale is generally considered to establish sufficient value for the assets being sold. *See, e.g., Abbotts Dairies*, 788 F.2d at 149. The "highest and best offer" has served as a relevant indicator of an asset's value. *See Moore*, 608 F.3d at 263 ("As a general matter the trustee must demonstrate that the proposed sale price is the highest and best offer[.]") BBI believes that the Sale process has been structured in a manner that will secure the highest purchase price for the assets being sold. BBI will

also provide a Notice of Sale to all known potential bidders, thereby maximizing the possibility that competing bidders will come forward to pay a higher price for the CPB Stock than offered by FNBC in the Agreement. In essence, FNBC has set the floor for the bidding at the Auction.

BBI specifically retained Chaffe to act as financial advisor to BBI and to assist BBI in identifying and analyzing possible transaction structures. Chaffe made presentations to the Board of Directors of BBI for the purpose of assisting the Board of Directors of BBI in making a reasoned and well informed decision regarding any course of action, which included, without limitation (i) a review of efforts to raise capital through an offering, a recapitalization of BBI and/or a business combination and to find a financial or strategic partner or buyer through a business combination or otherwise, (ii) a review of market conditions and comparable market transactions, and (iii) an overview of the current regulatory environment as it relates to a recapitalization. That impartial analysis and advice helped BBI determine the basis for the purchase price set out in the Agreement, which further demonstrates the fairness and reasonableness of the Closing Consideration and Additional Consideration.

Finally, courts have recognized that a debtor is entitled to "'great judicial deference' in deciding which bid to accept as the best and highest bid." *Gulf States Steel*, 285 B.R. at 516 (internal citation omitted). Here, too, BBI is entitled to deference in determining not only the manner in which the CPB Stock is to be sold, but how the value of those assets is to be maximized. Based on extensive marketing efforts and negotiations surrounding the Agreement, with the assistance of Chaffe, BBI believes that FNBC's offer (subject to overbid at the Auction) satisfies the requirement that the price

paid for the CPB Stock be fair and reasonable.

### 4. CPB Stock is Decreasing in Value.

The value of CPB Stock has the potential to continually decrease. Thus, the expedited Sale is necessary to maximize value for BBI's estate.

### 5. Adequate and Reasonable Notice Has Been Provided.

Section 363 of the Bankruptcy Code requires that interested parties receive adequate notice of the sale. Full disclosure of the terms of the Sale will be provided pursuant to the Notice of Sale as described above. Such notice is reasonably calculated to provide timely and adequate notice to BBI's major creditor constituencies, those parties most interested in this case, and those parties potentially interested in bidding on the CPB Stock.

### C. The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale of the Estate's Assets Free and Clear of Liens, Claims, and Encumbrances.

Section 363(f) of the Bankruptcy Code permits debtors to sell assets free and clear of liens, claims, and encumbrances with interests in the property attaching to the net proceeds of the sale. Section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2) such entity consents;
>
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4) such interest is in bona fide dispute; or
>
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

Further to the Agreement, where BBI represents and warrants that the CPB Stock is "free and clear of all Encumbrances," BBI requests that CPB Stock be transferred to FNBC free and clear of all Encumbrances with interests in the CPB Stock, if any, attaching to the proceeds of the Sale of the CPB Stock.

### E. The Proposed Bidding Protections are Reasonable and Necessary to Preserve the Sale Process and Enhance the Value of BBI's Estate.

In order to preserve the Sale process, and the resources already expended by BBI's bankruptcy estate in favor of such process, BBI seeks to approve certain bidding protections, including a Minimum Overbid, Bidding Increments, and the Expense Reimbursement (collectively, the "Bidding Protections"). These Bidding Protections will ensure a competitive and efficient bidding process which excludes disingenuous bidders while preserving the participation of a stalking-horse bidder.

Notably, during the past year, only FNBC emerged as a serious buyer willing and able to purchase the CPB Stock under a proposed section 363 sale structure. Now, as the Sale process draws to a close, publicity concerns have been compounded by timing constraints and shrinking resources. At this point, BBI can only proceed with serious buyers. The Minimum Overbid, therefore, will function as an effective tool to identify only highly motivated bidders. A Minimum Overbid of $1,325,000.00 will ensure both that the competing bidders are serious and that their overbids are meaningfully better for BBI (notwithstanding the added cost of facilitating further diligence to new bidders under time and publicity constraints). Ultimately, the Minimum Overbid will ensure that the auction will generate a material benefit to BBI's estate as a whole. Similarly, the Bidding Increments, set at a minimum of $25,000.00, will function as an effective filtering tool in the pool of any prospective bidders and ensure that competing bidders are seriously

motivated to purchase the CPB Stock. Thus, the Bidding Increments also provide a benefit to BBI's estate.

Another Bidding Protection—meant to preserve the Sale process and ultimately preserve BBI's estate resources already devoted to that Sale process— is the Expense Reimbursement. Bidding incentives encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. "Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers." *In re S.N.A. Nut Co.*, 186 B.R. 98, 101 (Bankr. N.D. Ill. 1995)

Without the prospect of the Expense Reimbursement, FNBC has informed BBI that it would not have continued discussions with BBI or incurred such expenses, nor would FNBC have an incentive to continue the Sale process through Closing. Indeed, under the Agreement, FNBC has the right to abandon the Sale should the Expense Reimbursement be denied even partially. Without a stalking-horse, BBI cannot move forward and meet regulatory requirements. Therefore, in order to ensure an effective and competitive Sale process (which requires a stalking-horse), BBI seeks authority for the Expense Reimbursement in the sum of $400,000.00 in the event that FNBC is not determined to be the highest bidder.

FNBC has expended substantial funds in documenting and negotiating the Sale. The Expense Reimbursement, therefore, is directly related to the unreimbursed amounts incurred by FNBC in relation to the Sale.

BBI believes that the Bidding Protections are reasonable, given the benefits to the estate of having a stalking horse and a definitive Agreement, and the risk to FNBC that a third-party offer ultimately may be accepted, and necessary to preserve and enhance the value of BBI's estate.

In the bankruptcy context, the test for determining whether a proposed break-up fee should be approved is whether it is in the best interests of the estate. *S.N.A. Nut Co.*, 186 B.R. at 104; *see also In re Am. West Airlines, Inc.*, 166 B.R. 908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D. Ohio 1992). There must be compelling circumstances "which clearly indicate that payment of the fee would be in the best interests of the estate." *S.N.A. Nut Co.*, 186 B.R. at 105. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999).

The proposed Bidding Protections satisfy this standard. The Agreement and the Bidding Protections are the product of extended good faith, arm's-length negotiations between BBI and FNBC. They are fair and reasonable in amount, particularly in view of FNBC's extensive efforts to date, the risk to FNBC of being used as a "stalking horse bidder," and the stabilizing effect that the execution of the Agreement is expected to have (thereby preserving value for creditors and increasing the likelihood of additional bidding).

Further, the Bidding Protections already have encouraged competitive bidding, in that FNBC would not have entered into the Agreement without these provisions. The mere existence of the Bidding Protections permits BBI to insist that competing bids for

the CPB Stock be materially higher or otherwise better than the Agreement, a clear benefit to BBI's estate.

In sum, BBI's ability to offer the Bidding Protections enables it to ensure the Sale to a contractually committed bidder at a price it believes to be fair, while at the same time providing it with the potential of even greater benefit to its estate. Thus, the Bidding Protections should be approved.

**F.  This Court Should Waive the Fourteen-Day Stay Period Imposed by Bankruptcy Rule 6004(h).**

Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h). BBI requests that the stay imposed by Bankruptcy Rule 6004(h) be waived under the circumstances of this case. It is in the interest of BBI's creditors and estate that the Sale be consummated as quickly as possible without any stay pending appeal because of CPB's undercapitalized status, the need for prompt action to prevent further decline in the CPB Stock value, and the desire to preserve the remaining value of the CPB Stock for BBI's creditors.

BBI has noticed the hearing on this Motion to all of its creditors, interest holders, and other parties-in-interest, and therefore any person having any objection to the Motion has been afforded a reasonable opportunity to voice any objections or concerns. Accordingly, BBI is aware of no prejudice that would be caused by the Court's waiver of Bankruptcy Rule 6004(h). BBI requests that any order approving the Sale be effective immediately by providing that the fourteen-day stay is inapplicable.

## NOTICE

Notice of this Motion has been provided to (i) all entities known to have expressed an interest in a transaction with respect to BBI, CPB or the CPB Stock (or a portion thereof); (ii) any entities known to have asserted any Encumbrance in or upon CPB Stock; (iii) all federal, state, and local regulatory authorities which have a reasonably known interest in the relief requested by the Motion, including the FDIC and Louisiana OFI; (iv) all parties to the Agreement and all related agreements; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the Federal Reserve Board; (ix) all entities that have requested notice in accordance with Bankruptcy Rule 2002; (x) all other known creditors of BBI; and (x) counsel to any official committee established in this Chapter 11 case. In light of the nature of the relief requested herein, BBI submits that no other or further notice is required.

## CONCLUSION

For all of the foregoing reasons, BBI respectfully requests entry of an order granting the relief requested herein and such other and further relief as the Court deems just.

Respectfully submitted,

ADAMS AND REESE, LLP

By: _/s/ Robin B. Cheatham_
    ROBIN B. CHEATHAM (#4004)
    LISA M. HEDRICK (#26421)
    SCOTT R. CHEATHAM (#31658)
    4500 One Shell Square
    New Orleans, LA 70139
    Telephone: (504) 581-3234
    Facsimile: (504) 566-0210
    *Attorneys for the Debtor*