## ACQUISITION AGREEMENT

This **ACQUISITION AGREEMENT** (this "**Agreement**") is made and entered into as of September 27, 2011, by and between **FIRST NBC BANK HOLDING COMPANY**, a Louisiana corporation with its principal offices in New Orleans, Louisiana ("**FNBC**") and **BLOSSMAN BANCSHARES, INC.**, a Louisiana corporation with its principal offices in Lacombe, Louisiana ("**BBI**").

### RECITALS

WHEREAS, BBI is a registered bank holding company and owns all of the issued and outstanding capital stock of Central Progressive Bank, a Louisiana state non-member bank with its principal offices in Lacombe, Louisiana ("**CPB**");

WHEREAS, FNBC is a registered bank holding company and owns all of the issued and outstanding capital stock of First NBC Bank, a Louisiana state non-member bank with its principal offices in New Orleans, Louisiana;

WHEREAS, BBI intends to file a voluntary bankruptcy petition under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* ("**Bankruptcy Code**"), in the United States Bankruptcy Court for the Eastern District of Louisiana ("**Bankruptcy Court**") on or shortly after the date this Agreement is executed ("**Bankruptcy Case**");

WHEREAS, BBI desires to sell all of the issued and outstanding shares of common stock of CPB ("**CPB Stock**") for cash, and FNBC desires to purchase the CPB Stock from BBI, on the terms and conditions contained in this Agreement ("**Acquisition**");

WHEREAS, the Acquisition will be subject to the approvals or waivers of the Federal Deposit Insurance Corporation ("**FDIC**"), Louisiana Office of Financial Institutions ("**OFI**") and the Board of Governors of the Federal Reserve System ("**FRB**"), and effectuated in accordance with an order of the Bankruptcy Court entered upon a motion by BBI under Section 363 of the Bankruptcy Code approving such transaction;

WHEREAS, following the receipt of all required regulatory approvals, BBI will cause CPB to join in and become a party to this Agreement; and

WHEREAS, the parties desire to enter into this Agreement for the purposes specified in this Agreement.

### AGREEMENT

NOW, THEREFORE, for and in consideration of the foregoing and of the mutual representations, warranties, covenants and agreements contained in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the conditions set forth below, the undersigned parties agree as follows:

Section 1.01    **Definitions**.    In this Agreement, except as the context may otherwise require, the following terms will have the meanings set forth below:

"**Action**" means any suit, action, investigation or proceeding or governmental or regulatory investigation of any kind or nature.



"**Acquisition**" has the meaning set forth in the Recitals.

"**Additional Consideration**" has the meaning set forth in Section 2.02(b).

"**Affiliate**" means, with respect to any Person, any Person that, directly or indirectly, controls, is controlled by, or is under common control with, such Person in question. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"**Agency**" has the meaning set forth in Section 4.31(c).

"**Agreement**" means this Acquisition Agreement, as amended, modified or restated from time to time in accordance with its terms.

"**Alternative Transaction**" means, other than the transactions contemplated by this Agreement, any inquiry, proposal or offer with respect to any tender or exchange offer to acquire 20% or more of the voting power of CPB, any inquiry, proposal or offer with respect to a merger, consolidation, share exchange or other business combination involving CPB or any other inquiry, proposal or offer to acquire, license, lease, exchange or transfer in any manner 20% or more of the voting power in (whether by purchase of newly issued or outstanding shares of common stock or securities convertible or exchangeable for shares of common stock whether or not such shares are currently exchangeable or convertible), or 20% or more of the business, revenue, net income, assets or deposits of, CPB, in each case, whether in one or any series of related transactions and whether from one Person or any "group" of Persons (as defined under Section 13(d) of the Exchange Act).

"**Asset Purchase Agreement**" means that certain Asset Purchase Agreement, dated as of August 19, 2011, by and between First NBC Bank, CPB and Green Energy Development Group, LLC, as the same may be amended from time to time.

"**Auction**" has the meaning set forth in Section 6.14.

"**Auction Procedures**" means the Auction Procedures in a form mutually agreeable to FNBC and BBI, as approved by the Bankruptcy Court in the Auction Procedures Order.

"**Auction Procedures Order**" means an order of the Bankruptcy Court in a form mutually agreeable to FNBC and BBI, (i) approving the Auction Procedures, (ii) approving the Expense Reimbursement, (iii) scheduling an auction ("**Auction**") and a hearing to consider the approval of the Acquisition or an Alternative Transaction ("**Sale Hearing**"), and (iv) approving the form and manner of notice of the Sale Motion and Sale Hearing

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Bankruptcy Exception**" means, in respect of any agreement, contract, commitment or obligation, any limitation thereon imposed by any bankruptcy, insolvency, fraudulent conveyance, reorganization, receivership, moratorium or similar Law affecting creditors' rights and remedies generally

and, with respect to the enforceability of any agreement, contract, commitment or obligation, by general principles of equity, including principles of commercial reasonableness, good faith and fair dealing, regardless of whether enforcement is sought in a proceeding at Law or in equity.

"BBI" has the meaning set forth in the Preamble.

"Business Day" means any day other than Saturday, a Sunday or a day on which banks are authorized or required to be closed in New Orleans, Louisiana.

"Call Report" has the meaning set forth in Section 4.05(b).

"Closing" has the meaning set forth in Section 3.01.

"Closing Consideration" has the meaning set forth in Section 2.02(a).

"Closing Date" has the meaning set forth in Section 3.01.

"Code" has means the Internal Revenue Code of 1986, as amended.

"Confidential Schedules" has the meaning set forth in Section 12.16.

"Constituent Documents" means, with respect to any Entity, its certificate or articles of incorporation, bylaws and any similar charter or other organizational documents of such Entity.

"Contracts" has the meaning set forth in Section 4.11.

"Controlled Group Plans" has the meaning set forth in Section 4.27.

"CPB" has the meaning set forth in the Recitals.

"CPB Stock" has the meaning set forth in the Recitals.

"Disclosing Party" has the meaning set forth in Section 11.01.

"Employee Plans" has the meaning set forth in Section 4.27.

"Entity" means any corporation, firm, unincorporated organization, association, partnership, limited liability company, trust (*inter vivos* or testamentary), estate of a deceased, insane or incompetent individual, business trust, joint stock company, joint venture or other organization, entity or business, whether acting in an individual, fiduciary or other capacity, or any Governmental Authority.

"Environmental Laws" means the common law and all federal, state, local and foreign Laws or regulations, codes, orders, decrees, judgments or injunctions issued, promulgated, approved or entered thereunder, now or hereafter in effect, relating to pollution or protection of public or employee health or safety or the environment, including Laws relating to (i) emissions, discharges, releases or threatened releases of Hazardous Materials, into the environment (including ambient air, indoor air, surface water, ground water, land surface or subsurface strata), (ii) the manufacture, processing, distribution, use, generation, treatment, storage, disposal, transport or handling of Hazardous Materials, and (iii) underground and above ground storage tanks, and related piping, and emissions, discharges, releases or threatened releases therefrom.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and in effect as of the date hereof.

"**Expense Reimbursement**" has the meaning set forth in Section 10.03.

"**FAS 106**" means Financial Accounting Standards Board Statement No. 106, "Employers' Accounting for Postretirement Benefits Other Than Pensions," as in effect on the date hereof.

"**FDIA**" means the Federal Deposit Insurance Act, as in effect on the date hereof.

"**FDIC**" means the Federal Deposit Insurance Corporation.

"**Final Order**" means any order or judgment of the Bankruptcy Court entered on the docket in the Bankruptcy Case, (i) that is not subject to a pending appeal or motion for rehearing, *certiorari* or other review, and (ii) for which the time for filing an appeal, or motion for rehearing, *certiorari* or other review has expired.

"**Financial Statements**" has the meaning set forth in Section 4.05(a).

"**FNBC**" has the meaning set forth in the Preamble.

"**FRB**" means the Board of Governors of the Federal Reserve System.

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Authority**" means any court, administrative agency or commission or other governmental authority or instrumentality, domestic or foreign, or any industry self-regulatory authority, including a Regulatory Authority.

"**GUST**" means, collectively, the Uruguay Rounds Agreement Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Small Business Job Protection Act of 1996 and the Taxpayer Relief Act of 1997.

"**Hazardous Material**" means any pollutant, contaminant, chemical, or toxic or hazardous substance, constituent, material or waste, or any other chemical, substances, constituent or waste including petroleum, crude oil or any fraction thereof or any petroleum product, but does not include normal quantities of any chemical used in the ordinary course of business as office or cleaning supplies.

"**Insurer**" has the meaning set forth in Section 4.31(c).

"**Intellectual Property**" has the meaning set forth in Section 4.15.

"**IRS**" means the Internal Revenue Service.

"**knowledge**" of any party means the actual knowledge, after due inquiry, of a director, officer or employee of that party.

"**Law**" means any federal, state, local or foreign statute, ordinance, Law, rule, regulation, order, judgment, decree, agency requirement or legal requirement (including federal and state securities Laws).

"**Lien**" means any charge, mortgage, pledge, security interest, restriction, claims, lien or encumbrance.

"**Loan Investor**" has the meaning set forth in Section 4.31(c).

"**Losses**" means liabilities, damages, losses, deficiencies, judgments, settlement amounts, costs, interest, penalties and expenses suffered or incurred, including costs of investigation and defense and reasonable attorneys' fees.

"**Louisiana Banking Law**" means the Louisiana Banking Law, La. Rev. Stat. §§6:1 *et seq.*

"**Material Adverse Change**" means any material adverse change in the business, results of operations, condition (financial or otherwise), prospects, assets, properties, employees, liabilities (absolute, accrued, contingent or otherwise) or reserves of CPB, excluding any change with respect to, or effect on, CPB resulting from (i) changes in GAAP or RAP generally applicable to banks or their holding companies, (ii) CPB's express compliance with the terms and conditions of this Agreement, including expenses incurred by such party in consummating the transactions contemplated by this Agreement, or (iii) from actions or omissions of CPB taken with the prior consent of FNBC in contemplation of the transactions contemplated hereby

"**OFI**" means the Office of Financial Institutions of the State of Louisiana.

"**P&A Agreement**" has the meaning set forth in Section 6.16.

"**party**" or "**parties**" means FNBC, on the one hand, and BBI and CPB (upon its joinder to this Agreement), on the other hand.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Person**" is to be interpreted broadly to include any natural individual or any Entity.

"**Property**" or "**Properties**" includes all real property currently owned or leased by CPB, including properties that CPB has foreclosed on and CPB's premises and all improvements and fixtures thereon.

"**RAP**" means regulatory accepted principles.

"**Recipient**" has the meaning set forth in Section 11.01.

"**Regulatory Authority**" means any Governmental Authority charged with the supervision and regulation of financial institutions or issuers of securities or engaged in the insurance of deposits or the supervision or regulation of any party hereto or its Subsidiaries.

"**Regulatory Agreement**" has the meaning set forth in Section 4.20.

"**Representative**" has the meaning set forth in Section 11.01.

"**Sale Hearing**" has the meaning set forth in Section 6.14.

"**Sale Motion**" means the motion filed by BBI with the Bankruptcy Court seeking, among other things, (i) entry of the Auction Procedures Order (with such additional changes as may be acceptable to FNBC) as a Final Order; and (ii) entry of the Sale Order (with such additional changes as may be acceptable to FNBC) as a Final Order.

"**Sale Order**" means an order of the Bankruptcy Court in a form mutually agreeable to FNBC and BBI, (i) finding that notice of Sale Hearing was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, (ii) finding that FNBC is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, (iii) finding that the acquisition of property interests, rights, and powers described in this Agreement will be free and clear of all Liens, and (iv) approving the transactions contemplated by this Agreement.

"**Section 338(h)(10) Election**" has the meaning set forth in Section 12.01.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Subject Information**" has the meaning set forth in Section 11.02.

"**Subsidiary**" means, when used with reference to an Entity, any corporation, a majority of the outstanding voting securities of which are owned directly or indirectly by such Entity or any partnership, joint venture or other enterprise in which any Entity has, directly or indirectly, a majority equity interest.

"**Shareholders' Equity**" means the tangible shareholders' equity of CPB on last day of the month immediately preceding the Closing Date calculated in accordance with the methodology used in the Bank's Call Report to calculate the total bank equity capital (Call Report Schedule RC - Balance Sheet, item 27.a) minus intangible assets (Call Report Schedule RC - Balance Sheet, items 10.a and 10.b), adjusted to reflect the payment or accrual of all expenses of CPB associated with or related to the transactions contemplated by this Agreement, the Asset Purchase Agreement and the P&A Agreement through the Closing Date, including, without limitation, legal fees, accounting fees, investment banking or brokerage fees, and consulting fees; provided however that Shareholders' Equity will not be adjusted to reflect any loss recognized by CPB between the date of this Agreement and the Closing Date on the sale of any asset subject to disposition under the Asset Purchase Agreement.

"**Shareholders' Equity Minimum**" means $6,700,000.

"**Tax**" or "**Taxes**" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code § 59A), customs, duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Welfare Plan**" has the meaning set forth in Section 6.12.

Section 1.02    **Interpretation**.  When a reference is made in this Agreement to the Recitals or an Article, Section, Exhibit or Schedule, that reference will be to the Recitals of, an Article or Section of, or an Exhibit or Schedule to, this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement are for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.  Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision in this Agreement.

Each use herein of the masculine, neuter or feminine gender will be deemed to include the other genders. Each use herein of the plural will include the singular and vice versa, in each case as the context requires or as is otherwise appropriate. The word "or" is used in the inclusive sense. Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. References to a Person are also to its permitted successors or assigns. This Agreement is the product of negotiation by the parties, having assistance of counsel and other advisors. The parties intend that this Agreement not be construed more strictly with regard to one party than with regard to the other. No provision of this Agreement is to be construed to require, directly or indirectly, any Person to take any action, or omit to take any action, which action or omission would violate applicable Law (whether statutory or common law), rule or regulation.

### ARTICLE II.
### PURCHASE AND SALE OF THE SHARES

Section 2.01  **Acquisition of the CPB Stock.**  On the terms and subject to the conditions contained in this Agreement, including the prior approval of the Bankruptcy Court, FNBC hereby agrees to purchase the CPB Stock, and BBI hereby agrees to sell, convey, transfer and assign the CPB Stock to FNBC, free and clear of all Liens, preemptive rights and adverse claims of every kind and character whatsoever.

Section 2.02  **Purchase Price.**  The purchase price and full consideration for the sale of the CPB Stock will be an amount equal to $900,000 in the aggregate, payable as follows:

(a)  cash consideration in the amount of $400,000 to be delivered to BBI at Closing in immediately available funds ("**Closing Consideration**"); plus

(b)  additional cash consideration in the amount of $500,000 ("**Additional Consideration**"), subject only to adjustment as more fully described in Section 2.03, to be delivered to BBI on the third anniversary of the Closing Date.

Section 2.03  **Terms of the Additional Consideration.**

(a)  Notwithstanding anything to the contrary contained in this Agreement, the Additional Consideration will be reduced to the extent (i) of any Loan Losses, (ii) of any Losses with respect to CPB incurred by FNBC or First NBC Bank arising out of or related to any action or omission of BBI or CPB occurring prior to the Closing Date, (iii) of any Losses incurred by FNBC or First NBC Bank arising out of or related to the breach of any representation, warranty, covenant or other agreement made by BBI or CPB in this Agreement or the Asset Purchase Agreement, or (iv) of any amount by which the Shareholders' Equity is less than the Shareholders' Equity Minimum.

(b)  For purposes of this Agreement, "**Loan Losses**" means, with respect to any asset acquired by First NBC Bank from CPB under the P&A Agreement (other than any such asset sold pursuant to the Asset Purchase Agreement), (i) the amount of charge-offs or charge downs with respect to principal on such asset at the request of any regulatory examiner or FNBC's accountants, in connection with any external loan review or appraisal, in accordance with the policies of FNBC or First NBC Bank, (ii) the amount of interest foregone by FNBC or First NBC Bank on any such asset, (iii) the amount of any loss of principal incurred as a result of the sale of

any such asset or settlement of litigation related to any such asset, and (iv) the out-of-pocket expenses incurred by FNBC or First NBC Bank in connection with the collection, maintenance and disposition of any such asset.

Section 2.04   **Alternative Acquisition Structure.**   Notwithstanding any provision of this Agreement to the contrary, FNBC will be permitted to restructure the method by which it accomplishes the acquisition of CPB, including, without limitation, by providing for the purchase and assumption by First NBC Bank of substantially all of the assets and liabilities of CPB or the merger of CPB with and into First NBC Bank or any of its affiliates; *provided however,* that FNBC will only be permitted to restructure the proposed transaction to the extent that there is no change in the amount or nature of the consideration to be paid under Section 2.02 of this Agreement.

## ARTICLE III.
## THE CLOSING AND THE CLOSING DATE

Section 3.01   **Time and Place of the Closing and Closing Date.**   On a date mutually acceptable to FNBC and BBI that is within ten (10) Business Days following the receipt of all necessary regulatory, corporate, and other approvals (including the approval of the Bankruptcy Court) and the expiration of all mandatory waiting periods ("**Closing Date**"), a meeting ("**Closing**") will take place at which the parties to this Agreement will exchange certificates, letters and other documents in order to determine whether all of the conditions set forth in Article VIII and Article IX have been satisfied or waived or whether any condition exists that would permit a party to this Agreement to terminate this Agreement.  If no such condition then exists or if no party elects to exercise any right it may have to terminate this Agreement, then the parties will execute such documents and instruments as may be necessary or appropriate to effect the transactions contemplated by this Agreement.  The Closing will take place at the offices of First NBC Bank, 210 Baronne Street, New Orleans, Louisiana 70112 at 10:00 a.m. on the Closing Date, or at such other time and place as the parties may agree, including by remote or electronic transmission or exchange of closing documents.  The parties agree that time is of the essence for purposes of this Agreement and with respect to the transactions contemplated by this Agreement.

Section 3.02   **Actions to be Taken at the Closing by BBI.**   At the Closing, BBI will execute and acknowledge, or cause to be executed and acknowledged (as appropriate), and deliver to FNBC such documents and certificates contemplated to be delivered pursuant to this Agreement or reasonably necessary to evidence the transactions contemplated by this Agreement, including the following (all of such actions constituting conditions precedent to FNBC's obligations to close hereunder):

(a)   One or more certificates evidencing and representing the CPB Stock, duly endorsed by BBI in blank or accompanied by stock powers signed by BBI in blank;

(b)   True, correct and complete copies of BBI's Articles of Incorporation and all amendments thereto, duly certified as of a recent date by the Louisiana Secretary of State;

(c)   True, correct and complete copies of CPB's Articles of Incorporation and all amendments thereto, duly certified as of a recent date by the OFI;

(d)   Good standing and existence certificates, dated as of a recent date, issued by the appropriate state officials, duly certifying as to the existence and good standing of each of BBI and CPB in the State of Louisiana and all other jurisdictions where either is qualified to conduct business;

(e)     A certificate, dated as of a recent date, issued by the FDIC, duly certifying that the deposits of CPB are insured by the FDIC to the extent provided in the FDIA;

(f)     A certificate, dated as of the Closing Date, executed by the Secretary or an Assistant Secretary of BBI, acting in his or her capacity as an officer of BBI, certifying (i) the due adoption by the Board of Directors of BBI of corporate resolutions attached to such certificate authorizing the Acquisition and the execution and delivery of this Agreement and the other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby; (ii) the incumbency and true signatures of those officers of BBI duly authorized to act on its behalf in connection with the Acquisition and to execute and deliver this Agreement and the other agreements and documents contemplated by this Agreement and the taking of all actions contemplated hereby and thereby on behalf of BBI, and (iii) the Bylaws of BBI, a true, correct and complete copy of which will be attached to such certificate;

(g)     A certificate, dated as of the Closing Date, executed by the Secretary or an Assistant Secretary of CPB, acting in his or her capacity as an officer of CPB, certifying (i) the due adoption by the Board of Directors of CPB of corporate resolutions attached to such certificate authorizing the Acquisition and the execution and delivery of this Agreement and the other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby; (ii) the incumbency and true signatures of those officers of CPB duly authorized to act on its behalf in connection with the Acquisition and to execute and deliver this Agreement and the other agreements and documents contemplated by this Agreement and the taking of all actions contemplated hereby and thereby on behalf of CPB, and (iii) the Bylaws of CPB, a true, correct and complete copy of which will be attached to such certificate;

(h)     A certificate, dated as of the Closing Date, signed by the President of BBI, acting solely in his capacity as President, certifying that: (i) all of the representations and warranties made in ARTICLE IV of this Agreement are true and correct on and as of the Closing Date as if made on such date; and (ii) BBI has performed and complied with all of its obligations and agreements required to be performed on or before the Closing Date under this Agreement;

(i)     A certificate, dated as of the Closing Date, signed by the President of CPB, acting solely in his capacity as President, certifying that: (i) all of the representations and warranties made in ARTICLE IV of this Agreement are true and correct on and as of the Closing Date as if made on such date; and (ii) CPB has performed and complied with all of its obligations and agreements required to be performed on or before the Closing Date under this Agreement;

(j)     Evidence reasonably satisfactory to FNBC that all consents and approvals required to be obtained by BBI or CPB from third parties to complete the transactions contemplated by this Agreement have been obtained and are in full force and effect;

(k)     An opinion of counsel to BBI, in the form hereto attached as Exhibit D; and

(l)     All other documents, certificates and instruments required to be delivered to FNBC by BBI or CPB under this Agreement or as are reasonably requested by FNBC or its counsel.

Section 3.03     **Actions to be Taken at the Closing by FNBC**.  At the Closing, FNBC will execute and acknowledge (where appropriate) and deliver to BBI such items, documents and certificates necessary to carry out the terms and provisions of this Agreement, including the following (all of such actions constituting conditions precedent to the obligations of BBI to close hereunder):

(a)     The Closing Consideration, in immediately available funds;

(b)     A certificate, dated as of the Closing Date, executed by the Secretary or an Assistant Secretary of FNBC, acting in his or her capacity as an officer of FNBC, certifying (i) the due adoption by the Board of Directors of FNBC of corporate resolutions attached to such certificate authorizing the Acquisition and the execution and delivery of this Agreement and the other agreements and documents contemplated hereby and the taking of all actions contemplated hereby and thereby; (ii) the incumbency and true signatures of those officers of FNBC duly authorized to act on its behalf in connection with the Acquisition and to execute and deliver this Agreement and the other agreements and documents contemplated by this Agreement and the taking of all actions contemplated hereby and thereby on behalf of BBI, and (iii) the Bylaws of FNBC, a true, correct and complete copy of which will be attached to such certificate;

(c)     A certificate, dated as of the Closing Date, signed by the President of FNBC, acting solely in his capacity as President, certifying that: (i) all of the representations and warranties made by FNBC in ARTICLE V of this Agreement are true and correct on and as of the Closing Date as if made on such date; and (ii) FNBC has performed and complied with all of its obligations and agreements required to be performed on or before the Closing Date under this Agreement;

(d)     Evidence reasonably satisfactory to BBI that all consents and approvals required to be obtained by FNBC or First NBC Bank from third parties to complete the transactions contemplated by this Agreement have been obtained and are in full force and effect; and

(e)     All other documents, certificates and instruments required to be delivered to BBI or CPB by FNBC under this Agreement or as are reasonably requested by BBI or its counsel.

### ARTICLE IV.
### REPRESENTATIONS AND WARRANTIES OF BBI AND CPB

Except as set forth in a Confidential Schedule delivered by BBI to FNBC as provided in this Agreement, which identifies exceptions by specific paragraph references, BBI makes the following representations and warranties to FNBC as of the date of this Agreement and, together with CPB, as of the Closing Date. BBI will deliver to FNBC, as provided in Section 12.16, Confidential Schedules to this Agreement referenced in this ARTICLE IV and elsewhere in the Agreement, which will set forth exceptions, qualifications and modifications of certain designated representations and warranties. BBI will provide to FNBC at or prior to the Closing supplemental Confidential Schedules reflecting any changes to the representations and warranties set forth herein between the date of this Agreement and the Closing Date; *provided however* that the revision of such Confidential Schedules to include one or more additional exceptions, qualifications or modifications will not relieve BBI or CPB of any breach of this Agreement based on the failure to previously disclose such exception, qualification or modification.

Section 4.01     **Organization and Qualification.**

(a)     BBI is a bank holding company registered under the Bank Holding Company Act of 1956, as amended. BBI is a corporation duly organized, validly existing and in good standing under the Laws applicable to corporations located in the State of Louisiana. BBI has all requisite corporate power and authority (including all licenses, franchises, permits and other governmental authorizations as are legally required) to carry on its business as now being conducted, to own, lease and operate its properties and assets, including, but not limited to, as now owned, leased or operated, and to enter into and carry out its obligations under this Agreement and all other

agreements and documents contemplated by this Agreement. BBI is duly qualified to conduct business in all jurisdictions where its ownership or leasing of property or assets or its conduct of business requires it to be so qualified. True and complete copies of the Constituent Documents of BBI as amended to date, certified by the Secretary of BBI, have been delivered to FNBC. BBI is not in violation of any provisions of its Constituent Documents.

(b) CPB is a state bank, duly organized, validly existing and in good standing under all Laws of the State of Louisiana. CPB has all requisite corporate power and authority (including all licenses, franchises, permits and other governmental authorizations as are legally required) to carry on its business as now being conducted, to own, lease and operate its properties and assets as now owned, leased or operated and to enter into and to enter into and carry out its obligations under this Agreement and all other agreements and documents contemplated by this Agreement. CPB is duly qualified to conduct business in all jurisdictions where its ownership or leasing of property or assets or its conduct of business requires it to be so qualified. True and complete copies of the Constituent Documents of CPB, as amended to date, certified by the Cashier of CPB, have been delivered to FNBC. CPB is not in violation of any provisions of its Constituent Documents. CPB is an insured bank as defined in the FDIA and is not a member of the Federal Reserve System.

(c) Except as set forth on *Confidential Schedule 4.01*, CPB has no equity interest, direct or indirect, in any other Entity, except as acquired through settlement of indebtedness, foreclosure, the exercise of creditors' remedies or in a fiduciary capacity, and the business carried on by CPB has not been conducted through any other direct or indirect Subsidiary or Affiliate of CPB.

Section 4.02   **Capitalization**. The entire authorized capital stock of CPB is as set forth on *Confidential Schedule 4.02*. All of the issued and outstanding shares of CPB Stock have been duly authorized, are validly issued, fully paid and nonassessable, and have been issued in compliance with all applicable securities Laws, and none of such outstanding shares have been issued in violation of the preemptive rights of any Person. Except as disclosed on *Confidential Schedule 4.02*, (i) none of the capital stock of CPB is subject to preemptive rights or any other similar rights; (ii) there are no outstanding options or other equity-based awards, warrants, scrip, rights to subscribe to, calls, agreements, arrangements or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, or evidencing the right to subscribe for, purchase or receive any shares of capital stock of CPB, (iii) there are no contracts, commitments, understandings or arrangements by which CPB is or may become bound to issue additional shares of capital stock of CPB or options or other equity-based awards, warrants, scrip, rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities or rights convertible into, or exercisable or exchangeable for, or evidencing the right to subscribe for, purchase or receive any shares of capital stock of CPB; (iv) there are no material outstanding debt securities, notes, credit agreements, credit facilities or other agreements, arrangements, commitments, documents or instruments evidencing indebtedness of CPB or by which CPB is bound, other than credit agreements or facilities entered into by CPB in the ordinary course of its business; (v) there are no outstanding securities or instruments, agreements, commitments, understandings or arrangements of CPB that contain any redemption or similar provisions, and there are no contracts, commitments, understandings or arrangements by which CPB is or may become bound to sell, transfer, dispose, repurchase or redeem a security of CPB; and (vi) CPB does not have any stock appreciation rights or "phantom stock" plans or agreements or any similar plan or agreement. Except as set forth on *Confidential Schedule 4.02*, there are no shareholder agreements, voting trusts or similar agreements relating to the CPB Stock to which CPB or BBI is a party. There are no restrictions applicable to the payment of dividends on the CPB Stock, except pursuant to applicable Laws, and all dividends declared prior to the date of this Agreement on the CPB Stock have been paid. All of the

issued and outstanding shares of the capital stock of CPB are owned of record and beneficially by BBI free and clear of all Liens with respect thereto.

Section 4.03    **Compliance with Laws, Permits and Instruments**.    Except as set forth on *Confidential Schedule 4.03*, CPB (i) is in material compliance with all Laws of any Governmental Authority applicable to its businesses or operations; (ii) is not in default under or in violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by CPB under), nor has CPB received written notice of a claim that it is in default under or that it is in violation of, any material contract applicable to CPB or affecting its assets or properties (whether or not such default or violation has been waived); and (iii) is not in violation of any order of any Governmental Authority having jurisdiction over CPB or its properties or assets.

Section 4.04    **Execution and Delivery; No Conflicts**.

(a)    BBI has all requisite corporate power and authority to execute and deliver this Agreement and, subject to the receipt of all required approvals of Governmental Authorities, to perform the transactions contemplated by this Agreement.  BBI has taken all requisite corporate action necessary to authorize the execution, delivery and (provided that all required approvals of Governmental Authorities are obtained) performance of this Agreement and the other agreements and documents contemplated hereby to which it is a party.  This Agreement has been duly and validly executed and delivered to FNBC.  Assuming due authorization, execution and delivery by FNBC, this Agreement constitutes the legal, valid and binding obligation of BBI, enforceable against it in accordance with its terms and conditions, except as enforceability may be limited by the Bankruptcy Exception.

(b)    Subject to the receipt of all required approvals of Governmental Authorities, CPB has all requisite corporate power and authority to execute and deliver this Agreement and to perform the transactions contemplated by this Agreement.  Upon its joinder as a party to this Agreement, CPB will have taken all requisite corporate action necessary to authorize the execution, delivery and (provided that all required approvals of Governmental Authorities are obtained) performance of this Agreement and the other agreements and documents contemplated hereby to which it is a party.  Upon CPB's joinder as a party to this Agreement this Agreement will have been duly and validly executed and delivered by CPB to FNBC.  Assuming due authorization, execution and delivery by FNBC, this Agreement constitutes the legal, valid and binding obligation of CPB, enforceable against it in accordance with its terms and conditions, except as enforceability may be limited by the Bankruptcy Exception.

(c)    Subject to the receipt of all required consents and approvals set forth in *Confidential Schedule 4.08* and the expiration of related waiting periods, neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby, constitutes or will constitute (i) a breach or violation of any provision of the Constituent Documents of BBI or CPB; (ii) a violation of any Law applicable to BBI, CPB or any of their respective properties or assets; or (iii) a breach or violation of, a conflict with, the loss of any benefit under, a default (or an event which, with notice or the lapse of time, or both, would constitute a default) under, an event of termination or cancellation under, an event giving rise to acceleration of the performance required by or rights or obligations under, or an event resulting in the creation of any Lien upon any of the properties or assets of BBI or CPB under, any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise, license or similar authorization to which BBI or CPB is a party, or by which it or any of its properties, assets or business activities may be bound or affected.

Section 4.05    **Financial Statements**.

(a)    BBI has furnished to FNBC true and complete copies of the audited consolidated financial statements of BBI as of and for the years ended December 31, 2008, 2009 and 2010, which include balance sheets and the related statements of income, statements of cash flows and changes in shareholders' equity for each such period, and the unaudited consolidated balance sheet of BBI as of June 30, 2011 and the related unaudited consolidated statement of income for the period then ended (collectively, the "**Financial Statements**"). The Financial Statements (including the related notes) fairly present, in all material respects, the financial position of BBI, on a consolidated basis, as of the respective dates thereof and the results of operations and changes in financial position of BBI, on a consolidated basis, for the periods then ended, in conformity with GAAP, applied on a basis consistent with prior periods (subject, in the case of the unaudited financial statements, to normal year-end adjustments and the fact that they do not contain all of the footnote disclosures required by GAAP), except as otherwise noted therein, and the accounting records underlying the Financial Statements accurately and fairly reflect, in all material respects, the transactions of BBI. The Financial Statements do not contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business except as expressly specified therein.

(b)    BBI has furnished FNBC with true and complete copies of the Reports of Condition and Income of CPB as of December 31, 2009, December 31, 2010 and June 30, 2011 (each, a "**Call Report**"). Each Call Report fairly presents, in all material respects, the financial position of CPB and the results of its operations at the date and for the period indicated in that Call Report in conformity with the Instructions for the Preparation of Call Reports as promulgated by applicable regulatory authorities. None of the Call Reports contain any items of special or nonrecurring income or any other income not earned in the ordinary course of business, except as expressly specified therein. CPB has calculated its allowance for loan losses in accordance with RAP as applied to banking institutions and in accordance with all applicable rules and regulations. The allowance for loan losses account for CPB is, and as of the Closing Date will be, adequate in all material respects to provide for all loan losses, net of recoveries relating to loans previously charged off, on all outstanding loans of CPB.

Section 4.06    **Undisclosed Liabilities**. CPB has not incurred any material liability or obligation, accrued, absolute, contingent or otherwise and whether due or to become due (including, without limitation, unfunded obligations under any Employee Plan or liabilities for federal, state or local taxes or assessments or liabilities under any tax sharing agreements between BBI and CPB), that is not reflected in or disclosed in the Financial Statements or the Call Reports, except (a) those liabilities and expenses incurred in the ordinary course of business and consistent with prudent business practices since the date of the Financial Statements or the Call Reports, respectively or (b) as disclosed on *Confidential Schedule 4.06*.

Section 4.07    **Litigation**. Except as set forth on *Confidential Schedule 4.07*, no Action is pending or, to the knowledge of BBI, threatened against or affecting BBI or CPB (and BBI is not aware of any basis for any such Action) that, individually or in the aggregate, (A) is material to BBI or CPB, (B) is reasonably likely to prevent or delay BBI or CPB in any material respect from performing its obligations under, or consummating the transactions contemplated by, this Agreement, (C) adversely affects or challenges the legality, validity or enforceability of this Agreement or the transactions contemplated hereby. Neither CPB, nor any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities Laws or a claim of breach of fiduciary duty. There are no outstanding orders, judgments, injunctions, awards or decrees of any Governmental Authority against CPB or any executive officers or directors of CPB in their capacities

as such. The amounts in controversy in each claim disclosed on *Confidential Schedule 4.07*, and the costs and expenses of the defense thereof (including attorneys' fees) are fully covered by insurance, subject to the deductibles and policy limits set forth on *Confidential Schedule 4.07*.

Section 4.08 **Consents and Approvals**. Except as disclosed in *Confidential Schedule 4.08*, no approval, consent, order or authorization of, or registration, declaration or filing with, any Governmental Authority or other third party is required on the part of BBI or CPB in connection with the execution, delivery or performance of this Agreement or the agreements contemplated hereby, or the completion by BBI and CPB of the transactions contemplated hereby or thereby.

Section 4.09 **Title to Assets; Real Property**. *Confidential Schedule 4.09* sets forth a list of all existing deeds, leases and title insurance policies for all real property owned or leased by CPB, including all other real estate, and all mortgages, deeds of trust, security agreements and other documents describing encumbrances to which such property is subject, true and complete copies of which have been made available to FNBC. CPB has good and marketable title to, or valid leasehold interest in, all of its assets and properties, and such assets and properties, other than assets and properties in which CPB has a leasehold interest, are owned free and clear of all Liens, except (A) as noted in the Financial Statements or the Call Reports or as set forth in the documents delivered to FNBC pursuant to this Section 4.09, (B) statutory liens not yet delinquent, (C) consensual landlord liens, (D) minor defects and irregularities in title and encumbrances that do not materially impair the use thereof for the purpose for which they are held, (E) pledges of assets in the ordinary course of business to secure public funds deposits, and (F) those assets and properties disposed of for fair value in the ordinary course of business since the dates of the most recent Financial Statement or Call Report. CPB has complied in all material respects with the terms of all leases to which it is a party, and (i) each such lease is in full force and effect; (ii) all rents and other monetary amounts that have become due and payable thereunder have been paid; (iii) there exists no default or event, occurrence, condition or act, which with the giving of notice, the lapse of time or both would become a default under such lease; and (iv) none of the transactions contemplated by this Agreement will constitute a default or a cause for termination or modification of such lease. None of the owned or leased premises or properties of CPB is subject to any current or potential interests of third parties or other restrictions or limitations that would impair or be inconsistent in any material respect with the current use of such property by CPB.

Section 4.10 **Absence of Certain Changes or Events**. Except as disclosed on *Confidential Schedule 4.11*, since December 31, 2010, CPB has conducted its business only in the ordinary course and has not:

(a) Incurred any obligation or liability, absolute, accrued, contingent or otherwise, whether due or to become due, other than in the ordinary course of business and consistent with past practices and safe and sound banking practices;

(b) Discharged or satisfied any Lien or paid any obligation or liability, whether absolute or contingent, due or to become due, other than in the ordinary course of business and consistent with past practices and safe and sound banking practices;

(c) Declared or made any payment of dividends or other distribution to its shareholders, or purchased, retired or redeemed, or obligated itself to purchase, retire or redeem, any of its shares of capital stock or other securities;

(d) Issued, reserved for issuance, granted, sold or authorized the issuance of any shares of its capital stock or other securities or subscriptions, options, warrants, calls, rights or commitments of any kind relating to the issuance thereto;

(e)     Acquired any capital stock or other equity securities or acquired any ownership interest in any Entity (except (i) through settlement of indebtedness, foreclosure, or the exercise of creditors' remedies or (ii) in a fiduciary capacity, the ownership of which does not expose it to any liability from the business, operations or liabilities of such Person);

(f)     Mortgaged, pledged or subjected to Lien any of its property, business or assets, tangible or intangible except (i) statutory liens not yet delinquent, (ii) consensual landlord liens, (iii) minor defects and irregularities in title and encumbrances that do not materially impair the use thereof for the purpose for which they are held, (iv) pledges of assets to secure public funds deposits, and (v) those assets and properties disposed of for fair value since the date of the most recent Call Report;

(g)     Sold, transferred, leased to others or otherwise disposed of any of its assets (except for assets disposed of for fair value) or canceled or compromised any debt or claim, or waived or released any right or claim of material value;

(h)     Terminated, canceled or surrendered, or received any notice of or threat of termination or cancellation of any contract, lease or other agreement or suffered any damage, destruction or loss which, individually or in the aggregate, may reasonably constitute a Material Adverse Change;

(i)     Disposed of, permitted to lapse, transferred or granted any rights under, or entered into any settlement regarding the breach or infringement of, any license or Intellectual Property or modified any existing rights with respect thereto;

(j)     Made any change in the rate of compensation, commission, bonus, vesting or other direct or indirect remuneration payable, or paid or agreed or orally promised to pay any bonus, extra compensation, pension or severance or vacation pay, to or for the benefit of any of its shareholders, directors, officers, employees or agents, or entered into any employment or consulting contract or other agreement with any director, officer or employee or adopted, amended in any material respect or terminated any pension, employee welfare, retirement, stock purchase, stock option, stock appreciation rights, termination, severance, income protection, golden parachute, savings or profit-sharing plan (including trust agreements and insurance contracts embodying such plans), any deferred compensation, or collective bargaining agreement, any group insurance contract or any other incentive, welfare or employee benefit plan or agreement maintained by it for the benefit of its directors, employees or former employees;

(k)     Except for improvements or betterments relating to Properties, made any capital expenditures or capital additions or betterments in excess of an aggregate of $10,000;

(l)     Instituted, had instituted against it, settled or agreed to settle any Action before any Governmental Authority relating to its property other than routine collection suits instituted by it to collect amounts owed or suits in which the amount in controversy is less than $10,000;

(m)     Except for the transactions contemplated by this Agreement or as otherwise permitted hereunder, entered into any transaction, or entered into, modified or amended any contract or commitment, other than in the ordinary course of business and consistent with past business practices and prudent banking practices;

(n)     Entered into or given any promise, assurance or guarantee of the payment, discharge or fulfillment of any undertaking or promise made by any Person, other than in the

ordinary course of business and consistent with past business practices and prudent banking practices;

(o)     Sold, disposed of, or otherwise divested itself of the ownership, possession, custody or control, of any corporate books or records of any nature that, in accordance with sound business practice, normally are retained for a period of time after their use, creation or receipt, except at the end of the normal retention period;

(p)     Made any, or acquiesced with any, change in any accounting methods, principles or material practices except as required by GAAP or RAP;

(q)     Sold (provided, however, that payment at maturity is not deemed a sale) or purchased any investment securities having an aggregate principal amount of $250,000 or more;

(r)     Made, renewed, extended the maturity of, or altered any of the material terms of any loan to any single borrower and his related interests in excess of the principal amount of $250,000; or

(s)     Entered into any agreement or made any commitment whether in writing or otherwise to take any of the types of action described in subsections (a) through (r) above.

Section 4.11     **Leases, Contracts and Agreements**.     *Confidential Schedule 4.11* sets forth a complete listing, as of June 30, 2011, of all leases, subleases, licenses, contracts and agreements to which either BBI or CPB is a party (the "**Contracts**") that involve payments to or by BBI or CPB of $25,000 or more during the term thereof. True and correct copies of all such Contracts, and all amendments thereto, have been made available to FNBC. For the purposes of this Agreement, the term "Contracts" does not include (i) loans made by, (ii) unfunded loan commitments of $25,000 or less made by, (iii) letters of credit issued by, (iv) loan participations of, (v) Federal funds sold or purchased by, (vi) repurchase agreements made by, (vii) spot foreign exchange transactions of, (viii) bankers acceptances of or (ix) deposit liabilities of, CPB. Except as set forth in *Confidential Schedule 4.11*, no participations or loans have been sold that have buy back, recourse or guaranty provisions that create contingent or direct liability to CPB. Each Contract to which CPB is a party is valid and binding on CPB and in full force and effect (other than due to the ordinary expiration of the term thereof), and, to BBI's knowledge, is valid and binding on the other parties thereto. CPB (and, to its knowledge, each other party thereto) has in all material respects performed all obligations required to be performed by it to date under each Contract. To BBI's knowledge, no other party to the Contracts is in breach, violation or default of any such Contract, and no event has occurred which with notice or lapse of time or both would constitute a breach, violation or default by any such other party to any such Contract. No power of attorney or similar authorization given directly or indirectly by CPB is currently outstanding.

Section 4.12     **Taxes**.

(a)     BBI and CPB have duly and timely filed all Tax Returns that they were required to file under applicable Laws with the appropriate Federal, state, local or foreign governmental agencies. All such Tax Returns were true, correct and complete in all material respects and have been prepared in substantial compliance with all applicable Laws. All Taxes due and owing by BBI or CPB (whether or not shown on any Tax Return) have been paid. Neither BBI nor CPB currently is the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where BBI or CPB does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Liens for Taxes (other than Taxes not yet due and payable) upon any of the assets of BBI or CPB.

(b)     BBI and CPB have withheld and paid all Taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, shareholder, or other third party, and all Forms W-2 and 1099 required with respect thereto have been properly completed and timely filed.

(c)     There is no material dispute or claim concerning any Tax liability of BBI or CPB either (i) claimed or raised by any authority in writing, or (ii) as to which any director or officer (or employee responsible for Tax matters) of BBI or CPB has knowledge based upon personal contact with any agent of such authority. Within the past 3 years, the IRS has not challenged the interest deduction on any of BBI's debt on the basis that such debt constitutes equity for federal income tax purposes.

(d)     *Confidential Schedule 4.12(d)* lists all federal, state, local, and foreign Tax Returns filed with respect to BBI or CPB for taxable periods ended on or after December 31, 2005, indicates those Tax Returns that have been audited, and indicates those Tax Returns that currently are the subject of audit. True and complete copies of the Federal income Tax Returns of BBI, as filed with the IRS for the years ended December 31, 2008, 2009, and 2010 have been delivered to FNBC. Neither BBI nor CPB has waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(e)     Neither BBI nor CPB has been a United States real property holding corporation within the meaning of the §897(c)(2) of the Internal Revenue Code of 1986, as amended ("**Code**"), during the applicable period specified in Code §897(c)(1)(A)(ii). Neither BBI nor CPB is a party to or bound by any tax allocation or sharing agreement, other than those to which only BBI or CPB are parties. Each of BBI and CPB has disclosed on their Federal income Tax Returns all positions taken therein that could give rise to substantial understatement of federal income Tax within the meaning of Code § 6662.

(f)     Neither BBI nor CPB (i) has been a member of a group filing a consolidated federal income tax return (other than a group the common parent of which was BBI) or (ii) has any liability for the Taxes of any Person other than BBI or CPB) under Treasury Regulation § 1.1502-6 (or any similar provision of state, local, or foreign Law), as a transferee or successor, by contract or otherwise.

(g)     The unpaid Taxes of BBI and CPB (i) did not exceed the provisions for current or deferred Taxes on the Financial Statements (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income) and (ii) will not exceed the provisions for current or deferred Taxes on the Financial Statements as of the Closing Date (excluding any reserve for deferred Taxes established to reflect timing differences between book and Tax income). Each of BBI and CPB is in compliance with the requirements of FIN 48, and their Tax accrual work papers explain and support all amounts provided and positions taken by BBI and CPB with respect to FIN 48.

(h)     Neither BBI nor CPB are required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any (i) change in method of accounting for a taxable period ending on or before the Closing Date; (ii) "closing agreement" as described in Code § 7121 (or any corresponding or similar provision of state, local, or foreign Tax Law) executed on or before the Closing Date; (iii) intercompany transactions or any excess loss account described in Treasury Regulations under Code § 1502 (or any corresponding or similar provision of state, local, or foreign Tax Law); (iv) installment sale or open transaction disposition made on or before the

Closing Date; (v) prepaid amount received on or before the Closing Date; or (vi) election under Code §108(i). Neither BBI nor CPB is a party to any agreement, contract, arrangement or plan that has resulted or would result, separately or in the aggregate, in the payment of any amount that will not be fully deductible as a result of Code § 162(m) (or any corresponding provision of Louisiana Tax Law or Tax Laws issued by jurisdictions within the State of Louisiana).

(i)     Neither BBI nor CPB has been a party to any "listed transaction" as such term is defined in Code § 6707A(c)(2) and Treasury Regulation § 1.6011-4(b)(2). Each of BBI and CPB have properly reported all "reportable transactions" as defined in Code § 6707A(c)(1) and Treasury Regulation § 1.6011-4(b) on its Federal income Tax Returns.

(j)     Neither BBI nor CPB has distributed stock of another Person or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355 or §361.

(k)     *Confidential Schedule 4.12(k)* lists and contains an accurate and complete description as to the United States federal net operating and capital loss carryforwards for CPB (including the year of origination of such carryforwards and whether any limitations of such net operating or capital loss carryforwards under Code Sections 382, 383 or 384 or the Treasury Regulations apply to the use of such carryforwards and, if so, the amount of such limitation) as of December 31, 2010, and the expiration dates thereof.

Section 4.13   **Insurance.** *Confidential Schedule 4.13* sets forth an accurate and complete list of all policies of insurance, including fidelity and bond insurance, relating to BBI and CPB. All such policies (i) are sufficient for compliance by BBI and CPB with all requirements of Law and all agreements to which BBI or CPB, (ii) are valid, outstanding and enforceable according to their terms, except as may be limited by the Bankruptcy Exception, (iii) will not in any significant respect be affected by, and will not terminate or lapse by reason of, the transactions contemplated by this Agreement, and (iv) are presently in full force and effect, no notice has been received of the cancellation, or threatened or proposed cancellation, of any such policy and there are no unpaid premiums due thereon. Neither BBI nor CPB is in default with respect to the provisions of any such policy and neither has failed to give any notice or present any claim thereunder in a due and timely fashion. Each property of CPB is insured for in amounts deemed adequate by CPB's management against risks customarily insured against. Except as set forth in *Confidential Schedule 4.13*, there have been no claims under any fidelity bonds of CPB within the last three (3) years, and BBI has no knowledge of any facts that would form the basis of a claim under such bonds. Each material property of each of BBI and CPB is insured for the benefit of BBI and CPB, respectively, in amounts deemed adequate by management of BBI and CPB, respectively, against risks customarily insured against. Neither BBI nor CPB has been refused any insurance with respect to its assets or operations, not has its insurance been limited by any insurance carrier to which BBI or CPB has applied for insurance within the last two (2) years.

Section 4.14   **No Material Adverse Change.** There has not been any Material Adverse Change since December 31, 2010, nor has any event or condition occurred that has resulted in, or has a reasonable possibility of resulting in the future, in a Material Adverse Change.

Section 4.15   **Intellectual Property; Privacy.** CPB owns, possesses, licenses or has other rights to use all foreign and domestic patents, patent applications, trade and service marks, trade and service mark registrations, brand names, trade names, copyrights, designs, inventions, trade secrets, technology, Internet domain names, know-how and other intellectual property (collectively, the "**Intellectual Property**"), free and clear of all Liens and third party rights, necessary for the conduct of their respective businesses as currently conducted. Except where such violations, misappropriations,

infringements or unauthorized use would not be material to CPB, (i) there are no rights of third parties to any such Intellectual Property; (ii) there is no infringement, misappropriation or unauthorized use by third parties of any such Intellectual Property; (iii) there is no pending or threatened Action by any Person challenging CPB's rights in or to any such Intellectual Property; (iv) there is no pending or threatened Action by any Person challenging the validity or scope of any such Intellectual Property; and (v) there is no pending or threatened Action by any Person that CPB infringes, misappropriates or otherwise violates any Intellectual Property of any other Person. CPB complies in all material respects with all Laws with respect to the protection of personal privacy, personally identifiable information, sensitive personal information and any special categories of personal information regulated thereunder.

Section 4.16 **Transactions with Certain Persons and Entities.** Except as disclosed in *Confidential Schedule 4.16* and excluding deposit liabilities, (i) there are no outstanding amounts payable to or receivable from, or advances by CPB to, and CPB is not otherwise a creditor to, any director or executive officer of BBI or CPB nor is CPB a debtor to any such Person other than as part of the normal and customary terms of such Person's employment or service as a director for CPB, (ii) CPB does not use any asset owned by any shareholder or any present or former director or officer of BBI or CPB, or any Affiliate thereof, in the operations (other than personal belongings of such officers and directors located in CPB's premises, the removal of which would not result in a Material Adverse Change), nor do any of such persons own or have the right to use real property that is adjacent to property on which CPB's facilities are located, and (iii) CPB is not a party to any other transaction or agreement with any director or executive officer of BBI or CPB.

Section 4.17 **Evidences of Indebtedness**.

(a)     Except as set forth on *Confidential Schedule 4.17,* all loans and leases that are reflected as assets of CPB (i) have been made for good, valuable and adequate consideration in the ordinary course of business; (ii) are evidenced by notes, agreements or other evidences of indebtedness that are true, genuine and what they purport to be; (iii) to the extent secured, have been secured by valid Liens and security interests that have been perfected; (iv) are not subject to any known or threatened defenses, offsets or counterclaims that may be asserted against CPB or the present holder thereof; and (v) are enforceable in accordance with their respective terms, except as enforceability may be limited by the Bankruptcy Exception. The credit files of CPB contain all material information (excluding general, local or national industry, economic or similar conditions) known to CPB that is reasonably required to evaluate in accordance with generally prevailing practices in the banking industry the collectibility of the loan portfolio of CPB (including loans that will be outstanding if any of them advances funds they are obligated to advance). CPB has disclosed to FNBC all of the substandard, doubtful, loss, nonperforming or problem loans on its most recent internal watch list (not earlier than June 30, 2011) or that have been adversely classified by the OFI or the FDIC, a copy of which list has been provided to FNBC.

(b)     CPB is not a party to any written or oral loan agreement, note or borrowing arrangement, including any loan guaranty, (i) with any director, executive officer or ten percent shareholder of BBI or CPB or any Person controlling, controlled by or under common control with any of the foregoing, except as specifically indicated in *Confidential Schedule 4.17*, or (ii) which is in violation of any Law, regulation or rule of any Governmental Authority.

(c)     The other real estate reflected on the Financial Statements and Call Reports are carried at the lower of cost or fair value, and adequate reserves have been established for possible subsequent valuation of adjustments. Loans in which CPB has more exposure to the risk of

ownership of the collateral than does the borrower are accounted for in the same manner as properties acquired through foreclosure.

(d)     With respect to any loan or other evidence of indebtedness all or a portion of which has been sold to or guaranteed by any Governmental Authority, including the Small Business Administration, each of such loans was made in material compliance and conformity with all relevant Laws and procedures that such Governmental Authority's guaranty of such loan is effective during the term of such loan in all material respects.

Section 4.18     **Condition of Assets**.  All tangible assets used by CPB are in good operating condition, ordinary wear and tear excepted, and conform with all applicable ordinances, regulations, zoning and other Laws, whether Federal, state or local.  None of CPB's premises or equipment are in need of maintenance or repairs other than ordinary routine maintenance and repairs that are not material in nature or cost.

Section 4.19     **Environmental Compliance**.

(a)     To the best of its knowledge, information and belief, CPB, and its operations and Properties, are in compliance with all Environmental Laws.  BBI is not aware of, and neither CPB nor BBI has received notice of, any past, present, or future conditions, events, activities, practices or incidents that may interfere with or prevent CPB's compliance with all Environmental Laws.

(b)     CPB has obtained all permits, licenses and authorizations that are required by it under all Environmental Laws.

(c)     No Hazardous Materials exist on, about or within any of the Properties, nor have any Hazardous Materials previously existed on, about or within or been used, generated, stored, transported, disposed of, on or released from any of the Properties.  The use that CPB makes and intends to make of the Properties will not result in the use, generation, storage, transportation, accumulation, disposal or release of any Hazardous Material on, in or from any of the Properties.

(d)     There is no Action before any Governmental Authority pending or, to the knowledge of BBI or CPB, threatened against CPB relating in any way to any Environmental Law.  CPB has no liability for remedial action under any Environmental Law.  CPB has not received any request for information by any Governmental Authority or other Person with respect to the condition, use or operation of any of the Properties nor has CPB received any notice of any kind from any Governmental Authority or other Person with respect to any violation of or claimed or potential liability of any kind under any Environmental Law.

(e)     *Confidential Schedule 4.19(e)* identifies all environmental reports, audits or assessments, or occupational health studies, that relate to properties or facilities now or formerly leased, owned or operated by CPB undertaken by governmental agencies or other parties, or by CPB, or by any of its lenders, agents, independent contractors or representatives.  BBI has delivered to FNBC true and complete copies of each such document and each environmental license, certificate or permit.

Section 4.20     **Regulatory Compliance**.  All reports, records, registrations, statements, notices and other documents or information required to be filed by CPB with any Regulatory Authority, including the OFI and the FDIC, have been duly and timely filed and all information and data contained in such reports, records or other documents are true, accurate, correct and complete in all material respects.  Except as disclosed on *Confidential Schedule 4.20*, CPB (i) is not subject to any cease-and-desist or other

similar order or enforcement action issued by, (ii) is not a party to any written agreement, consent agreement or memorandum of understanding with, (iii) is not a party to any commitment letter or similar undertaking to, (iv) is not subject to any capital directive by, and (v) has not adopted any board resolutions at the request of, any Governmental Authority that currently restricts in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its liquidity and funding policies and practices, its ability to pay dividends, its credit, risk management or compliance policies, its internal controls, its management or its operations or business (each item in this sentence, a "**Regulatory Agreement**"), nor has CPB been advised since January 1, 2011 by any Governmental Authority that it is considering issuing, initiating, ordering, or requesting any such Regulatory Agreement. CPB is in compliance in all material respects with each Regulatory Agreement to which it is party or subject, and CPB has not received any notice from any Governmental Authority indicating that CPB is not in compliance in all material respects with any such Regulatory Agreement.

Section 4.21    **Absence of Certain Business Practices**. Neither CPB nor any officer, employee or agent of CPB, or any other Person acting on their behalf, has, directly or indirectly, within the past ten (10) years, given or agreed to give any gift or similar benefit to any customer, supplier, governmental employee or other Person who is or may be in a position to help or hinder the business of CPB (or assist CPB in connection with any actual or proposed transaction) that (a) might subject CPB to any damage or penalty in any civil, criminal or governmental litigation or proceeding, (b) if not given in the past, might have resulted in a Material Adverse Change or (c) if not continued in the future might result in a Material Adverse Change or might subject CPB to suit or penalty in any private or governmental litigation or proceeding.

Section 4.22    **Books and Records**. The minute books, stock certificate books and stock transfer ledgers of CPB have been kept accurately in the ordinary course of business and are complete and correct in all material respects; the transactions entered therein represent bona fide transactions; and there have been no transactions involving the business of CPB that properly should have been set forth therein and that have not been accurately so set forth. The minute books, stock certificate books and stock transfer ledgers of CPB have been made available for inspection by FNBC.

Section 4.23    **Forms of Instruments, Etc.** BBI has made, and will make, available to FNBC copies of all standard forms of notes, mortgages, deeds of trust and other routine documents of a like nature used on a regular and recurring basis by CPB in the ordinary course of its business.

Section 4.24    **Fiduciary Responsibilities**. CPB has properly administered all accounts for which it acts as a fiduciary, including accounts for which it serves as a trustee, agent, custodian, personal representative, guardian, conservator or investment advisor, in accordance with the terms of the governing documents, applicable federal and state Law and regulation and common law. Neither CPB, nor any director, officer or employee of CPB, in any material respect, committed any breach of trust or fiduciary duty with respect to any such fiduciary account and the accountings for each such fiduciary account are true and correct in all material respects and accurately reflect the assets of such fiduciary account.

Section 4.25    **Guaranties**. Except for items in the process of collection in the ordinary course of CPB's business, none of the obligations or liabilities of CPB are guaranteed by any other Person, nor, except in the ordinary course of business, according to prudent business practices and in compliance with applicable Law, has CPB guaranteed the obligations or liabilities of any other Person.

Section 4.26    **Employment Matters**. No strike, grievance, or labor dispute exists or, to the knowledge of BBI, is threatened with respect to any of the employees of CPB. CPB is not a party to any collective bargaining agreement or does not employ any member of a union that relates to such employee's relationship with CPB and, to BBI's knowledge, there is no activity involving its employees

seeking to certify a collective bargaining unit or engaging in other organizational activity. To BBI's knowledge, no executive officer is, or is now expected to be, in violation of any material term of any employment contract, confidentiality, disclosure or proprietary information agreement or non-competition agreement, or any other contract or agreement or any restrictive covenant in favor of a third party, and the continued employment of each such executive officer does not subject CPB to any material liability with respect to any of the foregoing matters. CPB is in compliance in all material respects with all U.S. federal, state, local and foreign Laws and regulations relating to employment and fair employment practices, immigration, terms and conditions of employment, compensation, benefits, employment discrimination and harassment, workers compensation, occupational safety and health, and wages and hours. CPB is not a party to or otherwise bound by any consent decree with or citation by any Governmental Authority relating to employees or employment practices. As of the date of this Agreement, no material employee has given notice to CPB of his or her intent to terminate his or her employment or service relationship with CPB. CPB is in material compliance with all Laws concerning the classification of employees and independent contractors and have properly classified all such individuals for purposes of participation in employee benefit plans.

Section 4.27    **Employee Benefit Plans**.

(a)    Set forth on *Confidential Schedule 4.27(a)* is a complete and correct list of all "employee benefit plans" (as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA")), all "multi-employer plans" and "multiple employer" (as defined in ERISA and the Code), all specified fringe benefit plans as defined in Code § 6039D, and all other bonus, incentive, compensation, deferred compensation, profit sharing, stock option, phantom stock, stock appreciation right, stock bonus, stock purchase, employee stock ownership, savings, severance, supplemental unemployment, layoff, salary continuation, retirement, pension, health, life insurance, disability, group insurance, vacation, holiday, sick leave, fringe benefit or welfare plan or any other similar plan, agreement, policy or understanding (qualified or nonqualified, currently effective or terminated), and any trust, escrow or other agreement related thereto, which (i) have been sponsored, maintained or contributed to by CPB, or with respect to which CPB has or has had any liability during the last 6 years, and (ii) provide benefits, or describe policies or procedures applicable to, or for the welfare of, any officer, director, independent contractor, employee, service provider, former officer or former employee of CPB, or the dependents, spouses or beneficiaries of any such Person, regardless of whether funded (the "**Employee Plans**"). True, accurate and complete copies of the documents comprising each Employee Plan, including each trust, funding arrangements (including all annuity contracts, insurance contracts, and other funding instruments, summary plan descriptions and summaries of material modifications), the most current determination letter issued by the IRS, Form 5500 Annual Reports for the three most recent plan years, documents, records, policies, procedures or other materials related thereto, have been delivered to FNBC and are included and specifically identified in *Confidential Schedule 4.27(a)*. No unwritten amendment exists with respect to any Employee Plan.

(b)    No Employee Plan is a defined benefit plan within the meaning of ERISA § 3(35) or is otherwise subject to ERISA Title IV, and neither BBI nor CPB has ever sponsored or otherwise maintained such a plan or any plan subject to the minimum funding standards of Section 412 of the Code or Section 302 or ERISA.

(c)    There have been no prohibited transactions (as defined in Code § 4975(c)(1)), breaches of fiduciary duty or any other breaches or violations of any Law applicable to the Employee Plans that would subject CPB or any Employee Plan to any taxes, penalties, or other liabilities (including liability arising through indemnification). Each Employee Plan that is

represented to be qualified under Code § 401(a) has a favorable determination letter that covers all existing amendments at least up to and including GUST and has no obligation to adopt any amendments for which the remedial amendment period under Code § 401(b) has expired and BBI is not aware of any circumstances likely to result in revocation of any such favorable determination letter. Each such Employee Plan is so qualified and has been operated in compliance with applicable Law and its terms, any related trust is exempt from federal income tax under Code § 501(a) and no event has occurred that will or reasonably could result in the loss of such tax exemption or to liability for any tax under Code § 511. Except as disclosed on *Confidential Schedule 4.27(c)*, no Employee Plan holds any stock or other securities of CPB. There are no pending claims, lawsuits or actions relating to any Employee Plan (other than ordinary course claims for benefits) and, to BBI's knowledge, none are threatened. CPB does not provide benefits to any employee or dependent of such employee after the employee terminates employment other than as disclosed in this Agreement or any schedule hereto or as required by Law. No written or oral representations have been made to any employee or former employee of CPB promising or guaranteeing any employer payment or funding for the continuation of medical, dental, life or disability coverage or any other welfare benefit (as defined in ERISA § 3(1)) for any period of time beyond the employee's termination of employment with CPB (except to the extent of coverage required under Code § 4980B). Compliance with FAS 106 would not create any material change to the Financial Statements. The completion of the transactions contemplated by this Agreement will not cause a termination or partial termination, or otherwise accelerate the time of payment, exercise, or vesting, or increase the amount of compensation due to any employee, officer, former employee or former officer of BBI or CPB except (i) as required in connection with qualified plan amendments required by tax Law changes, (ii) as contemplated by this Agreement, or (iii) except as identified on *Confidential Schedule 4.27(c)*. There are no surrender charges, penalties, or other costs or fees that would be imposed by any Person against CPB, an Employee Plan, or any other Person, including an Employee Plan participant or beneficiary, as a result of the hypothetical liquidation as of the Closing Date of any insurance, annuity, or investment contracts or any other similar investment held by any Employee Plan.

(d)     No participant or beneficiary or non-participating employee has been denied any benefit due or to become due under any Employee Plan, and CPB has not misled any Person as to his or her rights under any Employee Plan or failed to disclose any information or provide any documents required to be disclosed or provided. All obligations required to be performed by CPB under any Employee Plan have been performed in all material respects and CPB is not in default under or in violation of any provision of any Employee Plan. To the knowledge of BBI and CPB, no event has occurred that would constitute grounds for an enforcement action by any party against CPB under part 5 of Title I of ERISA under any Employee Plan.

(e)     With respect to each "employee benefit plan" (as defined in ERISA) maintained or contributed to or required to be contributed to, currently or in the past, by BBI or CPB or any corporation or trade or business required to be treated as a single employer with BBI or CPB under any of the rules contained in ERISA or Code § 414 ("**Controlled Group Plans**"):

(i)     All Controlled Group Plans that are "group health plans" (as defined in Code § 5000(b)(1) and ERISA § 733(a)) have been operated up to the Closing in a manner so as to not subject CPB to any material liability under Code § 4980B or § 4980D;

(ii)     There is no Controlled Group Plan that is a defined benefit plan (as defined in ERISA § 3(35)) or a plan subject to the minimum funding requirements of

Section 412 of the Code or Section 302 of ERISA, nor has there been in the last 6 years; and

      (iii)    There is no Controlled Group Plan that is a "multiple employer plan" or "multi employer plan" (as either such term is defined in ERISA), nor has there been in the last 6 years.

Each such Controlled Group Plan is included in the listing of Employee Plans on *Confidential Schedule 4.27(a)*.

      (f)    Except as set forth on *Confidential Schedule 4.27(f)*, all Employee Plan documents, annual reports or returns, audited or unaudited financial statements, actuarial valuations, summary annual reports, and summary plan descriptions issued with respect to the Employee Plans are correct, complete, and current in all material respects, have been timely filed.

      (g)    No Employee Plan is invested in or provides the opportunity for the purchase of any employer security (within the meaning of ERISA § 407(d)).

      (h)    Except as set forth on *Confidential Schedule 4.27(h)*, neither BBI nor CPB maintains any Employee Plan that is a "nonqualified deferred compensation plan" within the meaning of Code §409A(d)(1) of the Code.

      (i)    CPB may withdraw at any time from any Employee Plan to which it contributes (but does not sponsor or maintain), including any such plan sponsored or maintained by BBI, without incurring liability except for unpaid premiums or contributions due for the pay period that includes the date of withdrawal or termination.

Section 4.28    **Obligations to Employees.**  All accrued obligations and liabilities of and all payments by CPB, and all Employee Plans, whether arising by operation of Law, by contract or by past custom, for payments to trusts or other funds, to any government agency or authority or to any present or former director, officer, employee or agent (or his or her heirs, legatees or legal representatives) have been and are being paid to the extent required by applicable Law or by the plan, trust, contract or past custom or practice, and adequate actuarial accruals and reserves for such payments have been and are being made by CPB according to GAAP and applicable Law applied on a consistent basis and actuarial methods with respect to: (a) withholding taxes, unemployment compensation or social security benefits; (b) all pension, profit-sharing, savings, stock purchase, stock bonus, stock ownership, stock option, phantom stock and stock appreciation rights plans and agreements; (c) all employment, deferred compensation (whether funded or unfunded), salary continuation, consulting, retirement, early retirement, severance, reimbursement, bonus or collective bargaining plans and agreements; (d) all executive and other incentive compensation plans, programs, or agreements; (e) all group insurance and health contracts, policies and plans; and (f) all other incentive, welfare (including vacation and sick pay), retirement or employee benefit plans or agreements maintained or sponsored, participated in, or contributed to by CPB for its current or former directors, officers, employees and agents. All obligations and liabilities of CPB for all other forms of compensation that are or may be payable to their current or former directors, officers, employees or agents, or pursuant to any Employee Plan, have been and are being paid to the extent required by applicable Law or by the plan or contract, and adequate actuarial accruals and reserves for payment therefor have been and are being made by CPB according to GAAP and generally accepted actuarial principles applied on a consistent basis. All accruals and reserves referred to in this Section are correctly and accurately reflected and accounted for in all material respects in the Financial Statements and the books, statements and records of CPB.

Section 4.29    **Interest Rate Risk Management Instruments**.  All interest rate swaps, caps, floors and option agreements and other interest rate risk management arrangements, whether entered into for the account of CPB or for the account of a customer of CPB, were entered into in the ordinary course of business and in accordance with prudent banking practice and applicable rules, regulations and policies of any regulatory authority and with counterparties believed to be financially responsible at the time and are legal, valid and binding obligations of CPB, enforceable according to their terms, subject to the Bankruptcy Exception.  CPB has duly performed in all material respects all of its obligations under such arrangements to the extent that such obligations to perform have accrued, and there are no material breaches, violations or defaults or allegations or assertions of such by any party thereunder.

Section 4.30   **Internal Controls**.  BBI and CPB maintains accurate books and records reflecting its assets and liabilities and maintains proper and adequate internal accounting controls that provide assurance that (i) transactions are executed with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of the Financial Statements and Call Reports in accordance with GAAP (and RAP) and to maintain asset and liability accountability; (iii) access to CPB's assets and incurrence of CPB's liabilities are permitted only in accordance with management's specific or general authorizations; (iv) the recorded accountability for assets and liabilities is compared with the existing assets and liabilities at reasonable intervals and appropriate action is taken with respect to any difference; and (v) extensions of credit and other receivables are recorded accurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis.  None of CPB's systems, controls, data or information are recorded, stored, maintained, operated or otherwise wholly or partly dependent on or held by any means (including any electronic, mechanical or photographic process, whether computerized or not) which (including all means of access thereto and therefrom) are not under the exclusive ownership and direct control of BBI, CPB or their accountants, except as would not reasonably be expected to have a materially adverse effect on the system of internal accounting controls described in the preceding sentence.  Neither BBI nor CPB has been advised of any material deficiencies in the design or operation of internal controls over financial reporting which could reasonably be expected to adversely affect its ability to record, process, summarize and report financial data, or any fraud, whether or not material, that involves management.  Since January 1, 2010, no material weakness in internal controls has been identified by BBI's auditors, and there have been no significant changes in internal controls that could reasonably be expected to materially and adversely affect internal controls.

Section 4.31   **Mortgage Banking Business**.

(a)    CPB has complied with, and all documentation in connection with the origination, processing, underwriting and credit approval of any mortgage loan originated, purchased or serviced by CPB satisfied, (A) all applicable federal, state and local Laws, rules and regulations with respect to the origination, insuring, purchase, sale, pooling, servicing, subservicing, or filing of claims in connection with mortgage loans, including all Laws relating to real estate settlement procedures, consumer credit protection, truth in lending Laws, usury limitations, fair housing, transfers of servicing, collection practices, equal credit opportunity and adjustable rate mortgages, (B) the responsibilities and obligations relating to mortgage loans set forth in any agreement between CPB and any Agency, Loan Investor or Insurer, (C) the applicable rules, regulations, guidelines, handbooks and other requirements of any Agency, Loan Investor or Insurer and (D) the terms and provisions of any mortgage or other collateral documents and other loan documents with respect to each mortgage loan; and

(b)    No Agency, Loan Investor or Insurer has (A) claimed in writing that CPB has violated or has not complied with the applicable underwriting standards with respect to mortgage loans sold by CPB to a Loan Investor or Agency, or with respect to any sale of mortgage

servicing rights to a Loan Investor, (B) imposed in writing restrictions on the activities (including commitment authority) of CPB or (C) indicated in writing to CPB that it has terminated or intends to terminate its relationship with CPB for poor performance, poor loan quality or concern with respect to CPB's compliance with Laws.

(c)     For purposes of this Section 4.31: (A) "**Agency**" means the Federal Housing Administration, the Federal Home Loan Mortgage Corporation, the Farmers Home Administration (now known as Rural Housing and Community Development Services), the Federal National Mortgage Association, the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture or any other Governmental Authority with authority to (i) determine any investment, origination, lending or servicing requirements with regard to mortgage loans originated, purchased or serviced by the CPB or (ii) originate, purchase, or service mortgage loans, or otherwise promote mortgage lending, including state and local housing finance authorities; (B) "**Loan Investor**" means any Person (including an Agency) having a beneficial interest in any mortgage loan originated, purchased or serviced by CPB or a security backed by or representing an interest in any such mortgage loan; and (C) "**Insurer**" means a Person who insures or guarantees for the benefit of the mortgagee all or any portion of the risk of loss upon borrower default on any of the mortgage loans originated, purchased or serviced by CPB, including the Federal Housing Administration, the United States Department of Veterans' Affairs, the Rural Housing Service of the U.S. Department of Agriculture and any private mortgage insurer, and providers of hazard, title or other insurance with respect to such mortgage loans or the related collateral.

Section 4.32     **Consumer Compliance Laws**. All loans of CPB have been made in compliance with all applicable statutes and regulatory requirements at the time of such loan or any renewal thereof, including Regulation Z (12 C.F.R. § 226 *et seq.*), the Federal Consumer Credit Protection Act (15 U.S.C. § 1601 *et seq.*), and all statutes governing the operation of Louisiana state-chartered banks. Each loan on the books of CPB was made in the ordinary course of its business.

Section 4.33     **Bank Secrecy Act, Foreign Corrupt Practices Act and U.S.A. Patriot Act**. CPB is in compliance with CPB Secrecy Act (12 U.S.C. §§ 1730(d) and 1829(b)), the United States Foreign Corrupt Practices Act and the International Money Laundering Abatement and Anti-Terrorist Financing Act, otherwise known as the U.S.A. Patriot Act, and all regulations issued thereunder, and CPB has properly certified all foreign deposit accounts and has made all necessary tax withholdings on all of its deposit accounts; furthermore, CPB has timely and properly filed and maintained all requisite Currency Transaction Reports and other related forms, including any requisite Custom Reports required by any agency of the United States Treasury Department, including the IRS. CPB has timely filed all Suspicious Activity Reports with the Financial Institutions - Financial Crimes Enforcement Network (U.S. Department of the Treasury) required to be filed by it under the Laws referenced in this Section.

Section 4.34     **Loans Secured by BBI Capital Stock**. No borrower of CPB was required to purchase capital stock of BBI in order to obtain a loan or other form of credit from CPB.

Section 4.35     **Application of Takeover Protections; Rights Agreements**. CPB has not adopted any stockholder rights plan or similar agreement, arrangement or understanding relating to accumulations of beneficial ownership of the CPB Stock or a change in control of CPB. CPB and its Board of Directors have taken all action necessary to render inapplicable any control share acquisition, business combination, fair price, moratorium, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under applicable Law, the Constituent Documents of CPB, or any agreement, arrangement or understanding with any of CPB's shareholders or any other

Person that is or could become applicable to FNBC as a direct consequence of the transactions contemplated by this Agreement.

Section 4.36 **Off Balance Sheet Arrangements**. CPB is not a party to any material agreement, commitment, transaction, arrangement or other relationship with any unconsolidated or other off balance sheet Entity.

Section 4.37 **Change in Control**. Neither the execution of this Agreement, nor the consummation of the Acquisition, will trigger any rights under any "change of control" provision in any agreement to which CPB is a party, including any employment, "change in control," severance or other compensatory agreements and any benefit plan, which results in payments to the counterparty or the acceleration of vesting of benefits.

Section 4.38 **Brokers**. Except as set forth on *Confidential Schedule 4.38*, no Person will have, as a result of the transactions contemplated by this Agreement, any valid right, interest or claim against or upon CPB, FNBC or First NBC Bank for any commission, fee or other compensation pursuant to any agreement, arrangement or understanding entered into by or on behalf of BBI or CPB.

Section 4.39 **Representations Not Misleading**. No representation or warranty by BBI contained in this Agreement, nor any written statement, exhibit or Confidential Schedule furnished to FNBC by BBI under and pursuant to, or in anticipation of this Agreement, contains or will contain on the Closing Date any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances under which it was or will be made, not misleading and such representations and warranties would continue to be true and correct following disclosure to any Governmental Authority having jurisdiction over BBI or CPB or its properties of the facts and circumstances upon which they were based. Except as disclosed herein, there is no matter that materially adversely affects BBI or CPB or the ability of either party to perform the transactions contemplated by this Agreement that has not otherwise been disclosed herein. No information material to the Acquisition, and that is necessary to make the representations and warranties herein contained not misleading, has been withheld by BBI.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES OF FNBC

FNBC makes the following representations and warranties to BBI as of the date of this Agreement and as of the Closing Date:

Section 5.01 **Organization and Qualification**. FNBC is a bank holding company registered under the Bank Holding Company Act of 1956, as amended. FNBC is a corporation, duly organized, validly existing and in good standing under all Laws applicable to corporations located in the State of Louisiana. FNBC has all requisite corporate power and authority (including all licenses, franchises, permits and other governmental authorizations as are legally required) to carry on its business as now being conducted, and to own, lease and operate its properties and assets as now owned, leased or operated.

Section 5.02 **Execution and Delivery; No Conflicts**.

(a) FNBC has all requisite corporate power and authority to execute and deliver this Agreement and, subject to the receipt of all required approvals of Governmental Authorities, to perform the transactions contemplated by this Agreement. FNBC has taken all requisite corporate action necessary to authorize the execution, delivery and (provided that all required

approvals of Governmental Authorities are obtained) performance of this Agreement and the other agreements and documents contemplated hereby to which it is a party. This Agreement has been duly and validly executed and delivered to BBI. Assuming due authorization, execution and delivery by BBI, this Agreement constitutes the legal, valid and binding obligation of FNBC, enforceable against it in accordance with its terms and conditions, except as enforceability may be limited by the Bankruptcy Exception.

(b)      Subject to the receipt of all required consents and approvals set forth in *Schedule 5.04* and the expiration of related waiting periods, neither the execution, delivery or performance of this Agreement nor the consummation of the transactions contemplated hereby, constitutes or will constitute (i) a breach or violation of any provision of the Constituent Documents of FNBC; (ii) a violation of any statute, code, ordinance, rule, regulation, judgment, order, writ, decree or injunction applicable to FNBC or any of its respective properties or assets; or (iii) a breach or violation of, a conflict with, the loss of any benefit under, a default (or an event which, with notice or the lapse of time, or both, would constitute a default) under, an event of termination or cancellation under, an event giving rise to acceleration of the performance required by or rights or obligations under, or an event resulting in the creation of any Lien upon any of the properties or assets of FNBC under, any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise, license or similar authorization to which FNBC is a party, or by which it or any of its properties, assets or business activities may be bound or affected.

Section 5.03      **Litigation**. No suit, action, investigation or proceeding or governmental or regulatory investigation of any kind or nature is pending or, to the knowledge of FNBC, threatened against or affecting FNBC (and FNBC is not aware of any basis for any such suit, action or proceeding) that, individually or in the aggregate, (A) is reasonably likely to prevent or delay FNBC in any material respect from performing its obligations under, or consummating the transactions contemplated by, this Agreement, or (B) adversely affects or challenges the legality, validity or enforceability of this Agreement or the transactions contemplated hereby.

Section 5.04      **Consents and Approvals**. Except as disclosed in *Confidential Schedule 5.04*, no approval, consent, order or authorization of, or registration, declaration or filing with, any Governmental Authority or other third party is required on the part of FNBC in connection with the execution, delivery or performance of this Agreement or the agreements contemplated hereby, or the completion by FNBC of the transactions contemplated hereby or thereby.

Section 5.05      **Representations Not Misleading**. No representation or warranty by FNBC contained in this Agreement, nor any written statement, exhibit or Confidential Schedule furnished to BBI by FNBC under and pursuant to, or in anticipation of this Agreement, contains or will contain on the Closing Date any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein, in light of the circumstances under which it was or will be made, not misleading and such representations and warranties would continue to be true and correct following disclosure to any Governmental Authority having jurisdiction over FNBC or its properties of the facts and circumstances upon which they were based.

## ARTICLE VI.
## COVENANTS OF BBI

Section 6.01      **Commercially Reasonable Efforts**. Subject to the terms and conditions of this Agreement, BBI will use, and cause CPB to use, its commercially reasonable efforts to take, or cause to be taken, in good faith, all actions, and to do, or cause to be done, all things necessary, proper or

desirable, or advisable under applicable Laws, so as to permit consummation of the transactions contemplated hereby as promptly as practicable, and BBI will and will cause CPB to cooperate fully with, and furnish information to, FNBC to that end.

Section 6.02 **Information for Applications and Statements**. BBI will and will cause CPB to promptly, but not later than 10 Business Days after receipt of a written request by FNBC, furnish to FNBC all information, data and documents concerning BBI and CPB, including financial statements, required to be included in any application or statement to be made by FNBC to, or filed by FNBC with, any Governmental Authority in connection with the transactions contemplated by this Agreement, or in connection with any other transactions while this Agreement is pending, and BBI represents and warrants that all information so furnished for such statements and applications will be true and correct in all material respects and will not omit any material fact required to be stated therein or necessary to make the statements made, in light of the circumstances under which they were made, not misleading. BBI will and will cause CPB to otherwise fully cooperate with FNBC in the filing of any applications or other documents necessary to complete the transactions contemplated by this Agreement.

Section 6.03 **Required Acts**. To the extent not inconsistent with the Bankruptcy Code and subject to any Order or direction of the Bankruptcy Court, and except as prohibited by Law, between the date of this Agreement and the Closing, BBI will cause CPB to:

(a) Operate only in the ordinary course of business and consistent with prudent banking practices;

(b) Except as required by prudent business practices, use all reasonable efforts to preserve its business organization intact and to retain its present customers, depositors and employees, and to maintain all assets owned, leased or used by it (whether under its control or the control of others), in good operating condition and repair, ordinary wear and tear excepted;

(c) Perform all of its obligations under contracts, leases and documents relating to or affecting its assets, properties and business, except such obligations as BBI or CPB may in good faith reasonably dispute;

(d) Maintain in full force and effect all insurance policies now in effect or renewals thereof and give all notices and present all claims under all insurance policies in due and timely fashion;

(e) Timely file, subject to extensions, all reports required to be filed with governmental authorities and observe and conform, in all material respects, to all applicable Laws, except those being contested in good faith by appropriate proceedings;

(f) Timely file, subject to extensions, all Tax Returns required to be filed by it and promptly pay all taxes, assessments, governmental charges, duties, penalties, interest and fines that become due and payable, except those being contested in good faith by appropriate proceedings;

(g) Withhold from each payment made to each of its employees the amount of all Taxes required to be withheld therefrom and pay the same to the proper Tax receiving officers;

(h) Account for all transactions and prepare all Financial Statements and Call Reports in accordance with GAAP (unless otherwise instructed by RAP in which instance account for such transaction in accordance with RAP);

(i)      Promptly classify and charge off loans and make appropriate adjustments to loss reserves in accordance with the Call Report Instructions and the Uniform Retail Credit Classification and Account Management Policy;

(j)      Use good faith best efforts to comply or maintain compliance with any and all regulatory commitment letters, memoranda of understanding, cease and desist orders, written agreements or other formal or information administrative actions to which CPB is subject; and

(k)      Pay (or establish adequate reserves for) all costs, expenses and other charges to be incurred by CPB in connection with the Acquisition, including all legal, accounting, consulting, investment banking and brokerage fees, before the Closing Date.

Section 6.04    **Prohibited Acts**. Except with the consent of FNBC (which consent will not be unreasonably withheld), or as expressly required by this Agreement, or as prohibited by Law, to the extent not inconsistent with the Bankruptcy Code and subject to any Order or direction of the Bankruptcy Court, between the date of this Agreement and the Closing, BBI will not, and will cause CPB not to:

(a)      Take or fail to take any action that would cause the representations and warranties made in ARTICLE IV to be inaccurate at the time of the Closing or preclude BBI from making such representations and warranties at the time of the Closing;

(b)      Except as contemplated by this Agreement, merge into, consolidate with or sell its assets to any other Person, change CPB's Constituent Documents, increase the number of shares of CPB Stock outstanding or increase the amount of CPB's surplus (as calculated in accordance with the Call Report Instructions);

(c)      Except in accordance with a Contract existing as of the date of this Agreement, engage in any transaction with any affiliated Person or allow such Persons to acquire any assets from CPB, except (i) in the form of wages, salaries, fees for services, reimbursement of expenses and benefits already granted or accrued under the Employee Plans or (ii) any deposit (in any amount) made by an officer, director or employee;

(d)      Discharge or satisfy any Lien or pay any obligation or liability, whether absolute or contingent, due or to become due, except in the ordinary course of business consistent with past practices and except for liabilities incurred in connection with the transactions contemplated hereby;

(e)      Issue, reserve for issuance, grant, sell or authorize the issuance of any shares of its capital stock or other securities or subscriptions, options, warrants, calls, rights or commitments of any kind relating to the issuance thereto;

(f)      Accelerate the vesting of pension or other benefits in favor of employees of CPB;

(g)      Acquire any capital stock or other equity securities or acquire any equity or ownership interest in any Entity (except (i) through settlement of indebtedness, foreclosure, or the exercise of creditors' remedies or (ii) in a fiduciary capacity, the ownership of which does not expose it to any liability from the business, operations or liabilities of such Person);

(h)      Mortgage, pledge or subject to Lien any of its property, business or assets, tangible or intangible except (i) statutory liens not yet delinquent, (ii) consensual landlord liens, (iii) minor defects and irregularities in title and encumbrances that do not materially impair the

use thereof for the purpose for which they are held, and (iv) pledges of assets to secure public funds deposits;

(i)     Sell, transfer, lease to others or otherwise dispose of any of its assets (except any sales of securities or sales of loans in the ordinary course of business consistent with past practices) or cancel or compromise any debt or claim, or waive or release any right or claim of a value in excess of $10,000;

(j)     Make any change in the rate or timing of payment of compensation, commission, bonus or other direct or indirect remuneration payable, or pay or agree or orally promise to pay, conditionally or otherwise, any bonus, extra compensation, pension or severance or vacation pay, to or for the benefit of any of its shareholders, directors, officers, employees or agents, other than periodic increases in compensation consistent with past practices, and bonuses, commissions, and incentives consistent with past and normal practices to CPB employees and officers;

(k)     Enter into any employment or consulting contract or other agreement with any director, officer or employee or adopt, amend in any material respect or terminate any pension, employee welfare, retirement, stock purchase, stock option, phantom stock, stock appreciation rights, termination, severance, income protection, golden parachute, savings or profit-sharing plan (including trust agreements and insurance contracts embodying such plans), any deferred compensation, or collective bargaining agreement, any group insurance contract or any other incentive, welfare or employee benefit plan or agreement maintained by it for the benefit of its directors, employees or former employees;

(l)     Except for improvements or betterments relating to Properties, make any capital expenditures or capital additions or betterments in excess of an aggregate of $10,000;

(m)     Hire or employ any Person as a replacement for an existing position with an annual salary equal to or greater than $30,000 or hire or employ any Person for any newly created position;

(n)     Sell or dispose of, or otherwise divest itself of the ownership, possession, custody or control, of any corporate books or records of any nature that, in accordance with sound business practice, normally are retained for a period of time after their use, creation or receipt, except at the end of the normal retention period;

(o)     Make any, or acquiesce with any, change in any (i) credit underwriting standards or practices, including loan loss reserves, (ii) asset liability management techniques, or (iii) accounting methods, principles or material practices, except as required by changes in GAAP as concurred in by BBI's independent auditors, or as required by any applicable Regulatory Authority;

(p)     Reduce the amount of CPB's allowance for loan losses except through charge offs (and subject to the obligations under Section 6.03(i)) or as required by any applicable Regulatory Authority;

(q)     Sell (but payment at maturity is not a sale) or purchase any investment securities, other than purchases of obligations of the U.S. Treasury (or any agency thereof) with a duration of four (4) years or less and an AAA rating by at least one nationally recognized ratings agency;

(r)     Make, commit to make, renew, extend the maturity of, or alter any of the material terms of any loan in excess of $50,000, or such higher amount as may be mutually agreeable to the parties, but FNBC will be deemed to have given its consent under this Section 6.04(r) unless FNBC objects to such transaction no later than three (3) Business Days after actual receipt by FNBC of all information relating to the making, renewal or alteration of that loan;

(s)     Make, commit to make any, renew, extend the maturity of, or alter any of the material terms of any loan to a borrower or to a known related interest of a borrower who is on CPB's internal classified asset or watch list;

(t)     Enter into any acquisitions or leases of real property, including new leases and lease extensions;

(u)     Remove any loans from CPB's watch list; or

(v)     Enter into any agreement or make any commitment whether in writing or otherwise to take any of the types of action described in subsections (a) through (u) above.

Section 6.05     **Access; Pre–Closing Investigation**. Subject to the provisions of ARTICLE XI, BBI will and will cause CPB to afford FNBC and its officers, directors, employees, attorneys, accountants, investment bankers and authorized representatives full access, to the extent legally permissible, to the Properties, books, contracts, records (including, without limitation, Tax Returns and work papers of independent auditors) and personnel of CPB, permit FNBC to make such inspections (including with regard to such Properties physical inspection of the surface and subsurface thereof and any structure thereon) as it may require and furnish to FNBC, to the extent legally permissible, all such information concerning CPB and its affairs as FNBC may reasonably request. BBI will not be required to afford access to or disclose information that would jeopardize attorney-client privilege or contravene any binding arrangement with any third party. The parties will make appropriate substitute arrangements in circumstances where the previous sentence applies. FNBC will use its commercially reasonable efforts not to disrupt the normal business operations of CPB. All inspections by FNBC under this provision will be at its expense. No investigation by FNBC of the business and affairs of CPB, under this Section 6.05 or otherwise, will affect or be deemed to modify or waive any representation, warranty, covenant or agreement in this Agreement, or the conditions to FNBC's obligation to consummate the transactions contemplated by this Agreement.

Section 6.06     **Invitations to and Attendance at Directors' and Committee Meetings**. BBI will cause CPB to give notice to two (2) designees of FNBC and to invite those persons to attend all regular and special meetings of the Board of Directors of CPB and all regular and special meetings of any board or senior management committee of CPB. However, CPB may exclude such invitees from any portion of any meeting (i) during which any aspect of the Acquisition or the Bankruptcy Case is discussed; (ii) as a result of which the invitee's presence may constitute a breach of attorney-client privilege; or (iii) as otherwise prohibited by applicable Law. In addition, BBI will cause CPB to provide FNBC with copies of the minutes of all regular and special meetings of the Board of Directors of CPB and minutes of all regular and special meetings of any board or senior management committee of CPB held on or after the date of this Agreement (except portions of such minutes that are devoted to the discussion of this Agreement or the Bankruptcy Case that, upon the advice of legal counsel, are otherwise privileged) at the same time that those minutes are provided to directors or officers of CPB or otherwise upon the request of FNBC.

Section 6.07     **Additional Financial Statements**. BBI will, or will cause CPB to, promptly furnish to FNBC (i) each additional Call Report filed by CPB after the date of this Agreement, as soon as

such Call Report is available, and (ii) unaudited month-end financial statements of CPB, within ten (10) calendar days following the end of each calendar month after the date of this Agreement.

Section 6.08 **Notification of Certain Matters**. BBI will promptly notify FNBC in writing if it becomes aware of any fact or condition that (i) makes or shows to be untrue any representation or warranty made by BBI in, or any information or Confidential Schedules provided to FNBC under, this Agreement, (ii) would cause or constitute a breach of, or failure to comply with, any of the covenants or agreements of BBI herein, or (iii) reasonably could be expected to give rise, individually or in the aggregate, to the failure of any closing condition set forth in ARTICLE IX. No notice pursuant to this Section will affect any representation or warranty given by BBI hereunder or any rights of FNBC under this Agreement.

Section 6.09 **Litigation and Claims**. BBI will promptly notify FNBC in writing of any legal action, suit or proceeding or judicial, administrative or governmental investigation, pending or, to the knowledge of such party, threatened against BBI or CPB, or affecting any of its properties or assets, (i) that questions or might question the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by the parties or their respective Subsidiaries with respect hereto or thereto, (ii) that seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby, or (iii) if such litigation or potential litigation might, upon an unfavorable outcome, reasonably be expected to result in a Material Adverse Change.

Section 6.10 **Consideration of Alternative Transactions**.

(a)     Between the date of this Agreement and the entry of the Auction Procedures Order:

(i)     BBI will not, and will cause CPB not to, directly or indirectly, through its Representatives encourage, solicit or initiate discussions or negotiations with any Person (other than FNBC or its Representatives) concerning any Alternative Transaction. Immediately upon receipt of any unsolicited Alternative Transaction, BBI will communicate to FNBC the terms of any proposal or request for information and the identity of the parties involved.

(ii)     BBI will not withdraw (or modify or qualify in any manner adverse to FNBC) or refuse to seek Bankruptcy Court approval of the Sale Motion.

(iii)     BBI will not, and will cause CPB not to, directly or indirectly, through its Representatives entertain, discuss or negotiate with, or provide any information to, or cooperate with, any Person (other than FNBC or its Representatives) concerning any unsolicited Alternative Transaction, or enter into any letter of intent, agreement in principle, or other agreement constituting or related to, or which is intended to lead to, an Alternative Transaction, except if (A) BBI determines in good faith (after consultation with outside counsel and its financial advisor) that the offered Alternative Transaction could be more favorable to BBI than this Agreement and such offer has been made and has not been withdrawn and continues to be more favorable after taking into account all adjustments to the terms of this Agreement that may be offered by FNBC pursuant to this Section; (B) such offer has the same or better likelihood of receiving all necessary regulatory approvals as the Acquisition contemplated by this Agreement; (C) BBI has given FNBC at least five (5) Business Days' prior written notice of its intention to pursue or entertain such offer (which notice will specify the material terms and conditions of any such offer and the identity of the party making such offer) and has contemporaneously

provided an unredacted copy of the relevant proposed transaction agreements with the party making such offer; and (D) prior to pursuing such Alternative Transaction, BBI has negotiated, and has caused its Representatives to negotiate, in good faith with FNBC during such notice period to the extent FNBC wishes to negotiate, to enable FNBC to revise the terms of this Agreement such that it would cause such offer to no longer constitute a more favorable offer. In the event of any material change to the terms of such offer, BBI will, in each case, be required to deliver to FNBC a new written notice, the notice period will have recommenced and BBI will be required to comply with its obligations under this Section with respect to such new written notice, except that the deadline for such new written notice will be reduced to three (3) Business Days (rather than five (5) Business Days referenced above). It will be a condition precedent to BBI's ability to enter into a definitive agreement with respect to the Alternative Transaction, and to consummate any such transaction, that such agreement makes appropriate provision for the Expense Reimbursement if requested by FNBC in accordance with Section 10.03(b).

(b)    From the entry of the Auction Procedures Order to the entry of the Sale Order, BBI and its Affiliates will be permitted to market and solicit inquiries, proposals, offers or bids from, any Person other than the FNBC regarding an Alternative Transaction, and may take any other affirmative action in connection therewith including (i) entering into any definitive agreement or letter-of-intent with respect thereto, (ii) issuing press releases, placing advertisements or making other releases or disclosures in connection therewith, or (iii) seeking approval of the Bankruptcy Court for any Alternative Transaction, and nothing in this Agreement will, or is intended to, in any way be deemed to restrict such actions or efforts. Neither BBI nor any of its Affiliates will have any liability to FNBC, under this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of such a definitive agreement for an Alternative Transaction, provided that BBI complies with the Expense Reimbursement provisions of Section 10.03(b).

(c)    If the Sale Order is approved with respect to the transactions contemplated by this Agreement, from the date of the entry of the Sale Order until the earlier of (i) the Closing Date and (ii) the valid termination of this Agreement pursuant to Section 10.01, BBI will not, directly or indirectly, pursue or facilitate any Alternative Transaction or, solicit, accept, facilitate, review, cooperate with, discuss, or provide information in connection with, any offer, inquiry, proposal, bid or indication of interest from any Person, or respond to any inquiries from or engage in any negotiations with any Person, or share any information regarding FNBC, BBI or CPB, with respect to or in possible contemplation of any Alternative Transaction, and BBI will not assist, cooperate with or help to facilitate any other Person in taking or effecting any such actions; provided, that all of the foregoing is subject to BBI's ability to finalize and memorialize any back-up bid resulting from the Auction.

Section 6.11    **Consents and Approvals**.    BBI will, and will cause CPB to, use its commercially reasonable efforts to obtain at the earliest practicable time all consents and approvals from third parties, including those listed on *Confidential Schedule 4.08*.

Section 6.12    **Benefit Plans**.    BBI agrees that any employee welfare benefit plan, as defined in ERISA §3(1) (each, a "**Welfare Plan**"), that is sponsored or maintained by BBI or CPB may be terminated, modified or merged into FNBC's Welfare Plans on or after the Closing Date, as determined by FNBC in its sole discretion, subject to compliance with applicable Law so long as any such action does not reduce any benefits to which a participant or beneficiary has already become entitled to thereunder. BBI will terminate any other Employee Plans for which CPB may have liability so that CPB

will have no liability from and after the Closing Date, and BBI will cause CPB to accrue any and all obligations with respect to the termination of such plans prior to the Closing.

Section 6.13 **Tail D&O Policy**. On or prior to the Closing Date, BBI will use its commercially reasonable efforts to obtain an extended reporting period (otherwise known as "tail coverage") policy covering the directors and officers of CPB for a period of at least 2 years from the Closing Date, and the total premium for such policy will be paid or accrued prior to the Closing.

Section 6.14 **BBI's Chapter 11 Bankruptcy Case**.

(a) As soon as practicable following the execution of this Agreement, BBI will file the Sale Motion in accordance with Sections 363 and 365 of the Bankruptcy Code.

(b) In the event that the Auction Procedures Order or the Sale Order is appealed, BBI will use its commercially reasonable efforts to defend such appeal.

(c) BBI will duly and properly give all notices required by Law in connection with the Bankruptcy Case to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual Liens on assets, the lessors on any material leases, the employees of BBI, and applicable taxing and Governmental Authorities.

Section 6.15 **Joinder in Agreement**. As soon as practicable after the execution of this Agreement and the receipt of all requisite regulatory approvals, BBI will cause CPB to become a party to this Agreement. The parties agree that CPB will have no liability of any kind or nature, and will not be bound by any provision of this Agreement until such time as CPB joins as a party this Agreement by execution of the joinder signature page this Agreement.

Section 6.16 **P&A Agreement**. As soon as practicable after the execution of this Agreement and the receipt of all requisite regulatory approvals, BBI will cause CPB to duly authorize and enter into an agreement ("**P&A Agreement**") to transfer substantially all of the assets and liabilities of CPB to First NBC Bank, substantially in the form attached as Exhibit F, with such additional revisions as may be reasonably requested by FNBC, such transaction to be effective immediately after the Acquisition is consummated. Furthermore, BBI will cause CPB to take, or CPB will take, all actions as may be reasonably requested by FNBC to facilitate the consummation of the P&A Agreement, the Asset Purchase Agreement, and the dissolution or liquidation of its Louisiana state bank charter.

## ARTICLE VII.
## COVENANTS OF FNBC

Section 7.01 **Commercially Reasonable Efforts**. Subject to the terms and conditions of this Agreement, FNBC will use its commercially reasonable efforts to take, or cause to be taken, in good faith, all actions, and to do, or cause to be done, all things necessary, proper or desirable, or advisable under applicable Laws, so as to permit consummation of the transactions contemplated hereby as promptly as practicable. FNBC will reasonably cooperate with BBI in connection with the Bankruptcy Case and the filing of any pleadings, documents or other instruments with the Bankruptcy Court necessary or appropriate to facilitate the consummation of the transactions contemplated by this Agreement. FNBC will furnish to the Bankruptcy Court, upon request, evidence that FNBC has the capacity to timely close the transactions contemplated by this Agreement. In addition, FNBC will reasonably cooperate with BBI in BBI's efforts to obtain the approval of the Auction Procedures Order and the Sale Order.

Section 7.02 **Information for Applications and Statements**. FNBC will promptly furnish to BBI all information concerning FNBC, including, but not limited to, financial statements, required for inclusion in any application or statement to be made by BBI or CPB to or filed by BBI or CPB with any Governmental Authority in connection with the transactions contemplated by this Agreement, or in connection with any unrelated transactions during the pendency of this Agreement, and FNBC represents and warrants that all information so furnished for such statements and applications will be true and correct in all material respects and will not omit any material fact required to be stated therein or necessary to make the statements made, in light of the circumstances under which they were made, not misleading. FNBC will otherwise fully cooperate with BBI in the filing of any applications or other documents necessary to consummate the transactions contemplated by this Agreement.

Section 7.03 **Notification of Certain Matters**. FNBC will promptly notify BBI in writing if it becomes aware of any fact or condition that (i) makes or shows to be untrue any representation or warranty made by FNBC in, or any information or Confidential Schedules provided to BBI under, this Agreement, (ii) would cause or constitute a breach of, or failure to comply with, any of the covenants or agreements of FNBC herein, or (iii) reasonably could be expected to give rise, individually or in the aggregate, to the failure of any closing condition set forth in ARTICLE VIII. No notice pursuant to this Section will affect any representation or warranty given by FNBC hereunder or any rights of BBI under this Agreement.

Section 7.04 **Litigation and Claims**. FNBC will promptly notify BBI in writing of any legal action, suit or proceeding or judicial, administrative or governmental investigation, pending or, to the knowledge of such party, threatened against FNBC or First NBC Bank, or affecting any of its properties or assets, (i) that questions or might question the validity of this Agreement or the agreements contemplated hereby or any actions taken or to be taken by the parties or their respective Subsidiaries with respect hereto or thereto, or (ii) that seeks to enjoin or otherwise restrain the transactions contemplated hereby or thereby.

Section 7.05 **Regulatory and Other Approvals**. FNBC, at its own expense, will promptly, but in no event later than 10 days after the date BBI provides FNBC with the information requested for the regulatory applications under Section 6.02, file or cause to be filed applications or waivers with respect to all regulatory approvals required to be obtained by FNBC in connection with this Agreement and the other agreements contemplated hereby. FNBC will use its commercially reasonable efforts to obtain all such regulatory approvals and any other approvals from third parties, including those listed on *Confidential Schedule 5.04*, at the earliest practicable time.

## ARTICLE VIII.
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BBI AND CPB

The obligations of BBI to consummate the Acquisition are subject to the fulfillment or, to the extent permissible under applicable Law, the written waiver, which may be in whole or in part, of BBI at or prior to the Closing of each of the following conditions:

Section 8.01 **Representations and Warranties**. The representations and warranties made by FNBC in this Agreement will be true and correct, in all material respects, as of the date of this Agreement and at and as of the Closing with the same force and effect as if such representations and warranties were made at and as of the Closing, except with respect to those representations and warranties specifically made as of an earlier date (in which case such representations and warranties will be true as of such earlier date).

Section 8.02  **Performance of Obligations**.  FNBC will have, or will have caused to be, performed or observed in all material respects all agreements, terms, covenants and conditions required by this Agreement to be performed or observed by FNBC at or before the Closing

Section 8.03  **Bankruptcy Court Approvals**.  The Bankruptcy Court will have entered (i) the Auction Procedures Order (with such additional changes as may be acceptable to FNBC) as a Final Order, and (ii) the Sale Order (with such additional changes as may be acceptable to FNBC) as a Final Order.

Section 8.04  **Government and Other Approvals**.  BBI and CPB will have received approvals, acquiescences or consents of the transactions contemplated by this Agreement from all necessary Governmental Authorities and other third parties, and all applicable waiting periods having expired, and those approvals and the transactions contemplated hereby will not have been contested or threatened to be contested by any Governmental Authority or by any other third party by formal proceedings.

Section 8.05  **No Litigation**.  No action will have been taken, and no statute, rule, regulation or order will have been promulgated, enacted, entered, enforced or deemed applicable to the Acquisition by any Federal, state or foreign government or governmental authority or by any court, including the entry of a preliminary or permanent injunction, that would (a) make the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby illegal, invalid or unenforceable, (b) impose material limits on the ability of any party to this Agreement to complete the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby, or (c) if the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby are completed, subject CPB or any officer, director, shareholder or employee of CPB to criminal or civil liability.  Further, no action or proceeding before any Governmental Authority, by any Governmental Authority or by any other Person will have been threatened, instituted or pending that would reasonably be expected to result in any of the consequences referred to in clauses (a) through (c) above.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF FNBC

All obligations of FNBC under this Agreement are subject to the satisfaction, before or at the Closing, of each of the following conditions, which may be waived in whole or in part by FNBC:

Section 9.01  **Representations and Warranties**. The representations and warranties made by BBI and CPB in this Agreement will be true and correct, in all material respects, as of the date of this Agreement and at and as of the Closing with the same force and effect as if such representations and warranties were made at and as of the Closing, except with respect to those representations and warranties specifically made as of an earlier date (in which case such representations and warranties will be true as of such earlier date).

Section 9.02  **Performance of Obligations**.  BBI or CPB will have, or will have caused to be, performed or observed in all material respects all agreements, terms, covenants and conditions required by this Agreement to be performed or observed by BBI at or before the Closing

Section 9.03  **Bankruptcy Court Approvals**.  The Bankruptcy Court will have entered (i) the Auction Procedures Order (with such additional changes as may be acceptable to FNBC) as a Final Order, and (ii) the Sale Order (with such additional changes as may be acceptable to FNBC) as a Final Order.

Section 9.04 **Government and Other Approvals**. FNBC will have received approvals, acquiescences or consents of the transactions contemplated by this Agreement, the P&A Agreement and the Asset Purchase Agreement from all necessary Governmental Authorities and other third parties, and all applicable waiting periods having expired, and those approvals and the transactions contemplated hereby will not have been contested or threatened to be contested by any Governmental Authority or by any other third party by formal proceedings.

Section 9.05 **No Litigation**. No action will have been taken, and no statute, rule, regulation or order will have been promulgated, enacted, entered, enforced or deemed applicable to the Acquisition by any Governmental Authority, including the entry of a preliminary or permanent injunction, that would (a) make this Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby illegal, invalid or unenforceable, (b) require the divestiture of a material portion of the assets of FNBC, its Subsidiaries or CPB, (c) impose material limits on the ability of any party to this Agreement to complete the Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby, (d) otherwise result in a Material Adverse Change or (e) if this Agreement or any other agreement contemplated hereby, or the transactions contemplated hereby or thereby are completed, subject FNBC or subject any officer, director, shareholder or employee of FNBC to criminal or civil liability. Further, no action or proceeding before any court or governmental authority, by any government or governmental authority or by any other Person, being threatened, instituted or pending that would reasonably be expected to result in any of the consequences referred to in clauses (a) through (e) above.

Section 9.06 **Releases**. FNBC will have received (i) from BBI an instrument dated as of the Closing Date releasing CPB from any and all claims of BBI (except to certain matters described therein), the form of which is attached as Exhibit A, (ii) from each of the directors of BBI and CPB an instrument dated as of the Closing Date releasing CPB from any and all claims of such directors (except to certain matters described therein), the form of which is attached as Exhibit B, and (iii) from each of the officers of BBI and CPB with titles of vice president and above an instrument dated as of the Closing Date releasing CPB from any and all claims of such officers (except as to certain matters described therein), the form of which is attached as Exhibit C.

Section 9.07 **Support Agreements**. FNBC will have received Support Agreements, dated as of the date of this Agreement, in the form attached as Exhibit E to this Agreement, from each director of BBI and CPB, and those agreements will be in full force and effect.

Section 9.08 **Shareholders' Equity Minimum**. The Shareholders' Equity will be not less than the Shareholders' Equity Minimum.

Section 9.09 **Limited Selling Shareholder Indemnification**. FNBC will have entered into an indemnification agreement with certain shareholders of BBI identified by FNBC, on terms and conditions mutually agreeable to FNBC and such shareholders.

Section 9.10 **Related Transactions**. All of the conditions precedent to the closings of the Asset Purchase Agreement and the P&A Agreement will have been satisfied or waived.

## ARTICLE X.
## TERMINATION

Section 10.01 **Right of Termination**. This Agreement and the transactions contemplated hereby may be terminated at any time before or at the Closing as follows, and in no other manner:

(a)     By the mutual written consent of FNBC and BBI;

(b)     By either BBI or FNBC (as long as the terminating party is not in material breach of any representation, warranty, covenant or other agreement contained herein) if the conditions precedent to such parties' obligations to close as set forth in this Agreement have not been met or waived by December 31, 2011;

(c)     By either FNBC or BBI if any of the transactions contemplated by this Agreement are disapproved by any Governmental Authority whose approval is required to complete such transactions or if any court of competent jurisdiction in the United States or other federal or state governmental body has issued an order, decree or ruling or taken any other action restraining, enjoining, invalidating or otherwise prohibiting the Agreement or the transactions contemplated hereby and such order, decree, ruling or other action is final and nonappealable;

(d)     By FNBC, if it reasonably determines, in good faith and after consulting with counsel, there is substantial likelihood that any necessary approval by a Governmental Authority will not be obtained or will be obtained only upon a condition or conditions that make it inadvisable to proceed with the transactions contemplated by this Agreement;

(e)     By FNBC, if the Asset Purchase Agreement is terminated in accordance with its terms;

(f)     By FNBC, if BBI fails to comply in any material respect with any of its covenants or agreements contained in this Agreement or in any other agreement contemplated hereby and such failure has not been cured within a 30 day period after notice from FNBC, or if any of the representations or warranties of BBI contained herein or therein are inaccurate in any material respect;

(g)     By BBI, if FNBC fails to comply in any material respect with any of its covenants or agreements contained in this Agreement or in any other agreement contemplated hereby and such failure has not been cured within a 30 day period after notice from BBI, or if any of the representations or warranties of FNBC contained herein or therein are inaccurate in any material respect;

(h)     By FNBC, if the Bankruptcy Court approves an Alternative Transaction;

(i)     By FNBC, if it determines that any approval of a Governmental Authority required to consummate the transactions contemplated by this Agreement will not be obtained prior to the time that CPB is placed into receivership by the FDIC; or

(j)     By FNBC, in accordance with Section 12.16.

Section 10.02   **Notice of Termination**. The power of termination provided for by Section 10.01 may be exercised only by a notice given in writing, as provided in Section 12.07 of this Agreement.

Section 10.03   **Effect of Termination**.

(a)     Subject to Section 10.03(b), and without limiting any other relief to which any party hereto may be entitled for breach of this Agreement, if this Agreement is terminated in accordance with Section 10.01 hereof, no party to this Agreement will have any further liability or obligation to any other party under this Agreement, except for (i) the obligations set forth in

Section 10.03(b) hereof, and (ii) the confidentiality provisions of ARTICLE XI hereof, which will remain in effect indefinitely.

(b)      If BBI or CPB pursues and closes an Alternative Transaction, then BBI will, contemporaneously with the closing of the Alternative Transaction, pay FNBC an Expense Reimbursement in an amount equal to $400,000, which amount will be in reimbursement of the expenses and costs of FNBC and First NBC Bank incurred in connection with the Acquisition and the Bankruptcy Case, including due diligence costs, legal, accounting, and consulting expenses and costs, and management time and expense ("**Expense Reimbursement**"). If requested by FNBC, in lieu of providing for the direct payment by BBI of the Expense Reimbursement, BBI will include a provision in the definitive agreement with respect to the Alternative Transaction that directs the Person effecting the Alternative Transaction to make such Expense Reimbursement to FNBC as a condition to entering into such an Alternative Transaction.

## ARTICLE XI.
## CONFIDENTIAL INFORMATION

Section 11.01   **Definition of "Recipient," "Disclosing Party" and "Representative".**   For purposes of this ARTICLE XI, the term "Recipient" means the party receiving the Subject Information (as defined in Section 11.02) and the term "Disclosing Party" means the party furnishing the Subject Information. The terms "Recipient" or "Disclosing Party", as used herein, include: (a) all persons and entities related to or affiliated in any way with the Recipient or the Disclosing Party, as the case may be, and (b) any Person controlling, controlled by or under common control with the Recipient or the Disclosing Party, as the case may be. The term "Representative" as used herein, includes all directors, officers, shareholders, employees, representatives, advisors, attorneys, accountants and agents of any of the foregoing.

Section 11.02   **Definition of "Subject Information".**   For purposes of this ARTICLE XI, the term "Subject Information" means all information furnished to the Recipient or its Representatives (whether prepared by the Disclosing Party, its Representatives or otherwise and whether or not identified as being nonpublic, confidential or proprietary) by or on behalf of the Disclosing Party or its Representatives relating to or involving the business, operations or affairs of the Disclosing Party or otherwise in possession of the Disclosing Party, including the terms of this Agreement. The term "Subject Information" does not include information that (a) was already in the Recipient's possession at the time it was first furnished to Recipient by or on behalf of Disclosing Party, provided that such information is not known by the Recipient to be subject to another confidentiality agreement with or other obligation of secrecy to the Disclosing Party, its Subsidiaries or another party, or (b) becomes generally available to the public other than as a result of a disclosure by the Recipient or its Representatives, or (c) becomes available to the Recipient on a non-confidential basis from a source other than the Disclosing Party, its Representative or otherwise, provided that such source is not known by the Recipient to be bound by a confidentiality agreement with or other obligation of secrecy to the Disclosing Party, its Representative or another party.

Section 11.03   **Confidentiality.**   Each Recipient hereby agrees that the Subject Information will be used solely for the purpose of reviewing and evaluating the transactions contemplated by this Agreement and the other agreements contemplated hereby and that the Subject Information will be kept confidential by the Recipient and the Recipient's Representatives; provided, however, that (a) any of such Subject Information may be disclosed to the Recipient's Representatives (including, but not limited to, the Recipient's accountants and attorneys) who need to know such information for the purpose of evaluating any such possible transaction between the Disclosing Party and the Recipient (it being understood that such Representatives will be informed by the Recipient of the confidential nature of such

information and that the Recipient will direct and cause such persons to treat such information confidentially); and (b) any disclosure of such Subject Information may be made to which the Disclosing Party consents in writing before any such disclosure by Recipient.

Section 11.04 **Securities Law Concerns**. Each Recipient hereby acknowledges that the Recipient is aware, and the Recipient will advise the Recipient's Representatives who are informed as to the matters that are the subject of this Agreement, that the United States securities Laws prohibit any Person who has received material, non-public information from an issuer of securities from purchasing or selling securities of such issuer or from communicating such information to any other Person under circumstances in which it is reasonably foreseeable that such Person is likely to purchase or sell such securities.

Section 11.05 **Return of Subject Information**. In the event of termination of this Agreement for any reason, the Recipient will promptly return to the Disclosing Party all written material containing or reflecting any of the Subject Information other than information contained in any application, notice or other document filed with any governmental agency and not returned to the Recipient by such governmental agency. In making any such filing, the Recipient will request confidential treatment of such Subject Information included in any application, notice or other document filed with any governmental agency.

Section 11.06 **Specific Performance/Injunctive Relief**. Each Recipient acknowledges that the Subject Information constitutes valuable, special and unique property of the Disclosing Party critical to its business and that any breach of ARTICLE XI of this Agreement by it will give rise to irreparable injury to the Disclosing Party that is not compensable in damages. Accordingly, each Recipient agrees that the Disclosing Party will be entitled to obtain specific performance or injunctive relief against the breach or threatened breach of ARTICLE XI of this Agreement by the Recipient or its Representatives. Each Recipient further agrees to waive, and use its reasonable efforts to cause its Representatives to waive, any requirement for the securing or posting of any bond in connection with such remedies. Such remedies are not the exclusive remedies for a breach of ARTICLE XI of this Agreement, but are in addition to all other remedies available at Law or in equity to the Disclosing Party.

**ARTICLE XII.**
**MISCELLANEOUS**

Section 12.01 Tax Elections.

(a) BBI will join with FNBC in making an election under Code Section 338(h)(10) (and any corresponding elections under state, local or foreign Law) (collectively, a "**Section 338(h)(10) Election**"), in the manner prescribed under Code Section 338 and the Treasury Regulations thereunder, with respect to the purchase of the CPB Stock hereunder. In connection with the Section 338(h)(10) Election, FNBC will prepare IRS Form 8023, or any successor or applicable state or local form on which the Section 338(h)(10) Election will be made, in advance of Closing. BBI's and FNBC's authorized officers will execute the Form 8023 at Closing, and BBI and FNBC agree to jointly file timely the executed Form 8023, with FNBC assuming responsibility for the timely submission, via certified mail, return receipt requested, of IRS Form 8023 to the IRS. BBI and FNBC will provide each other party with evidence of such timely filing of the Form 8023. BBI and FNBC each agree to cooperate and take such steps as may be required to in connection with the filing of the Form 8023, or its equivalent, for any state or local income tax purposes.

(b)     BBI and FNBC agree that the purchase price will be allocated among the assets of CPB in accordance with Code Section 338 of the Code and the Treasury Regulations promulgated thereunder, based on the allocations prepared by FNBC. BBI and FNBC further agree to file the IRS Forms 8883 required to be filed by each of them consistently with the purchase price allocation determined pursuant to this provision, and to provide the other party with a copy of the filed IRS Form 8883. If, at the time BBI or FNBC are required to file IRS Form 8883, there remain unresolved issues relating to purchase price allocation, BBI or FNBC may timely file IRS Form 8883 but will file a revised IRS Form 8883, with Part VI completed consistently with the purchase price allocation determined pursuant to this provision, upon resolution of any such issues and will provide the other party with a copy of the revised IRS Form 8883. BBI and FNBC will be bound by the allocations determined pursuant to this provision for purposes of determining any Taxes, and in the event that any such allocation is disputed by any taxing authority the party receiving notice of such dispute will promptly notify and consult with the other party hereto concerning resolution of such dispute.

(c)     BBI and FNBC will report the sale and acquisition, respectively, of the CPB Stock under this Agreement consistent with the Section 338(h)(10) Election, and no party will take any position (whether in audits, Tax Returns, any proceeding before any taxing authority or otherwise) that is inconsistent with such allocation as determined in accordance with this Section 12.01 unless required to do so by applicable Law.

(d)     To the extent permissible by Law, FNBC will prepare and file or cause to be filed (i) any corrections, amendments or supplements to the IRS Form 8023 and (ii) any state or local forms or reports that are necessary or appropriate for purpose of complying with the requirements for making any Section 338(h)(10) Election under state or local Tax Laws, provided that FNBC will provide BBI with four copies of such filing, three copies of which BBI will cause the proper party to execute on behalf of the BBI, if necessary, and return to FNBC on or prior to the thirtieth (30th) day after receipt to be executed by the proper party on behalf of FNBC, if necessary, and one copy of which FNBC will file with the IRS or the appropriate state or local taxing authority.

(e)     Neither FNBC nor BBI will take any action to modify any of the forms or reports (including any corrections, amendments or supplements thereto) that are required for the making of the Section 338(h)(10) Election after their execution or to modify or revoke any of the Section 338(h)(10) Election following the filing of the Form 8023 by FNBC or the Forms 8883 by FNBC or BBI or any corresponding state or local provisions without the written consent of BBI or FNBC, as the case may be, which consent may not be unreasonably withheld.

(f)     BBI will prepare or cause to be prepared and file or cause to be filed all Tax Returns, and pay all Taxes due with respect to such Tax Returns of CPB, which are or were due on or before the Closing Date. BBI also will prepare or cause to be prepared and file or cause to be filed all Tax Returns, and pay all Taxes due with respect to such Tax Returns of CPB for the taxable period that ends on the Closing Date, which return will be prepared in a manner consistent with the Section 338(h)(10) Election and as otherwise proscribed in this Section 8.01. FNBC will prepare or cause to be prepared, and file or cause to be filed, all Tax Returns for CPB for all periods that begin after the Closing Date and that are due after the Closing Date. BBI will provide FNBC with a copy of all Tax Returns prepared for CPB that are for the period that ends on or with the Closing Date.

Section 12.02  **Expenses**.  Except as otherwise specifically provided in this Agreement, all costs and expenses incurred in connection with this Agreement and the consummation of the transactions contemplated hereby will be borne and paid by the party incurring such expense.

Section 12.03  **Entire Agreement**.  This Agreement and the other agreements, documents, schedules and instruments signed and delivered by the parties to each other at the Closing are the full understanding of the parties, a complete allocation of risks between them and a complete and exclusive statement of the terms and conditions of their agreement relating to the subject matter hereof and supersede any and all prior agreements, whether written or oral, that may exist between the parties with respect thereto.  Except as otherwise specifically provided in this Agreement, no conditions, usage of trade, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement is binding unless hereafter made in writing and signed by the party to be bound, and no modification will be effected by the acknowledgment or acceptance of documents containing terms or conditions at variance with or in addition to those set forth in this Agreement.

Section 12.04  **Binding Effect; Assignment**.  All of the terms, covenants, representations, warranties and conditions of this Agreement are binding upon, and inure to the benefit of and are enforceable by, the parties and their respective successors, representatives and permitted assigns.  Nothing expressed or referred to herein is intended or is to be construed to give any Person other than the parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement, it being the intent of the parties that this Agreement, and the terms hereof are for the sole benefit of the parties to this Agreement and not for the benefit of any other Person.  No party to this Agreement will assign this Agreement, by operation of Law or otherwise, in whole or in part, without the prior written consent of the other parties, and any assignment made or attempted in violation of this Section is void and of no effect.

Section 12.05  **Further Cooperation**.  The parties agree that they will, at any time and from time to time after the Closing, upon request by the other and without further consideration, do, perform, execute, acknowledge and deliver all such further acts, deeds, assignments, assumptions, transfers, conveyances, powers of attorney, certificates and assurances as may be reasonably required in order to fully complete the transactions contemplated by this Agreement or to carry out and perform any undertaking made by the parties hereunder.

Section 12.06  **Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future Laws, then (a) this Agreement is to be construed and enforced as if such illegal, invalid or unenforceable provision were not a part hereof; (b) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by such illegal, invalid or unenforceable provision or by its severance from this Agreement; and (c) there will be added automatically as a part of this Agreement a provision mutually agreed to which is similar in terms to such illegal, invalid or unenforceable provision as may be possible and still be legal, valid and enforceable. If any provision of this Agreement is so broad as to be unenforceable, the provision will be interpreted to be only as broad as is enforceable.

Section 12.07  **Notices**.  Any and all payments (other than payments at the Closing), notices, requests, instructions and other communications required or permitted to be given under this Agreement after the date of this Agreement by any party hereto to any other party may be delivered personally or by nationally recognized overnight courier service or sent by mail or (except in the case of payments) by facsimile transmission or electronic mail, at the respective addresses or transmission numbers set forth below and is deemed delivered (a) in the case of personal delivery, facsimile transmission or electronic mail, when received; (b) in the case of mail, upon the earlier of actual receipt or five Business Days after deposit in the United States Postal Service, first class certified or registered mail, postage prepaid, return

receipt requested; and (c) in the case of an overnight courier service, one Business Day after delivery to such courier service with and instructions for overnight delivery. The parties may change their respective addresses and transmission numbers by written notice to all other parties, sent as provided in this Section. All communications must be in writing and addressed as follows:

IF TO BBI OR CPB:

> Mr. Brandon Faciane
> President and Chief Executive Officer
> Central Progressive Bank
> 29092 Krentel Road
> Lacombe, Louisiana 70445
> Telecopy: (985) 882-6701
> Electronic mail: bfaciane@cpb.com

WITH A COPY TO:

> Mr. Garland W. Binns, Jr.
> Dover Dixon Horne PLLC
> 425 West Capitol, 37th Floor
> Little Rock, Arkansas 72201
> Telecopy: (501) 375-6484
> Electronic mail: gbinns@ddh-ar.com

IF TO FNBC:

> Mr. Ashton J. Ryan, Jr.
> President and Chief Executive Officer
> First NBC Bank Holding Company
> 210 Baronne Street
> New Orleans, Louisiana 70112
> Telecopy: (504) 566-8000
> Electronic mail: ARyan@FirstNBCBank.com

WITH A COPY TO:

> Mr. Geoffrey S. Kay
> Fenimore, Kay, Harrison & Ford, LLP
> 111 Congress Avenue, Suite 820
> Austin, Texas 78701
> Telecopy: (512) 583-5940
> Electronic mail: gkay@fkhpartners.com

Section 12.08 **GOVERNING LAW**. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF EACH OF THE PARTIES SUBJECT TO THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF LOUISIANA, WITHOUT REGARD FOR THE PROVISIONS THEREOF REGARDING CHOICE OF LAW. EXCLUSIVE VENUE FOR ANY CAUSE OF ACTION ARISING FROM THIS AGREEMENT WILL LIE IN A COURT OF COMPETENT JURISDICTION IN NEW ORLEANS, LOUISIANA.

Section 12.09 **Multiple Counterparts**. For the convenience of the parties hereto, this Agreement may be signed in multiple counterparts, each of which will be deemed an original, and all counterparts hereof so signed by the parties hereto, whether or not such counterpart will bear the execution of each of the parties hereto, will be deemed to be, and is to be construed as, one and the same Agreement. A facsimile or other electronic transmission of a signed counterpart of this Agreement will be sufficient to bind the party or parties whose signature(s) appear thereon.

Section 12.10 **Specific Performance**. Each of the parties hereto acknowledges that the other parties would be irreparably damaged and would not have an adequate remedy at Law for money damages if any of the covenants contained in this Agreement were not performed in accordance with its terms or otherwise were materially breached. Each of the parties hereto therefore agrees that, without the necessity of proving actual damages or posting bond or other security, the other party may be entitled to temporary and/or permanent injunction or injunctions which a court of competent jurisdiction concludes is justified to prevent breaches of such performance and to specific enforcement of such covenants in addition to any other remedy to which they may be entitled, at Law or in equity.

Section 12.11 **Attorneys' Fees and Costs**. If attorneys' fees or other costs are incurred to secure performance of any of the obligations herein provided for, or to establish damages for the breach thereof, or to obtain any other appropriate relief, the prevailing party will be entitled to recover reasonable attorneys' fees and costs incurred therein and determined by the court to be justified.

Section 12.12 **Public Disclosure**. No party will issue any press release, written employee communication, written shareholder communication or other public disclosure of the existence, terms, conditions or status of this Agreement or the transactions contemplated hereby without first consulting with the other parties hereto nor will any party issue any such communication or make such public statement without the prior written consent of the other party, which will not be unreasonably withheld or delayed. Notwithstanding the foregoing, a party may, without the prior consent of the other party (but after prior consultation, to the extent practicable under the circumstances) issue such communication or make such public statement as may be required by applicable Law or regulation. The parties will cooperate to develop all public communications and make appropriate members of management available at presentations related to the transactions contemplated by this Agreement as reasonably requested by the other party.

Section 12.13 **Extension; Waiver**. At any time before the Closing Date, the parties may (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties contained herein or in any document, certificate or writing delivered pursuant hereto, or (c) waive compliance with any of the agreements or conditions contained herein. Such action will be evidenced by a signed written notice given in the manner provided in Section 12.07. No party to this Agreement will by any act (except by a written instrument given pursuant to Section 12.07) be deemed to have waived any right or remedy hereunder or to have acquiesced in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising any right, power or privilege hereunder by any party hereto will operate as a waiver thereof. No single or partial exercise of any right, power or privilege hereunder will preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver of any party of any right or remedy on any one occasion will not be construed as a bar to any right or remedy that such party would otherwise have on any future occasion or to any right or remedy that any other party may have hereunder. Any party may unilaterally waive a right which is solely applicable to it.

Section 12.14 **Survival of Representations, Warranties and Covenants**. All of the representations and warranties made by BBI contained in this Agreement will survive for 36 months following the Closing Date, at which time such representations and warranties will terminate. All

covenants and agreements made by the parties in Section 2.02(b), Section 2.03, ARTICLE XI and ARTICLE XII will survive the Closing Date. All other covenants terminate at the Closing Date.

Section 12.15 **Amendments**. This Agreement may be amended, modified or supplemented only by an instrument in writing executed by the party against which enforcement of the amendment, modification or supplement is sought.

Section 12.16 **Delivery of Confidential Schedules**. In order to provide for the prompt execution of this Agreement, the parties hereto agree that, no later than 5:00 p.m., New Orleans time, on the 10th calendar day following the date of this Agreement, BBI will deliver or cause to be delivered to FNBC, full and complete disclosure schedules ("**Confidential Schedules**") referred to as being attached to this Agreement, but which are not available on the date of this Agreement. FNBC will have a period of ten (10) Business Days to review the Confidential Schedules and to terminate the Agreement in its sole discretion if the contents of the Confidential Schedules are unsatisfactory in any respect.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, FNBC and BBI have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

FIRST NBC BANK HOLDING COMPANY

By: _____

Ashton J. Ryan, Jr.
President and Chief Executive Officer

BLOSSMAN BANCSHARES, INC.

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, FNBC and BBI have caused this Agreement to be signed by their duly authorized officers as of the date first above written.

FIRST NBC BANK HOLDING COMPANY

By: _____
        Ashton J. Ryan, Jr.
        President and Chief Executive Officer

BLOSSMAN BANCSHARES, INC.

By: _____
Name: _____James J. Venezia_____
Title: _____President_____

**To be executed following the receipt by CPB of any and all required regulatory approvals:**

### JOINDER AGREEMENT

IN WITNESS WHEREOF, from and following the date set forth below, CPB hereby agrees to become a party to this Agreement for all purposes of the Agreement and will be entitled to all of the rights and benefits, and subject to all of the obligations and restrictions, of this Agreement as a named party.

CENTRAL PROGRESSIVE BANK

By: _____

Name: _____

Title: _____