UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:: | CASE NO.: |
| BLOSSMAN BANCSHARES, INC. | 11-13519 |
| Debtor. | SECTION "B" |
| | CHAPTER 11 |

### OBJECTION OF ALESCO PREFERRED FUNDING XIV, LTD., TO MOTION FOR AUTHORITY TO SELL CERTAIN ASSETS FREE AND CLEAR OF ALL ENCUMBRANCES AND FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a) AND 363(b); FED. R. BANKR. P. 2002, 6004, AND 9014; (I) APPROVING (A) AUCTION PROCEDURES AND (B) THE FORM AND MANNER OF NOTICE OF THE SALE OF CERTAIN ASSETS; AND WAIVING THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h)

Alesco Preferred Funding XIV, Ltd. ("*Alesco*"), through ATP Management LLC ("*ATP Management*"), successor to certain management rights held by Cohen & Company Financial Management, LLC with respect to Alesco, which is the holder of the issued and outstanding trust preferred securities issued by Central Progressive Statutory Trust IV, which is the holder of certain junior subordinated debt securities issued by Blossman BancShares, Inc. (the "*Debtor*"), submits the following as its objection (the "*Objection*") to the auction procedures, including certain bid protections, proposed by the Debtor in the *Motion for Authority to Sell Certain Assets Free and Clear of All Encumbrances and for Orders Pursuant to 11 U.S.C. §§ 105(a) and 363(B); Fed. R. Bankr. P. 2002, 6004, and 9014; (I) Approving (A) Auction Procedures and (B) the Form and Manner of Notice of the Sale of Certain Assets; and Waiving the 14-Day Stay of Fed. R. Bankr. P. 6004* (Docket No. 3) (the "*Motion*"):

### Preliminary Statement

1. The expedited sale process proposed in the Motion does not provide for a meaningful auction, but rather requests Court approval of an expedited sale of the Debtor's most

valuable asset to a pre-selected buyer under the guise of an illusory auction process, and therefore should be denied unless the process is modified as requested in this objection.

2. The Debtor has engaged in a multi-year process in an attempt to recapitalize Central Progressive Bank ("*CPB*"), but now, after all this time, the Debtor requests approval of an overly-rushed 363 sale process that is not in the best interest of the Debtor's estate or creditors. The Debtor seeks Court approval of proposed auction and bidding procedures (collectively, the "*Auction Procedures*") that (i) dictate a two-step transaction form which currently results in Debtor's pre-selected buyer (rather than the Debtor's estate or creditors) benefiting from the apparent substantial book equity value in the Debtor's most valuable assets and (ii) provide creditors and potentially interested buyers with only ***nine (9) days*** after the hearing on the Auction Procedures (the "*Auction Procedures Hearing*") to conduct due diligence, explore alternatives, or propose competing bids which might potentially increase value for the Debtor's estate and creditors. This unreasonable request should be denied. Each of the dates proposed in the Auction Procedures should be continued for at least forty-five (45) days. The requested continuance will still allow the Auction to be concluded prior to the December 31, 2011, deadline established by First NBC Bank Holding Company ( "*FNBC*", or the "*Initial Bidder*") to consummate its offer. The Auction Procedures also fail to specify what information, if any, will be provided to other potential purchasers in connection with their efforts to conduct due diligence or explore alternative transactions. Simultaneously, however, the Acquisition Agreement (the "*Agreement*") between the Debtor and the Initial Bidder provides the Initial Bidder with expansive access to almost all information about the Debtor and CPB. Other bidders and parties in interest should receive the same access to information. The Debtor also should identify the proposed post-petition marketing efforts. Further, the Debtor has failed to establish

that the proposed sale of the CPB stock (the "*Sale*") will result in more value for the Debtor's estate and creditors than selling CPB's assets, and thus the Auction Procedures should be modified to permit bids on some or all of CPB's assets. In addition, there are many other problems with the relief requested in the Motion.

3. First, the Debtor has failed to established that the $900,000.00 proposed purchase price (the "*Proposed Price*") for the stock of CPB (the "*CPB Stock*") offered by the Initial Bidder is adequate. This problem is exacerbated by the fact that only a fraction of the Proposed Price, $400,000, is to be paid at closing (the "*Closing Consideration*"), with the remaining $500,000 of the Proposed Price payable, if at all, three years from the closing date, and then only to the extent certain unlikely conditions are met. Nevertheless, the Debtor's Schedules of Assets and Liabilities (the "*Schedules*") value the CPB Stock at $2,452,256.56, which is over ***six hundred percent (600%)*** more than Closing Consideration, which is the only portion of the Proposed Price the Debtor's estate is guaranteed to receive. The transaction as currently proposed by Debtor results in the apparent balance of this book equity being procured by the pre-selected buyer, without additional consideration to the Debtor's estate or creditors, upon the contemporaneous consummation of "purchase and assumption" transaction further transferring the assets of CPB.

4. Second, the Debtor has failed to establish that its pre-petition marketing efforts were adequate. The Motion contains only general, conclusory statements, which fail to support a finding that the Debtor's pre-petition marketing efforts were so expansive that no real post-petition marketing efforts are required. In fact, it is unclear from the Motion whether Debtor or its representatives have presented a transaction in the form of the proposed Sale to potentially interested parties.

5. Third, the proposed bidding protections designed by the Debtor (the "*Bidding Protections*") are unreasonable and will chill bidding. The Bidding Protections include a $400,000.00 expense reimbursement (the "*Expense Reimbursement*"). This amount equals *100%* of the Closing Consideration, and is 44% of the total Proposed Price. The Debtor has cited no authority or precedent that would support an expense reimbursement that constitutes such a large percentage of the Proposed Price or the Closing Consideration. Additionally, as a result of the exceptionally high Expense Reimbursement, the Bidding Protections include an initial overbid of $1,325,000 (the "*Initial Overbid*"), which is 147% of the $900,000.00 Proposed Price. These onerous bidding protections together with the uncertain access to information and the extremely truncated timeline will chill bidding and can only result in potentially interested superior bidders declining to participate in the process to the great detriment of the Debtor's estate and creditors.

6. Fourth, there has not been enough time since the filing of the Debtor's bankruptcy case to permit the U.S. Trustee to solicit interest and appoint a committee of unsecured creditors. By continuing each of the dates in the Auction Procedures by at least forty-five (45) days as requested herein, the U.S. Trustee will have sufficient time to appoint a committee of unsecured creditors (the "*Committee*") and the Committee will have time to conduct an expedited review of the Sale. Moreover, the requested continuance will provide parties in interest and/or the Committee with an opportunity to seek the appointment of an examiner or a chapter 11 trustee if their initial due diligence reveals that such an appointment would be appropriate.

## General Background

7. On September 27, 2011, the Debtor and the Initial Bidder entered into the Agreement.

8. On October 26, 2011 (the "*Petition Date*"), the Debtor commenced this bankruptcy case and filed the Motion.

9. On October 27, 2011, the Court entered the *Order Granting Expedited Hearing Dates for Approving Auction Procedures; Form and Manner of Notice of Sale of Certain Assets and Waiving the 14-Day Stay* (the "*Auction Procedures Hearing Order*"). The Auction Procedures Hearing Order scheduled the Auction Procedures Hearing for November 2, 2011.

10. Alesco is the holder of all of the issued and outstanding trust preferred securities (the "*TruPS*") issued by Central Progressive Statutory Trust IV ("*CPS Trust*"), a special purpose entity formed to effectuate a capital raising transaction in 2006. ATP Management serves as collateral manager for Alesco and is acting on behalf of Alesco pursuant to authority granted to ATP Management under an Indenture which governs Alesco in respect of certain collateral which includes the TruPS. CPS Trust is the holder of certain junior securities issued by the Debtor.

11. Alesco respectfully requests that the Court deny the Motion if the Auction Procedures are not modified as requested in this objection.

**Objection**

**A.  The Auction Procedures Should Be Modified**

12. The court in *In re Gulf Coast Oil Corporation*, 404 B.R. 407, 424 (Bankr. S.D. Tex. 2009) stated that "when assets are sold immediately after the case is filed, the court can have very little confidence that all parties in interest have adequately organized, have received adequate notice, have obtained appropriate information, and have been able to participate in the proceedings." That court also noted that "[p]roposals for quick sales, understood by a few parties who would benefit from the sale, are inherently suspect." *Gulf Coast Oil*, 404 B.R. at

423-24. The Debtor's proposed Sale of the CPB Stock to the Initial Bidder raises all of the concerns noted by the court in *Gulf Coast Oil*, and the proposed transaction is inherently suspect.

13. The Debtor filed its chapter 11 petition on October 26, 2011, thereby commencing the above-captioned chapter 11 case. The Motion was filed on the same day and the Auction Procedures Hearing is set to be heard on November 2, 2011, a mere seven (7) days after the commencement of the case. If the Motion is granted in its current form, the deadline to submit competing bids will be nine (9) days after the Auction Procedures Hearing. The Motion, however, fails to contain any explanation of why the Debtor waited to file this bankruptcy case for over four weeks after the Debtor executed the Agreement with the Initial Bidder on September 27, 2011. This unexplained delay appears to have exacerbated the alleged exigent circumstances that the Debtor argues support proceeding at break-neck pace. Without the modifications proposed herein, the Court can have little, if any, confidence that an auction performed in accordance with the proposed Auction Procedures will provide a meaningful opportunity for creditors and parties in interest to understand the terms and conditions of the proposed sale, allow potential bidders to assess the assets for purposes of bidding, or yield the greatest benefit to the Debtor's estate and creditors. Accordingly, the Auction Procedures should be modified to incorporate the proposed amendments contained herein.

**(i)** **The Deadlines Should Be Extended**

14. Each of the dates identified in the Auction Procedures should be extended for at least forty-five (45) days. In their current form, the Auction Procedures will serve only to chill alternative bids and lock in the Initial Bidder as the prevailing bidder. To be approved by this Court, the Auction Procedures should strike a balance between encouraging an initial bid and not stifling subsequent bids. *See In re President Casinos, Inc.*, 314 B.R. 784, 786 (Bankr. E.D. Mo.

2004) ("Structured bid procedures should provide a vehicle to enhance the bid process and should not be a mechanism to chill prospective bidders' interest.").

15. As proposed, the Auction Procedures tilt the balance too far in favor of the Initial Bidder to the detriment of the Debtor's estate and creditors. In fact, the hurried nature of the proposed Auction Procedures calls into question the integrity of the proposed sale process.

16. The Agreement between the Debtor and the Initial Bidder prohibits the Debtor from marketing the CPB Stock until after the approval of the Auction Procedures. *See* Agreement, § 6.10. Accordingly, the Auction Procedures provide only nine (9) days from the date of approval of the Auction Procedures, at the earliest November 2, 2011, until the proposed deadline to submit alternative bids on November 11, 2011 (the "*Bid Deadline*") even though the Debtor has been prohibited from marketing the CPB Stock since entering into the Agreement on September 27, 2011. Thus, the Debtor only has, at most, a nine (9) day window to conduct post-petition marketing and obtain competing bids. Similarly, any alternative bidders only have this same nine (9) days to conduct due diligence, determine whether to submit bids, and to prepare and submit their bids. This time period is inadequate to conduct any reasonable post-petition marketing process and provides no realistic or meaningful opportunity for an auction. At a minimum, the Bid Deadline should be extended for forty-five (45) days to allow the Debtor to conduct a reasonable expedited post-petition marketing process and to provide alternative bidders with sufficient time to conduct expedited due diligence, determine whether to submit bids, and to prepare and submit their bids.

17. The brief timeline proposed in the Auction Procedures is particularly egregious because the terms of the Agreement provide that the deadline for the closing date for the Sale is not until December 31, 2011. *See* Agreement, § 10.01(b). Extending each of the deadlines in the

7

Auction Procedures for forty-five (45) days will permit the Debtor and the Initial Bidder to meet the December 31, 2011, deadline identified in the Agreement. As a result, extending the deadlines as requested herein will not prejudice the Debtor or the Initial Bidder.

18. Moreover, the truncated proposed timeline prevents creditors and parties in interest, including Alesco, from investigating and understanding the pre-petition sale process and the Debtor's decision to sell the CPB Stock instead of selling CPB's assets. Under the proposed Auction Procedures, parties in interest would be locked into the form of transaction proposed by the Initial Bidder and have only fourteen (14) days from the Auction Procedures Hearing until the auction and the hearing on the Sale. This is insufficient time to investigate and assess whether the Sale of the CPB Stock is the best interest of the Debtor's estate and creditors.

19. The compressed timeline also prohibits interested parties from investigating the full circumstances surrounding the proposed Sale to ensure the integrity of the sale process. *See Gulf Oil Corp.* 404 B.R. at 423-24 (stating that "[p]roposals for quick sales, understood by a few parties who would benefit from the sale, are inherently suspect"). Of particular concern is the fact that the Motion indicates that there will be an indemnification agreement between certain of the Debtor's shareholders and the Initial Bidder. The Motion and the Agreement do not indicate the nature of the indemnification to be provided. Additional time is needed for parties in interest to investigate all of the circumstances surrounding the proposed Sale and the Agreement, including, without limitation, whether the proposed Sale includes (i) any releases or indemnifications for officers, directors, shareholders or employees of the Debtor or CPB; (ii) employment agreements for officers directors, shareholders or employees of the Debtor or CPB; or (iii) any other benefits for officers, directors, shareholders or employees of the Debtor or CPB.

20. Additional time also is needed for parties in interest to investigate the pre-petition marketing process, including, without limitation, (i) which potential bidders the Debtor contacted pre-petition and when the Debtor contacted them; (ii) the potential transactions the Debtor marketed to such bidders, including whether Debtor marketed the sale of some or all of CPB's assets and/or transactions similar to the proposed transaction with the Initial Bidder; (iii) whether the Debtor refused to provide bidders pertinent information ; (iv) whether potential bidders other than the Initial Bidder made any offers and the terms of such offers, including any offers for some or all of CPB's assets.

21. Further, the Bid Procedures should not be granted in their current form based on the Debtor's allegations of exigent circumstances. In the Motion the Debtor acknowledges that financial difficulties have existed for not months, but years. Moreover, the Debtor entered into the Agreement with the Initial Bidder on September 27, 2011, and then waited an entire month to commence this bankruptcy case. Thus, the Debtor's claims of exigent circumstances are illusory or are of the Debtor's own making. Given these circumstances, the Debtor has not cited any case law approving such an expedited sale process under similar circumstances.

### (ii) The Information Procedures Should Be Modified

22. The Motion fails to identify the due diligence information potential bidders will receive if they are approved as bidders. The Initial Bidder, on the other hand, is granted almost unfettered access to information about the Debtor and CPB, including, without limitation, the books, contracts, records, and personnel of CPB as well as the right to make physical inspections of CPB real properties. *See* Agreement, § 6.05. All potential bidders should be granted the same access. Otherwise, there cannot be a level playing field between the Initial Bidder and other potential bidders.

23. In addition, under the proposed scheme, a potential bidder must produce detailed financial information demonstrating its ability to consummate the transaction if it is the highest bidder. The Debtor then unilaterally determines whether the potential bidder is qualified to bid. Only upon the unilateral determination of the Debtor that a bidder is qualified will the bidder be given access to due diligence information. The Motion is silent regarding how long the Debtor has to determine whether a potential bidder is qualified or the basis for such a determination. Any delay in the approval process by the Debtor is detrimental to any potential bidder because it shortens the already brief timeline for conducting due diligence. Moreover, the uncertainty surrounding the qualification and approval process and the impact such uncertainty has on post-petition marketing substantially chills alternative bids. Thus, the Auction Procedures should be modified to identify how long the Debtor has to determine whether bidders are qualified and the quantitative basis for the Debtor's determination, and to provide a timely and efficient mechanism for the Court to approve a potential bidder as qualified to bid in the event of a dispute over the right of a potential bidder to make a bid.

**(iii)** **The Auction Procedures Should Clarify the Debtor's Responsibilities**

24. The Motion does not describe the Debtor's post-petition marketing efforts, or who at the Debtor or the Debtor's professionals will run this auction process. Instead, the closest the Motion comes to proposed marketing activities is to require notice of the Motion to all creditors of CPB, regulatory authorities, parties to the Agreement, creditors of the Debtor, all entities that have requested notice, and to require the Debtor to run an advertisement in *The Times Picayune* for a period of five (5) days after the Auction Procedures are approved. This is wholly inadequate.

25. The Debtor should be required to engage in a reasonable post-petition marketing program, including, without limitation, national marketing and soliciting entities across the

nation that may be interested in purchasing the CPB Stock or some or all of the assets of CPB. The Debtor also should be required to identify the alternative potential bidders the Debtor intends to contact and to identify how the Debtor will contact such potential bidders. In addition, the Debtor should be required to identify who at the Debtor or the Debtor's professionals will run the sale process so that, among other things, potential bidders know who to contact.

### (iv) The Auction Procedures Should Authorize Bids for CPB's Assets

26. The Debtor has failed to identify why the sale of the CPB Stock is better for the Debtor's estate and creditors than a sale of CPB's assets. To protect the integrity of the sale process and to promote the best interests of the Debtor's estate and creditors, the Auction Procedures should be modified to authorize bids for some or all of CPB's assets. Prohibiting such bids may prevent the Debtor from maximizing the value of its assets to the substantial detriment of the Debtor's estate and creditors.

### B. The Proposed Price Is Highly Uncertain

27. The Debtor's Schedules suggest that the Proposed Price and the Closing Consideration are not reasonable. In the Schedules, the Debtor states that the CPB Stock is worth $2,452,256.56, which is over ***six hundred percent (600%)*** more than the Closing Consideration. Even if all of the conditions are met for the payment of the entire Proposed Price, which is unlikely, and three years from the closing date the Debtor receives the remainder of the Proposed Price, the value of the CPB Stock identified in the Schedules is over ***two hundred seventy percent (270%)*** more than the Proposed Price.

28. The substantial discrepancy between the valuation of the CPB Stock in the Schedules and the Proposed Price and the Closing Consideration provides further support for modifying the Auction Procedures as requested above. Specifically, this discrepancy in value strongly supports both extending the deadlines so that there can be a reasonable post-petition

11

marketing and sale process, and authorizing bids for some or all of CPB's assets so that the Debtor's estate can receive the full value of the Debtor's interests in CPB.

C.      **The Debtor's Pre-Petition Marketing Efforts**

29.     The Debtor has not established that its pre-petition marketing efforts were so expansive that post-petition marketing efforts are not needed. The Motion only contains generalized statements regarding discussions the Debtor had with an unknown number of unidentified banks, bank holding companies, and private shareholders during its efforts to recapitalize or sell CPB.

30.     Further, the Debtor's pre-petition marketing efforts are called into doubt by the Debtor's stated concerns that publicity surrounding the Debtor's financial uncertainty would result in a loss of CPB customers. The Debtor's publicity concerns may have materially impeded the pre-petition marketing.

31.     As a result, the Court should not prevent a reasonable post-petition marketing and sale process. *See Gulf Cost Oil Corp.*, 404 B.R. at 424 (noting that the "principal justification for § 363(b) sales is that aggressive marketing in an active market assures that the estate will receive maximum benefit"). *See also In re Brookfield Clothes, Inc.*, 31 B.R. 978, 985-86 (Bankr. S.D.N.Y. 1983) (observing that granting a sale under section 363 is inappropriate when there has been "insufficient advertising of assets so as to deny the court the means by which to determine the reasonableness of the price or to deny creditors the highest price obtainable").

32.     The forty-five (45) day extension of the deadlines in the Auction Procedures proposed above would permit the Debtor to engage in a reasonable but still expedited marketing and sale process, and thus, ensure the integrity of the sale process and promote the best interests of the Debtor's estate and creditors.

### D. The Bidding Protections Are Unreasonable

33. Alesco objects to the Expense Reimbursement and the Initial Overbid contained in the Bidding Protections. The proposed Expense Reimbursement of $400,000 is unreasonably high. Similarly, largely as a result of the Expense Reimbursement, the Initial Overbid is unreasonably high.

34. Neither the Debtor nor the Initial Bidder have provided any evidence to support the reasonableness of the Expense Reimbursement. A leading case, *Calpine Corp. v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 535 (3d Cir. 1999), clarifies that the permissibility of expenses like the Expense Reimbursement "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." Consequently, the Initial Bidder bears "the heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." *Id.* at 533.

35. In assessing the reasonableness of an expense reimbursement, bankruptcy courts assess the size of the reimbursement relative to the consideration realized by the debtors. While expense reimbursements and break-up fees, together, at and below 4 percent of the consideration received by debtors have been approved, courts have refused requests for higher percentages. *See In re Bidermann Industries U.S.A., Inc.*, 203 B.R. 547, 553 (Bankr. S.D.N.Y. 1997) (refusing to approve fees in the range of 4.4% to 6%); *In re Tama Beef Packing, Inc.*, 321 B.R. 496, 498 (B.A.P. 8th Cir. 2005) (noting that fees in the range of 1 percent to 4 percent are generally upheld as reasonable); *In re Twenver, Inc.*, 149 B.R. 954, 956-57 (Bankr. D. Col. 1992)

(observing that break-up or topping fees generally approved by courts do not exceed 1% or 2% of purchase price).

36. The Debtor cites no case law in support of permitting an expense reimbursement that totals approximately 44% of the Proposed Price offered by the Initial Bidder, let alone case law that supports an expense reimbursement of 100% of the Closing Consideration, which because of the conditions to the payment of the final installment of the Proposed Price likely would be the only consideration the Debtor actually receives under the Agreement with the Initial Bidder.

37. Instead, in the Motion the Debtor attempts to support the Expense Reimbursement by asserting that the Expense Reimbursement should be approved because the Initial Bidder required it. *See* Motion, at 38-39. Such an argument would support any expense reimbursement requested by any bidder with the wherewithal to require an expense reimbursement, and is not the appropriate standard.

38. In addition, the Expense Reimbursement raises the amount of the minimum overbid dramatically from $925,000.00, the Proposed Price plus a reasonable $25,000 bidding increment, to the Initial Overbid of $1,325,000.00, or 147% of the Proposed Price. *See* Motion, at 25. Such a high Initial Overbid will chill bidding and is inappropriate.

39. As a result, Alesco requests that this Court deny the Debtor's request for approval of the Expense Reimbursement and the Initial Overbid.

E. **Additional Time for a Committee an Examiner or a Trustee**

40. To date, the U.S. Trustee has not appointed a committee of unsecured creditors. By continuing each of the dates in the Auction Procedures by at least forty-five (45) days, the

U.S. Trustee will have sufficient time to appoint a Committee and the Committee will have time to initiate its review of the Sale.

41. Only with this additional time will the Committee be able to properly perform its role of representing the Debtor's unsecured creditors and ensure that the Debtor maximizes the value of its interests in CPB. *See Gulf Coast Oil*, 404 B.R. at 423 (recognizing that it takes time for committees to organize, appoint counsel, and to engage proper financial advisors).

42. Additionally, there may be sufficient grounds that become apparent after the Committee and/or other interested parties perform initial due diligence to support either the appointment of an examiner to analyze the facts and circumstances concerning the proposed Sale, or the appointment of a chapter 11 trustee. Thus, the potential need for an examiner or a chapter 11 trustee also supports the proposed forty-five day extension.

## **Reservation of Rights**

43. Alesco reserves the right to raise additional objections to the Auction Procedures prior to or at the Auction Procedures Hearing, and reserves the right to raise objections concerning the Sale and other relief requested in the Motion prior to or at any hearing concerning the Motion.

WHEREFORE, Alesco respectfully requests that this Court enter an Order denying the Motion, or in the alternative, enter an Order approving auction procedures that have been modified as requested in this objection.

Dated: November 1, 2011

Respectfully submitted,

*/s/ William H. Patrick, III*

Douglas S. Draper
William H. Patrick, III
Heller, Draper, Patrick & Horn, LLC
650 Poydras Street
25th Floor
New Orleans, Louisiana 70130
Telephone: (504) 299-3300
Facsimile: (504) 299-3399

and

Jason W. Harbour
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
(804) 788-8200